ANDREW M. CALAMARI
REGIONAL DIRECTOR
Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281-1022
Tel: (212) 336-0589 (Howard A. Fischer, Senior Trial Counsel)
Email: FischerH@SEC.Gov

**14 CV 7575**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                        Plaintiff,<br><br>   -against-<br><br>JASON COPE, IZAK ZIRK DE MAISON (F/K/A IZAK ZIRK ENGELBRECHT), LOUIS MASTROMATTEO, ANGELIQUE DE MAISON, TRISH MALONE, KIERAN T. KUHN, PETER VOUTSAS, RONALD LOSHIN, GEPCO, LTD., SUNATCO LTD., SUPRAFIN LTD., WORLDBRIDGE PARTNERS, TRAVERSE INTERNATIONAL, and SMALL CAP RESOURCE CORP.,<br><br>                        Defendants. | 14 Civ. _____<br><br><br>COMPLAINT |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint

against defendants Jason Cope ("Cope"), Izak Zirk de Maison (f/k/a Izak Zirk Engelbrecht)

("Engelbrecht"), Louis Mastromatteo ("Mastromatteo"), Angelique de Maison ("de Maison"),

Trish Malone ("Malone"), Kieran T. Kuhn ("Kuhn"), Peter Voutsas ("Voutsas"), Ronald Loshin

("Loshin"), Gepco, Ltd. ("Gepco"), Sunatco Ltd. ("Sunatco"), Suprafin Ltd. ("Suprafin"),

Worldbridge Partners ("Worldbridge"), Traverse International ("Traverse"), and Small Cap Resource Corp. ("SCR") (collectively, the "Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      This case concerns a sophisticated pump-and-dump scheme led by Engelbrecht and Cope, who have profited from and stand to further profit from their control and manipulation of the common stock of Gepco, Ltd., a publicly traded microcap issuer and former public shell company.

2.      In the scheme's first phase, Engelbrecht, who since Gepco's inception has served as its undisclosed control person, extracted tens of millions of shares of common stock from Gepco for the purpose of conducting two separate, but both illegal, distributions of Gepco-related securities. To obtain the shares, Engelbrecht first orchestrated Gepco's December 2013 reverse merger into GemVest, Ltd. ("GemVest"), a private company he created just a few months prior. As a result of the merger, Engelbrecht came to beneficially own 112.5 million (or 75%) of the 150 million shares initially issued by Gepco to GemVest's purported shareholders. Since then, Engelbrecht has caused Gepco, through Malone, the company's President, Chief Financial Officer, and Secretary, to issue more than 38 million additional shares to him and his associates. Engelbrecht is using these shares to conduct his illegal distributions.

3.      In the first illegal distribution, Engelbrecht transferred shares of the extracted stock to various associates, most notably Cope, for their sale. In the second illegal distribution, Engelbrecht is using a nominee, Sunatco, to illegally sell convertible promissory notes to investors solicited by Kuhn through his penny stock promotion firm, SCR. The notes allow the holders to convert their principal into Gepco stock. When a holder elects to convert his or her principal into Gepco stock, Engelbrecht delivers shares to the investor, which come not from the

2

issuer Gepco, but out of the stockpile of shares Engelbrecht obtained from Gepco. Engelbrecht has already earned hundreds of thousands of dollars in ill-gotten gains from these illegal sales.

4.      While conducting both of these illegal distributions, Engelbrecht and his wife, de Maison, who served as Gepco's Chairwoman between October 2013 and July 2014, manipulatively traded in Gepco's common stock in the public market. The purpose of their manipulative trading was twofold: to pump up the stock's share price so that Engelbrecht's associates could sell the shares at an inflated price, and to create the illusion of genuine investor demand. The manipulation worked: Gepco's share price rose from $.07 on October 14, 2013, the eve of the announcement of the reverse merger, and the day the pair began their manipulative trading, to a high of $.292 on March 13, 2014—a more than fourfold increase that resulted in Gepco, a company with virtually no assets or revenues, obtaining a market capitalization of $67,484,120.

5.      In the scheme's second phase, Cope's nominee illegally sold more than 2.5 million of the shares obtained in the first illegal distribution into the public market. Cope profited handsomely from this dumping of shares. He bought the shares from Engelbrecht for $0.005 per share and sold them—over the course of the manipulative trading—at prices ranging from $0.09 to $0.29 per share, earning hundreds of thousands of dollars in ill-gotten gains at a realized rate of return of almost 3,000%. Equally alarming, Cope is using the proceeds of those sales to make monthly payments to the Commission that this Court ordered him to pay when, earlier this year, it held him in contempt of an over $20 million judgment obtained by the Commission against him and others for another fraud in 2001.

6.     Engelbrecht, Cope, and the other Defendants have profited from the first dumping of shares and stand to continue to profit from the two unregistered distributions and any future dumping of shares unless enjoined from any further securities laws violations.

## VIOLATIONS

7.     By virtue of the conduct alleged herein:

  a.   Cope, Engelbrecht, Mastromatteo, Malone, Kuhn, Gepco, Sunatco, Suprafin, Worldbridge, Traverse, and SCR directly or indirectly, singly or in concert, have engaged in acts, practices, and courses of business that constitute violations of Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a) and 77(q)(b)];

  b.   Cope, Engelbrecht, de Maison, Mastromatteo, Malone, Kuhn, Gepco, Sunatco, Suprafin, Worldbridge, Traverse, and SCR directly or indirectly, singly or in concert, have engaged in acts, practices, and courses of business that constitute violations of Section 17(a)(1) and (a)(3) of the Securities Act and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)];

  c.   Engelbrecht and de Maison have directly or indirectly, singly or in concert, engaged in acts, practices, and courses of business that constitute violations of Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)];

  d.   de Maison and Voutsas have directly or indirectly, singly or in concert, engaged in acts, practices, and courses of business that constitute violations of

4

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder;

e. de Maison and Loshin have directly or indirectly, singly or in concert, engaged in acts, practices, and courses of business that constitute violations of Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rule 16a-3 [17 C.F.R. § 240.16a-3] thereunder; and

f. Kuhn and SCR have directly or indirectly, singly or in concert, engaged in acts, practices, and courses of business that constitute violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78*o*].

## NATURE OF PROCEEDINGS AND RELIEF SOUGHT

8.      The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)].

9.      The Commission seeks a final judgment:  (i) restraining and permanently enjoining Defendants from engaging in the acts, practices, transactions, and courses of business alleged herein; (ii) requiring Defendants each to disgorge the ill-gotten gains they received as a result of the violations, and to pay prejudgment interest thereon, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)]; (iii) imposing civil monetary penalties upon Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and/or Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (iv) imposing a penny stock bar against Cope, Engelbrecht, de Maison, Malone, Mastromatteo, Kuhn, and Voutsas pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; and (v) issuing an order barring Engelbrecht, de Maison, and Malone from

acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]. Finally, the Commission seeks such other relief as the Court may deem just and appropriate.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action under Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa], and 28 U.S.C. § 1331.

11.     Venue is proper in the Southern District of New York under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern District of New York and were effected, directly or indirectly, by making use of the means and instruments of transportation or communication in interstate commerce, or the mails. For example, multiple participants in the fraudulent scheme, including Cope, Engelbrecht, Malone, and Mastromatteo communicated with and conducted transactions with Gepco's transfer agent, Continental Stock Transfer & Trust Company, at 17 Battery Place, New York, New York 10006, and shares transferred to Traverse and others were held at the Depository Trust Corporation at 55 Water Street, New York, New York.

## DEFENDANTS

12.     **Cope**, age 41, resides in Gates Mills, Ohio. While Cope is not currently associated with any registered entity, between 1995 and June 2001 he was employed as a registered representative at multiple registered broker-dealers. Cope previously held series 7, 24, and 63 licenses. In 2001, this Court enjoined and ordered Cope, jointly and severally with other

defendants, to pay total monetary relief of more than $20 million.  In February 2014, this Court found Cope in contempt of that judgment and ordered him to, among other things, begin paying the Commission $10,000 per month beginning March 10, 2014, with payments increasing to $15,000 per month beginning September 10, 2014.  *SEC v. Milan Capital Group, Inc.*, No. 00 Civ. 108 (S.D.N.Y. Feb. 28, 2014).

13.     **Engelbrecht**, age 57, resides in Redlands, California.  He is the undisclosed control person of Gepco and is married to de Maison.  Since at least 2008, he has served as an officer and director of a number of microcap issuers.

14.     **Malone**, age 39, resides in Santee, California.  She is Gepco's President, Chief Financial Officer, and Secretary and has served alongside Engelbrecht as an officer of several other microcap issuers.

15.     **Mastromatteo**, age 41, resides in Bay Village, Ohio.  While Mastromatteo is not currently associated with any registered entity, between 2001 and 2009 he was employed as a registered representative at multiple registered broker-dealers.  Mastromatteo previously held series 7 and 63 licenses.  Since 2001, Mastromatteo has been a self-employed "consultant," and since 2004 his sole consulting client has been Cope and the various entities he controls.

16.     **De Maison**, age 43, resides in Redlands, California.  She is married to Engelbrecht.  Between October 2013 and July 2014, de Maison served as Gepco's Chairwoman.

17.     **Kuhn**, age 32, resides in Port Washington, New York.  While Kuhn is not currently associated with any registered entity, between January and August 2007 he was employed as a registered representative at two registered broker-dealers.  He previously held series 7 and 63 licenses.  He is the sole owner and officer of SCR.

18.    **Voutsas**, age 53, resides in Santa Monica, California.  Voutsas is the Chief Executive Officer and Chief Investment Officer of Gepco and GemVest, Ltd.  Voutsas also owns a retail jewelry store in Beverly Hills, California.

19.    **Loshin**, age 72, resides in San Anselmo, California.  Loshin served as Gepco's Chief Creative Officer between October 2013 and August 2014.

20.    **Gepco** is a Nevada corporation with its principal place of business in Santee, California.  Gepco's common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act and its shares are currently quoted on OTC Link (formerly the "Pink Sheets") operated by OTC Markets Group Inc. under the symbol "GEPC."  Gepco was originally incorporated on June 27, 2008 as Kensington Leasing, Ltd., a company that purported to "specialize in leasing equipment to a select clientele."  Gepco entered into a reverse merger with a private Nevada corporation, GemVest Ltd., that was completed on December 6, 2013.  The company purports to "broker high end investment grade diamonds."  For the period ending June 30, 2014, Gepco reported cash of $6,716, total stockholders' equity deficit of $545,263, and a net loss since inception of $176,487.  On September 18, 2014, the Commission suspended trading in Gepco's securities for a period of ten business days on the ground that it appeared there was a lack of accurate information concerning, and potentially manipulative transactions in, Gepco's securities.

21.    **SCR** is a New York corporation with its sole office in Port Washington, New York.  It is wholly owned by Kuhn, who serves as its sole officer and director.  SCR claims to be an investor-relations firm that publishes a subscription-based newsletter that purportedly offers unbiased investment advice.  In reality, Engelbrecht pays SCR to use the newsletter to tout the stock of companies he controls, including Gepco.

8

22.     **Suprafin** is a Wyoming corporation formed in 2009.  It is wholly owned by Engelbrecht, who serves as its President and Director.  Malone serves as Suprafin's Secretary and Treasurer.  Suprafin has no operations.

23.     **Sunatco** is a Wyoming corporation formed in May 2013.  It is wholly owned by Engelbrecht, who serves as its only officer.  Sunatco has no operations.

24.     **Worldbridge** is a Nevada corporation formed in September 2009.  Its President and sole officer is Cope and its directors are Cope and Mastromatteo.  Worldbridge has no operations.

25.     **Traverse** is a Nevada corporation formed in January 2012.  Its sole owner, officer, and director is Mastromatteo.  Traverse has no operations.

## FACTS

### I.     The Fraudulent Pump-and-Dump Scheme

A.     *Engelbrecht Orchestrates the Reverse Merger and Then Controls Gepco.*

26.     Engelbrecht has controlled the company now known as Gepco since its incorporation in 2008.  Between 2008 and early-2013, Engelbrecht caused Gepco to enter into a number of reverse mergers, changing Gepco's line of business from "leasing equipment to select clientele," to "the production, marketing and distribution of a retail line of prepaid stored value cards for the purchase of technology support and security services for electronic devices," to the " design, develop[ment] and operat[ion of] an Internet-based social media website, Wikifamilies.com."  In mid-2013, after failing to merge the company (then, a public shell company called WikiFamilies) into a private mixed martial arts company, Engelbrecht decided to create his own private company—a purported gemological business—and merge the public shell company into it.

27.     On August 27, 2013, Engelbrecht caused Malone to change the company's name from WikiFamilies, Inc. to Gepco, Ltd.  Approximately five weeks later, on October 2, 2013, Engelbrecht caused Malone to incorporate GemVest Ltd., the purported gemological business, in Nevada, naming herself, along with de Maison, Loshin, Voutsas, and another individual as directors.

28.     On October 15, 2013, Gepco announced that it had entered into a Stock Purchase Agreement with GemVest.  The reverse merger was completed on December 6, 2013 and disclosed in a Form 8-K filed on December 12, 2013.  As a result of the reverse merger, de Maison was named Executive Chairwoman of Gepco and GemVest; Voutsas was named Chief Executive Officer and Chief Investment Officer of Gepco and GemVest; and Malone was named President, Chief Financial Officer, and Secretary of Gepco and Chief Financial Officer, Chief Operating Officer, and Secretary of GemVest.

29.     As a result of the reverse merger, Gepco issued 150 million shares of common stock to GemVest's purported shareholders.  Of those 150 million shares, 88.5 million shares were issued to de Maison and an entity she controlled, and 24 million shares were issued to the "Gil-Galad Foundation" and the "Unicorn Funds Foundation," two fictitious businesses that purport to share the same business address as Gepco's office, where only Malone and another employee of Engelbrecht's work.

30.     Despite the fact that Gepco has never named Engelbrecht as an officer or director of Gepco—either in its filings with the Commission, in press releases, or on its website—he has always controlled the company.  Engelbrecht's control of Gepco is evidenced by, among other things, the following facts: he caused the company's name to be changed from WikiFamilies to Gepco; he purchased the gemvest.com website; he oversaw the creation of the company's

business plan; he installed Malone as CFO and Secretary; he hired Kuhn and SCR to promote Gepco's stock and sell convertible promissory notes issued by Suprafin and Sunatco; and he arranged for de Maison's personal jewelry to be sold by Gepco.

        B.      *Engelbrecht and Malone Cause Gepco to Issue Engelbrecht Tens of Millions of Shares of Gepco's Common Stock.*

31.     Since the reverse merger with GemVest, Engelbrecht has caused Gepco, through Malone, to issue and transfer more than 38 million shares of restricted common stock to himself; his associates, including Cope and Mastromatteo; and others.

32.     In April and August 2013, when Gepco was a shell company and its stock was not actively traded, Engelbrecht caused Gepco, through Malone, to issue two convertible promissory notes to him. The first note, issued to Suprafin, a nominee of Engelbrecht's, was in a principal amount of $141,460. It allowed Suprafin to convert any or all of the note's principal into Gepco's common stock at a conversion rate of $.005 per share. The second note, issued to Sunatco, another nominee of Engelbrecht's, was in a principal amount of up to $100,000. It allowed Suprafin to convert any or all of the note's principal into Gepco's common stock at a conversion rate of $.010 per share.

33.     On May 24, 2013, Suprafin in turn issued a convertible promissory note to one of Cope's nominees, Worldbridge, in the amount of $25,000 (the "Worldbridge Note"). The Worldbridge Note allowed Cope to convert any or all of its principal into Gepco common stock at the same conversion rate as in the Suprafin note—$.005 per share.

34.     That same day, Cope caused Worldbridge to assign its interest in $15,000 of the Worldbridge Note's principal to Mastromatteo's nominee, Traverse.

35.     On January 10, 2014, Mastromatteo wrote on behalf of Traverse to Suprafin, electing to convert the $15,000 of principal in its note into Gepco common stock. Malone then wrote on Gepco's behalf to Gepco's transfer agent, directing it to issue 3 million shares of Gepco common stock to Traverse.

36.     Three days later, Gepco's transfer agent issued a stock certificate representing those 3 million shares to Traverse. The following day, January 14, 2014, Mastromatteo, writing on Traverse's behalf, asked Gepco's transfer agent to cancel the 3 million restricted shares and deliver to it a new stock certificate without a restrictive legend.

37.     Traverse's request was accompanied by an opinion letter written by Engelbrecht's long-time counsel ("Lawyer A"). In his letter, Lawyer A opined that the transfer agent could deliver unrestricted shares because, although not registered, the issuance of shares fell under one of the exemptions to the Securities Act's registration requirement. Malone, acting at Engelbrecht's direction, authorized Gepco's transfer agent to rely on Lawyer A's letter. Gepco's transfer agent then issued a certificate representing 3 million unrestricted shares of Gepco common stock to Traverse.

38.     Mastromatteo over time then deposited the three million shares issued to Traverse in three brokerage accounts. Between January 9 and July 28, 2014—a seven-month period of time overlapping with Engelbrecht's and de Maison's manipulative trading—Mastromatteo dumped more than 2.5 million of Traverse's shares into the public market at prices between $0.09 to $0.29 per share. Because the shares were obtained at $0.005 per share, Traverse's sales earned a realized rate of return of almost 3,000%.

39.     As Mastromatteo sold the stock, he funneled the proceeds of the sales to Cope. For example, on March 7, 2014, Traverse received a wire of $27,500 from a trust company holding the proceeds of some sales of the Gepco stock.  On March 10, 2014 Traverse wrote a check in the amount of $25,000 to Cope's wife, which she deposited into a joint account with Cope at JPMorgan Chase ("JPMC").

40.     On March 24, 2014, Traverse received another wire of $52,000 of proceeds of some sales of the Gepco stock.  That same day, he wrote a check in the amount of $50,000 to Cope's wife, which she again deposited into the joint account at JPMC.  Cope's seven payments to the Commission since March 2014 have been made by checks drawn on the JPMC account and by cashier's checks issued by JPMC.

41.     Mastromatteo's ability to sell the stock issued to Traverse was dependent on Cope and Worldbridge buying the Worldbridge Note from Suprafin and then assigning $15,000 worth of the Worldbridge Note's principal to Traverse.  But for Cope and Worldbridge's involvement, Traverse would not have received the Gepco stock and therefore would not have been able to sell it into the public market.  Cope and Worldbridge played their part because Cope knew that Mastromatteo would funnel most of the proceeds of the sales back to him.

42.     In a similar series of transactions, Cope caused Worldbridge to obtain 2 million shares of Gepco's common stock.  On October 15, 2013 (the same day that Gepco's reverse merger with GemVest was announced in a press release), Cope wrote on behalf of Worldbridge to Suprafin, electing to convert the $10,000 of principal in the Worldbridge Note into Gepco common stock.  In response, Malone wrote on Gepco's behalf to Gepco's transfer agent,

directing it to issue 2 million shares of Gepco common stock to a Bahamian broker-dealer for Worldbridge's benefit.

43.     The following day, Malone, writing on Gepco's behalf, instructed Gepco's transfer agent to issue a stock certificate representing the 2 million shares in Worldbridge's name to Alliance, which the transfer agent did on October 23, 2013.  On November 19, 2013, the Bahamian broker-dealer, writing on Worldbridge's behalf, asked Gepco's transfer agent to cancel the 2 million restricted shares and deliver to it a new stock certificate without a restrictive legend.

44.     Worldbridge's request, like Traverse's, was accompanied by an opinion letter written by Lawyer A that was effectively identical to the letter Lawyer A wrote for Traverse. Malone, acting at Engelbrecht's direction, again authorized Gepco's transfer agent to rely on Lawyer A's letter.  Gepco's transfer agent then issued a certificate representing 2 million unrestricted shares of Gepco common stock to Traverse.

45.     Cope has tried but has thus far been unable to transfer the 2 million shares to a domestic broker-dealer for resale.

C.     *Engelbrecht, Kuhn, and SCR Are Illegally Selling Convertible Promissory Notes Issued by Engelbrecht's Nominee, Sunatco.*

46.     Since May 8, 2013, Engelbrecht has paid Kuhn to use SCR to sell convertible promissory notes issued by Sunatco to investors—largely elderly and/or unsophisticated investors identified in a nationwide cold-calling campaign conducted by SCR.  The notes are convertible into Gepco common stock.

47.     The terms of the notes allow the investor to convert all or part of her outstanding principal into Gepco's common stock at a 40% discount to the current trading price.  Investors pay for the notes by wiring funds directly to a bank account in Sunatco's name at U.S. Bank.

48.     Engelbrecht pays Kuhn commissions for the notes that SCR sells to an investor. The amount of the commission is a percentage of the amount of the debt issued in the note. Kuhn in turn pays his employees at SCR a commission for each note they sell.  The amount of the employees' commissions is also a percentage of the amount of the debt issued in the note.

49.     Kuhn and his employees at SCR do not disclose to investors to whom they sell the notes that Engelbrecht pays them commissions to sell the notes.

50.     When an investor elects to convert his or her note into Gepco's common stock, Engelbrecht generates the shares to be delivered in one of two ways.  He either converts a portion of one of the notes that Gepco issued to Sunatco and Suprafin in mid-2013 into Gepco stock and then transfers the shares directly to the investor, or he sends an existing stock certificate in Sunatco's or Suprafin's name to Gepco's transfer agent and asks that it deliver a stock certificate to the investor and deliver the remaining shares in a new certificate back to Sunatco or Suprafin.

51.     Since May 2013, Engelbrecht has earned hundreds of thousands of dollars in ill-gotten gains from Sunatco's sales of the convertible promissory notes—sales brokered by SCR and Kuhn—to investors.

D.     *Engelbrecht and de Maison Manipulate the Market for Gepco's Common Stock.*

52.     Between October 2013 and April 2014, while extracting more than 38 million shares from Gepco, while selling the Sunatco notes to investors, and while Mastromatteo was dumping Traverse's shares into the market, Engelbrecht and de Maison manipulated the market

for Gepco's common stock. The purpose of their manipulative trading was twofold: (i) to
increase Gepco's share price so that associates like Traverse and Mastromatteo could sell stock
at inflated prices, and (ii) to create an appearance of genuine investor demand in Gepco's
common stock.

53.   First, Engelbrecht and de Maison increased Gepco's trading volume by serially
purchasing large blocks of Gepco stock, particularly on or around the dates of major
announcements, to create an illusion of genuine investor demand and thereby induce others to
purchase the stock. Engelbrecht deceptively traded not in an account of his own, but in a
brokerage account held in Loshin's name. De Maison separately traded in two accounts held at
the same broker-dealer.

54.   For example, on October 14, 2013, the eve of the announcement of Gepco's
reverse merger, de Maison's purchases accounted for more than one-third of all purchases of
Gepco's stock that day. Thereafter, between October 23, 2013 and March 20, 2014,
Engelbrecht's and de Maison's buying accounted for more than one-quarter of all daily
purchases on ten separate trading days, and more than 40% of all daily purchases on five of those
days.

55.   As Gepco officers, de Maison and Loshin, Gepco's Chief Creative Officer, were
required to file with the Commission a Form 4 disclosing any changes in their ownership of
Gepco stock. Loshin filed a Form 4 for all of the January 21, January 23, and some of the
January 22 trades placed in his account, but he failed to file a Form 4 for 115,000 of the shares
Engelbrecht bought in his account on January 22 and for any of the trades placed in his account
after January 23. De Maison filed Form 4s disclosing her trading on December 11, 2013 and

between January 8 and 22, 2014, but she failed to file a Form 4 for any of her purchases in October 2013, February 2014, and March 2014.

56.     In addition to the large volume of buying, between October 24, 2013 and March 12, 2014 de Maison placed either the last trade of the day or the second-to-last trade of the day on eleven separate trading days in an effort to increase Gepco's share price.  Throughout this same time period, de Maison also consistently placed economically irrational trades.  For example, on seventeen separate occasions she placed limit orders[1] to buy Gepco stock at a price higher than the best existing ask price.  For example, on one occasion, when the best ask price for Gepco's common stock was $.13, de Maison placed a limit order to buy 500 shares of Gepco's stock at a price of $.14 or better.  In other words, when an investor was offering to sell Gepco's stock for $.13 per share, de Maison offered to buy the stock for $.14 per share.

57.     Throughout this same time period, Engelbrecht, de Maison, and other associates also entered matched trades[2] on at least thirteen separate occasions in an effort to create trading volume and thus an appearance of genuine investor demand.  For example, on February 3, 2014, de Maison placed a limit order at 3:51:13 p.m. to buy 4,000 shares of Gepco's common stock at a price of $.13 or better.  That order matched an order to sell 4,000 shares at $.13 placed by an Engelbrecht associate.  The trade was executed at 3:51:13 p.m.—i.e., the same second that de Maison placed her buy order.

---

[1]     A limit order is an order to buy or sell a specific number of shares at a specified price or better.

[2]     A matched trade is an order to buy or sell securities that is entered with knowledge that a matching order on the opposite side of the transaction has been or will be entered for the purpose of (1) creating a false or misleading appearance of active trading in any publicly traded security or (2) creating a false or misleading appearance with respect to the market for any such security.

58.     Engelbrecht's and de Maison's manipulative trading worked, and thereby allowed Traverse to sell more than 2.5 million shares at artificially inflated prices.  Over this time period, the price of Gepco's common stock rose from $.07 on October 14, 2013, the day before the announcement of the reverse merger, to a high of $.292 on March 13, 2014.  As a result of this more than fourfold increase, Gepco had a market capitalization on March 13, 2014 of $67,484,120, a paper value belied by the company's performance and financial condition:  For the period of October 15, 2013 through March 31, 2014, Gepco reported a cumulative net loss of $89,401, total stockholders' deficit of $198,299, and a cash balance of $10,385.

59.     Engelbrecht's emails and text messages to Kuhn and others demonstrate that Engelbrecht's trading was intended to generate an appearance of trading volume and to drive up Gepco's share price.  For example, on October 23, 2013, at the outset of his manipulative trading, Engelbrecht wrote to Kuhn and Loshin, and expressed his desire to control Gepco's stock, saying "I don[']t want to put Gepco stock outside of our group and face the same relentless selling as with [another microcap issuer controlled by Engelbrecht]."  On March 24, 2014, Engelbrecht wrote to Kuhn and others to express the need for them to find buyers:  "We need to talk urgently when I land.  This [Gepco] is a great opportunity and we are dropping the ball.  The volume is Zero apart from bid hitting.  I bought 40,000 on Friday which was the only buying.  I need help and partners.  If the deal is not for you, please tell me."

E.     *De Maison and Voutsas Participate in the Scheme by Making Materially Misleading Statements Concerning Gepco to the Public.*

60.     On January 23, 2014, Gepco announced in a press release the purchase of a 10.76 carat diamond—one of only two diamond purchases or sales announced by Gepco to date.  The press release was initially drafted by Malone, who forwarded it to Engelbrecht and de Maison on January 22 for their comments and for de Maison to provide a quote.  The final version released

the following day stated that GemVest had purchased the stone "for half of the current Rapaport [a diamond price benchmark publication] wholesale price" and that it anticipated being "able to at least triple our investment upon its sale." The release also quoted Voutsas and de Maison extolling the purchase.

61.     De Maison was quoted as saying, "[i]t is very reassuring that our first purchase is such a substantial stone. The Rapaport price is over $500,000 and we paid half of that price. We are very confident that Peter [Voutsas] will obtain the best price for us that will still represent fair value for the new owner. We are very determined to continue what we are starting here and have great confidence in the business model."

62.     Voutsas was quoted as saying, "[t]his is a spectacular stone" and that "[b]y being able to purchase this stone for half of the current Rapaport wholesale price, I anticipate that we will be able to at least triple our investment upon its sale."

63.     Both de Maison and Voutsas omitted from their statements a number of material facts necessary to make their misrepresentations not misleading. The first was that the diamond that Gepco purported to purchase was actually de Maison's own ring. They further failed to disclose that de Maison had already pledged the stone to an investor in another Engelbrecht company to secure a $250,000 loan; that when she was unable to repay that debt, Loshin stepped in and repaid the $250,000 and received the stone in return; and that Loshin then sold the stone to Gepco in exchange for a $250,000 promissory note that Gepco issued to him.

64.     Engelbrecht believed that the press release would cause the price of Gepco's stock to increase. And he was right: on January 23, 2014, Gepco's stock price closed at $.165, almost 19% higher than the previous day's closing price. Indeed, Engelbrecht had Kuhn use the fact of the announcement as a selling point to induce investors to buy Gepco's stock. On January 21,

Engelbrecht texted Kuhn about an investor, telling him to "[s]peculate about the first big diamond deal.  Very vaguely."  Kuhn responded by saying in pertinent part, "Will do."

      F.     *Engelbrecht Caused Gepco's Stock to Be Actively Promoted During the Unregistered Distributions, the Manipulative Trading, and Traverse's Dumping of Shares.*

      65.     While Engelbrecht and others conducted the unregistered distributions and manipulated the market for Gepco's stock, and while Traverse dumped more than 2.5 million of its shares, Engelbrecht used Kuhn and his firm, SCR, among others, to actively promote Gepco's stock to potential investors.

      66.     For example, in December 2013 and January 2014, Kuhn sent an email to SCR subscribers stating, among other things, that "GemVest . . . actively sources large inventories of the highest grade polished gems and diamonds for resale"; that "GemVest purchases much of its diamonds at the source and has relationships worldwide to buy finished distress sale products up to 60% below rap report pricing"; and that "GemVest obtains customers in different geographical areas."  None of these representations was true.

      67.     In addition, Kuhn has caused SCR to disseminate a purported research report dated January 18, 2014 that cites a $15 million capital raise by Gepco and states that the author sees "little limit to the amount of capital that can be raised to support the growth of this business."  Indeed, the report projects expected revenues of $45 million in 2014, $58 million in 2015, and $76 million in 2016, with corresponding share price increases to $.93 in Year 1, $1.29 in Year 2, $1.78 in Year 3, $2.46 in Year 4, and $3.40 in Year 5.  No support is provided for these baseless projections.

      68.     On April 29, 2014, Gepco signed a letter of intent with Voutsas to acquire his retail jewelry store.  That acquisition has not been consummated.  On May 23, 2014 Kuhn sent

an email to SCR subscribers touting the diamond business and Gepco, falsely claiming "$605,000 in diamond sales generated in first 14 days of sales activity."

## FIRST CLAIM FOR RELIEF
### Violations of Sections 5(a) and 5(c) of the Securities Act
### (Cope, Engelbrecht, Mastromatteo, Malone, Gepco, Sunatco, Suprafin, Worldbridge, and Traverse)

69.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 68, as if fully set forth herein.

70.     The shares of Gepco that Cope, Engelbrecht, Mastromatteo, Malone, Gepco, Sunatco, Suprafin, Worldbridge, and Traverse sold constitute "securities" within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

71.     At all relevant times, the Gepco shares that Cope, Engelbrecht, Mastromatteo, Malone, Gepco, Sunatco, Suprafin, Worldbridge, and Traverse sold were not registered in accordance with the provisions of the Securities Act and no exemption from registration was applicable.

72.     Cope, Engelbrecht, Mastromatteo, Malone, Gepco, Sunatco, Suprafin, Worldbridge, and Traverse, therefore, singly or in concert, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and to sell securities when no registration statement had been filed or was in effect as to such offers and sales of such securities and no exemption from registration was available.

73.     By reason of the activities described herein, Cope, Engelbrecht, Mastromatteo, Malone, Gepco, Sunatco, Suprafin, Worldbridge, and Traverse, singly or in concert, directly or

indirectly, have violated, and unless enjoined and restrained will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## SECOND CLAIM FOR RELIEF
### Violations of Sections 5(a) and 5(c) of the Securities Act
### (Engelbrecht, Sunatco, Kuhn, SCR)

74.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 68, as if fully set forth herein.

75.    The convertible promissory notes that Sunatco sold constitute "securities" within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

76.    At all relevant times, the convertible promissory notes that Sunatco sold were not registered in accordance with the provisions of the Securities Act and no exemption from registration was applicable.

77.    Engelbrecht, Sunatco, Kuhn, and SCR, therefore, singly or in concert, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and to sell securities when no registration statement had been filed or was in effect as to such offers and sales of such securities and no exemption from registration was available.

78.    By reason of the activities described herein, Engelbrecht, Sunatco, Kuhn, and SCR, singly or in concert, directly or indirectly, have violated, and unless enjoined and restrained will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

### THIRD CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)
### Thereunder
### (Cope, Engelbrecht, Mastromatteo, de Maison, Malone, Kuhn, Gepco, Sunatco, Suprafin, Worldbridge, Traverse, and SCR)

79.     The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 68, as if fully set forth herein.

80.     Cope, Engelbrecht, Mastromatteo, de Maison, Malone, Kuhn, Gepco, Sunatco,

Suprafin, Worldbridge, Traverse, and SCR, in connection with the purchase or sale of securities,

directly or indirectly, singly or in concert, by the use of the means or instrumentalities of

interstate commerce, or of the mails, or of the facilities of a national securities exchange, with

scienter, have employed devices, schemes, and artifices to defraud, and have engaged in

transactions, acts, practices, and courses of business which operated as a fraud or deceit.

81.     By reason of the foregoing, Cope, Engelbrecht, Mastromatteo, de Maison,

Malone, Kuhn, Gepco, Sunatco, Suprafin, Worldbridge, Traverse, and SCR directly or indirectly,

have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15

U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

### FOURTH CLAIM FOR RELIEF
### Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act
### (Cope, Engelbrecht, Mastromatteo, de Maison, Malone, Kuhn, Gepco, Sunatco, Suprafin, Worldbridge, Traverse, and SCR)

82.     The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 68, as if fully set forth herein.

83.     Cope, Engelbrecht, Mastromatteo, de Maison, Malone, Kuhn, Gepco, Sunatco,

Suprafin, Worldbridge, Traverse, and SCR, directly or indirectly, singly or in concert, in the

offer and sale of securities, by the use of the means and instruments of transportation and

communication in interstate commerce and of the mails, knowingly or with reckless disregard for the truth: (a) employed devices, schemes or artifices to defraud; and (b) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

84.     By reason of the foregoing, Engelbrecht, Cope, Mastromatteo, de Maison, Malone, Kuhn, Gepco, Sunatco, Suprafin, Worldbridge, Traverse, and SCR, singly or in concert, directly or indirectly, have violated, and unless enjoined and restrained will continue to violate, Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)].

**FIFTH CLAIM FOR RELIEF**
**Violations of Section 9(a) of the Exchange Act**
**(Engelbrecht and de Maison)**

85.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 68, as if fully set forth herein.

86.     Engelbrecht and de Maison, directly or indirectly, with scienter, by use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange, for the purpose of creating a false or misleading appearance of active trading in Gepco, or a false and misleading appearance with respect to the market for Gepco, engaged in the following unlawful activity:

a.     Entered an order or orders for the purchase of the securities with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of the securities, had been or would be entered by or for the same or different parties; or

b.      Entered an order or orders for the sale of the securities with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of the securities, had been or would be entered by or for the same or different parties.

87.      Engelbrecht and de Maison, directly or indirectly, with scienter, by use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange, effected, alone or with one or more persons, a series of transactions in Gepco securities creating actual or apparent trading in those securities, or raising or depressing the price of those securities, for the purpose of inducing the purchase or sale of those securities by others.

88.      By virtue of the foregoing, Engelbrecht and de Maison have violated, and unless enjoined will continue to violate, Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)].

**SIXTH CLAIM FOR RELIEF**
**Violations of Section 16(a) of the Exchange Act and Rule 16a-3 Thereunder**
**(de Maison and Loshin)**

89.      The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 68, as if fully set forth herein.

90.      Section 16(a) of the Exchange Act [15 U.S.C. § 78p] and Rule 16a-3 thereunder [17 C.F.R. § 240.16a-3] require any person that directly or indirectly beneficially owns more than 10% of a company's class of stock registered under Section 12 of the Exchange Act, or who is a director or an officer of the issuer of such security, to notify the Commission within 10 days of the acquisition.  Additionally, Section 16(a) of the Exchange Act requires that if there has been a change of such ownership during a month, the reporting persons shall file with the

Commission a statement indicating their ownership at the end of the calendar month and the changes in that ownership that occurred during the month.  Exchange Act Rule 16a-3 requires that initial statements of beneficial ownership be filed on Form 3, and that statements of changes in beneficial ownership be filed on Form 4.

91.     By virtue of the conduct described above, de Maison and Loshin failed to file with the Commission Forms 4 for statements of changes in beneficial ownership of their Gepco stock.

92.     As part and in furtherance of their violative conduct, de Maison and Loshin failed to timely file Forms 4 when they had a duty to do so under Section 16(a) of the Exchange Act.

93.     By reason of the foregoing, de Maison and Loshin have violated, and unless permanently enjoined, will again violate, Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rule 16a-3 [17 C.F.R. § 140.16a-3] thereunder.

## SEVENTH CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (de Maison and Voutsas)

94.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 68, as if fully set forth herein.

95.     Defendants de Maison and Voutsas, directly or indirectly, with scienter, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, the mails, or any facility of a national securities exchange, made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).

96.     Defendants de Maison and Voutsas have violated, and unless restrained and enjoined, will in the future violate Section 10(b) of the Exchange Act and Rule 10b-5.

## EIGHTH CLAIM FOR RELIEF
### Violations of Section 15(a) of the Exchange Act
### (SCR and Kuhn)

97.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 68, as if fully set forth herein.

98.     Defendants SCR and Kuhn, while engaged in the business of effecting transactions in securities for the account of others made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, a security without being registered in accordance with Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

99.     Defendants SCR and Kuhn have violated, and unless restrained and enjoined will in the future violate Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court issue a Final Judgment:

### I.

Permanently restraining and enjoining:

(a)     defendants Engelbrecht, Cope, Mastromatteo, Malone, Kuhn, Gepco, Sunatco, Suprafin, Worldbridge, Traverse, and SCR, and their agents, servants, employees and attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from

violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77q(a) and 77q(b)], pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)];

(b)     defendants Engelbrecht, Cope, Mastromatteo, de Maison, Malone, Kuhn, Gepco, Sunatco, Suprafin, Worldbridge, Traverse, and SCR, and their agents, servants, employees and attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5], pursuant to Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)];

(c)     defendants Engelbrecht, Cope, Mastromatteo, de Maison, Malone, Kuhn, Gepco, Sunatco, Suprafin, Worldbridge, Traverse, and SCR and their agents, servants, employees and attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Sections 17(a)(1) and 17(a)(3) of the Securities Act [ 15 U.S.C. § 77q(a)(1) and (a)(3)] pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)];

(d)     defendants Engelbrecht and de Maison and their agents, servants, employees and attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)] pursuant to Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)];

(e)     defendants de Maison and Loshin and their agents, servants, employees and

attorneys, and all persons in active concert or participation with them who receive

actual notice of the injunction by personal service or otherwise, from violating

Section 16(a) of the Exchange Act [15 U.S.C. § 78p] and Rule 16a-3 thereunder

[17 C.F.R. § 240.16a-3] pursuant to Section 21(d)(1) of the Exchange Act [15

U.S.C. § 78u(d)(1)];

(f)     defendants de Maison and Voutsas and their agents, servants, employees and

attorneys, and all persons in active concert or participation with them who receive

actual notice of the injunction by personal service or otherwise, from violating

Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5(b)

thereunder [17 C.F.R. § 240.10b-5(b)], pursuant to Section 21(d)(1) of the

Exchange Act [15 U.S.C. § 78u(d)(1)];

(g)     defendants SCR and Kuhn and their agents, servants, employees and attorneys,

and all persons in active concert or participation with them who receive actual

notice of the injunction by personal service or otherwise, from violating Section

15(a) of the Exchange Act [15 U.S.C. § 78o(a)] pursuant to Section 21(d)(1) of

the Exchange Act [15 U.S.C. § 78u(d)(1)].

## II.

Ordering Engelbrecht, Cope, Mastromatteo, Suprafin, Sunatco, Worldbridge, and

Traverse to provide a sworn accounting, pursuant to Section 21(d)(5) of the Exchange Act [15

U.S.C. § 78u(d)(5)], to determine the profit reaped from the conduct described above, the

location of their assets, and their ability to pay disgorgement and civil monetary penalties.

### III.

Ordering Engelbrecht, Cope, Mastromatteo, Malone, de Maison, Kuhn, Voutsas, Loshin, Gepco, Sunatco, Suprafin, Worldbridge, Traverse, and SCR to disgorge any and all ill-gotten gains they received as a result of the violations of the federal securities laws, plus prejudgment interest thereon, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

### IV.

Ordering Engelbrecht, Cope, Mastromatteo, Malone, de Maison, Kuhn, Voutsas, Loshin, Gepco, Sunatco, Suprafin, Worldbridge, Traverse, and SCR to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and/or Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] for violations of the federal securities laws.

### V.

Ordering Engelbrecht, de Maison, Malone, Cope, Mastromatteo, Kuhn, and Voutsas to be barred from participation in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and/or Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)].

### VI.

Ordering Malone, de Maison, and Engelbrecht to be barred from serving as an officer or director of a public company, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] Section 21(d)(2) of the Exchange Act [15 U.S.C.§ 78u(d)(2)] for the violations alleged herein.

## VI.

Granting such other and further relief as the Court may deem just and proper.


Dated: New York, New York
September 18, 2014

By: _____
Andrew M. Calamari
SECURITIES AND EXCHANGE COMMISSION
Regional Director
Howard A. Fischer, Senior Trial Counsel
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0589 (Fischer)
Email: FischerH@SEC.gov


Of Counsel:
Amelia A. Cottrell (CottrellA@SEC.gov)
Leslie Kazon (KazonL@SEC.gov)
John O. Enright (EnrightJ@SEC.gov)