ANDREW M. CALAMARI
REGIONAL DIRECTOR
Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281-1022
Tel: (212) 336-0589 (Howard A. Fischer, Senior Trial Counsel)
Email: FischerH@SEC.Gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                              Plaintiff,

          -against-

JASON COPE, IZAK ZIRK DE MAISON (F/K/A
IZAK ZIRK ENGELBRECHT), GREGORY
GOLDSTEIN, STEPHEN WILSHINSKY,
TALMAN HARRIS, WILLIAM SCHOLANDER,
JACK TAGLIAFERRO, VICTOR ALFAYA,
JUSTIN ESPOSITO, KONA JONES BARBERA,
LOUIS MASTROMATTEO, ANGELIQUE DE
MAISON, TRISH MALONE, KIERAN T. KUHN,
PETER VOUTSAS, RONALD LOSHIN, GEPCO,
LTD., SUNATCO LTD., SUPRAFIN LTD.,
WORLDBRIDGE PARTNERS, TRAVERSE
INTERNATIONAL, and SMALL CAP
RESOURCE CORP.,

                              Defendants,

And

ANGELIQUE DE MAISON,

                              Relief Defendant.

14 Civ. 7575 (DLC)

AMENDED
COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission"), for its Amended Complaint against defendants Jason Cope ("Cope"), Izak Zirk de Maison (f/k/a Izak Zirk Engelbrecht) ("Engelbrecht"), Gregory Goldstein ("Goldstein"), Stephen Wilshinsky ("Wilshinsky"), Talman Harris ("Harris"), William Scholander ("Scholander"), Jack Tagliaferro ("Tagliaferro"), Victor Alfaya ("Alfaya"), Justin Esposito ("Esposito"), Kona Jones Barbera ("Barbera"), Louis Mastromatteo ("Mastromatteo"), Angelique de Maison ("de Maison"), Trish Malone ("Malone"), Kieran T. Kuhn ("Kuhn"), Peter Voutsas ("Voutsas"), Ronald Loshin ("Loshin"), Gepco, Ltd. ("Gepco"), Sunatco Ltd. ("Sunatco"), Suprafin Ltd. ("Suprafin"), Worldbridge Partners ("Worldbridge"), Traverse International ("Traverse"), and Small Cap Resource Corp. ("SCR") (collectively, the "Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      This case concerns a series of sophisticated fraudulent schemes orchestrated by Engelbrecht and a series of confederates, including Cope, Goldstein, Kuhn, and other named Defendants. These schemes involved the control and manipulation of the common stock of various microcap issuers, including Lenco Mobile Inc., with the ticker symbol LNCM ("Lenco"); Kensington Leasing, Ltd., with the ticker symbol KNSL ("Kensington Leasing"); Wikifamilies Inc., with the ticker symbol WFAM ("Wikifamilies"); Casablanca Mining Ltd., with the ticker symbol CUAU ("Casablanca"); Lustros Inc. with the ticker symbol LSTS ("Lustros"); and Gepco, Ltd., with the ticker symbol GEPC ("Gepco"). Collectively, these issuers will be referred to as the "Fraudulent Issuers."

2.      The schemes, which took place between approximately 2008 and 2014, followed the same general blueprint: Engelbrecht would cause each issuer to issue tens of millions of

shares of restricted stock to him and his nominees, which he then used for two types of illegal distributions.

3.      In the first type of illegal distribution, Engelbrecht, along with his confederates, illegally sold the shares into the public market, often by inducing Wilshinky, Harris, Scholander, and Tagliaferro (the "Registered Representative Defendants"), as well as Goldstein, to place buy orders in their customers' accounts with the purpose of matching trades with Engelbrecht's sales.[1]

4.      In the second type of illegal distribution, Engelbrecht and his confederates paid unregistered individuals undisclosed commissions to sell his shares to investors in purported private placements.

5.      In both, Engelbrecht, the Registered Representative Defendants, and the unregistered individuals named herein frequently made misrepresentations and omissions to investors in connection with the sales of these shares.

6.      The Defendants named herein, as well as relief Defendant de Maison, have profited from the illegal distributions of shares and stand to continue to profit from these and other unregistered distributions and any future illegal sales of shares unless enjoined from any further securities laws violations.

---

[1]      A matched trade is an order to buy or sell securities that is entered with knowledge that a matching order on the opposite side of the transaction has been or will be entered for the purpose of (1) creating a false or misleading appearance of active trading in any publicly traded security or (2) creating a false or misleading appearance with respect to the market for any such security.

## VIOLATIONS

7.   By virtue of the conduct alleged herein:

a.   Cope, Engelbrecht, de Maison, Mastromatteo, Malone, Kuhn, Gepco, Sunatco, Suprafin, Worldbridge, Traverse, and SCR, directly or indirectly, singly or in concert, have engaged in acts, practices, and courses of business that constitute violations of Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and 77e(b)];

b.   Cope, Engelbrecht, Goldstein, de Maison, Mastromatteo, Malone, Kuhn, Gepco, Sunatco, Suprafin, Worldbridge, Traverse, and SCR, directly or indirectly, singly or in concert, have engaged in acts, practices, and courses of business that constitute violations of Section 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)];

c.   Engelbrecht, Goldstein, Cope, Kuhn, Alfaya, Esposito, Barbera, Goldstein, the Registered Representative Defendants, and Loshin, directly or indirectly, singly or in concert, have engaged in acts, practices, and courses of business that constitute violations of Section 17(a)(2) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)];

d.   Engelbrecht, Goldstein, Cope, Kuhn, Alfaya, Esposito, Barbera, Goldstein, and the Registered Representative Defendants, directly or indirectly, singly or in concert, have engaged in acts, practices, and courses of business that

4

constitute violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)];

e.  Engelbrecht, Cope, de Maison, Loshin, Kuhn, SCR and Alfaya, Esposito, and Barbera (the latter three collectively referred to herein as the "SCR Defendants"), directly or indirectly, singly or in concert, have engaged in acts, practices, and courses of business that constitute violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)];

f.  Engelbrecht, Goldstein and de Maison, directly or indirectly, singly or in concert, have engaged in acts, practices, and courses of business that constitute violations of Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)];

g.  De Maison and Voutsas, directly or indirectly, singly or in concert, have engaged in acts, practices, and courses of business that constitute violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder; and

h.  De Maison and Loshin, directly or indirectly, singly or in concert, have engaged in acts, practices, and courses of business that constitute violations of Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rule 16a-3 [17 C.F.R. § 240.16a-3] thereunder.

## NATURE OF PROCEEDINGS AND RELIEF SOUGHT

8.  The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)].

9.      The Commission seeks a final judgment:  (i) restraining and permanently enjoining Defendants from engaging in the acts, practices, transactions, and courses of business alleged herein; (ii) requiring Defendants each to disgorge the ill-gotten gains they received as a result of the violations, and to pay prejudgment interest thereon, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)]; (iii) imposing civil monetary penalties upon Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and/or Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (iv) imposing a penny stock bar against Cope, Engelbrecht, de Maison, Malone, Mastromatteo, Kuhn, Goldstein, the Registered Representative Defendants, the SCR Defendants, and Voutsas pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; and (v) issuing an order barring each of Engelbrecht, de Maison, Malone, and Loshin from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].  Finally, the Commission seeks such other relief as the Court may deem just and appropriate.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action under Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa], and 28 U.S.C. § 1331.

11.      Venue is proper in the Southern District of New York under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern District of New York and were effected, directly or indirectly, by

6

making use of the means and instruments of transportation or communication in interstate

commerce, or the mails.  For example, multiple participants in the fraudulent scheme, including

Cope, Engelbrecht, Malone, de Maison, and Mastromatteo, communicated with and conducted

transactions with Kensington Leasing, Wikifamilies, Casablanca, and Gepco's transfer agent,

Continental Stock Transfer & Trust Company, at 17 Battery Place, New York, New York 10006,

and shares transferred to Traverse and others were held at the Depository Trust Corporation at 55

Water Street, New York, New York.

## DEFENDANTS

12.     **Cope**, age 41, resides in Gates Mills, Ohio.  While Cope is not currently

associated with any registered entity, between 1995 and June 2001 he was employed as a

registered representative at multiple registered broker-dealers.  Cope previously held series 7, 24,

and 63 licenses.  In 2001, this Court enjoined and ordered Cope, jointly and severally with other

defendants, to pay total monetary relief of more than $20 million.  In February 2014, this Court

found Cope in contempt of that judgment and ordered him to, among other things, begin paying

the Commission $10,000 per month beginning March 10, 2014, with payments increasing to

$15,000 per month beginning September 10, 2014.  *SEC v. Milan Capital Group, Inc.*, No. 00

Civ. 108 (S.D.N.Y. Feb. 28, 2014).

13.     **Engelbrecht**, age 58, resides at the Northeast Ohio Correctional Center in

Youngstown, Ohio.  He previously resided in Redlands, California.  Between approximately

1996 and September 18, 2014, Engelbrecht served as an officer, director, and self-described

"financier" of various microcap issuers, including the Fraudulent Issuers, for which he often

served as the undisclosed control person.  On April 2, 2015, Engelbrecht pleaded guilty in the

Northern District of Ohio to a seven-count information charging him with securities fraud,

7

conspiracy to commit securities fraud, and wire fraud in connection with the securities of Lenco, Kensington Leasing, Wikifamilies, Casablanca Mining, Lustros, and Gepco. He is married to de Maison.

14.     **Malone**, age 40, resides in Santee, California, and has served as an officer for most of the Fraudulent Issuers. She served as Chief Financial Officer ("CFO") and director for Kensington Leasing, as Secretary for Lenco, as CFO and director for Wikifamilies, and as President, Chief Financial Officer, and Secretary for Gepco. She has also served alongside Engelbrecht as an officer of several other microcap issuers.

15.     **Goldstein**, age 43, resides in Stevenson Ranch, California. Between October 1993 and December 2000, Goldstein was a registered representative associated with Lew Lieberbaum & Co., Inc.; Joseph Dillon & Company Inc.; Eisner Securities, Inc.; and Benson York Group, Inc. Between December 2000 and February 2013, Goldstein was a registered representative associated with Marquis Financial Services, Inc, a registered broker-dealer he owned from 2002 to 2013. On May 15, 2013, Goldstein was barred by FINRA from associating with any FINRA-member firm for his failure to respond to FINRA's Rule 8210 requests in connection with his employment at Marquis. On July 22, 2013, FINRA cancelled Marquis's membership for failure to pay outstanding fees. On June 19, 2013, Marquis withdrew its broker-dealer registration with the Commission.

16.     **Harris**, age 38, resides, upon information and belief, in Garden City, New York. Between 2000 and 2013, Harris was a registered representative associated with Investec Ernst & Company; Spencer Clarke LLC; Joseph Stevens & Company, Inc.; Ehrenkrantz King Nussbaum, Inc.; Harrison Securities Inc.; Benchmark Securities; New York Global Securities, Inc.; Legend Securities, Inc.; Basic Investors, Inc.; Martinez Ayme Securities; Seaboard Securities, Inc.; First

Merger Capital, Inc.; and Radnor Research & Trading Company LLC.  On August 16, 2013, a FINRA Hearing Panel barred Harris from associating with any FINRA-member firm.  That decision was affirmed by FINRA's National Adjudicatory Council on December 29, 2014. Harris has appealed that decision to the Commission, which is pending.  On March 4, 2015, the Commission denied his motion to stay imposition of the bar pending his appeal.

17.     **Scholander**, age 39, resides, upon information and belief, in Brooklyn, New York.  Between 2000 and 2013, Scholander was a registered representative associated with Cambridge Capital, LLC; Prestige Financial Center, Inc.; Harrison Securities, Inc.; Benchmark Securities Group, Inc.; New York Global Securities, Inc.; Legend Securities, Inc.; Basic Investors Inc.; Martinez-Ayme Securities; Seaboard Securities, Inc.; First Merger Capital, Inc.; and Radnor Research & Trading Company LLC.  On August 16, 2013, a FINRA Hearing Panel barred Scholander from associating with any FINRA-member firm.  That decision was affirmed by FINRA's National Adjudicatory Council on December 29, 2014.  Scholander has appealed that decision to the Commission, which is pending.  On March 4, 2015, the Commission denied his motion to stay imposition of the bar pending his appeal.

18.     **Tagliaferro**, age 43, resides, upon information and belief, in Glen Cove, New York.  Between 1998 and 2011, Tagliaferro was a registered representative associated with First Providence Financial Group, Inc.; Dalton Kent Securities Group, Inc.; Madison Capital Markets Corp.; Oscar Gruss & Son, Inc.; National Securities Corporation; Metlife Securities Inc.; Harrison Securities, Inc.; LH Ross & Company, Inc.; Brundyn Securities Inc.; J.P. Turner & Company, L.L.C.; Gunnallen Financial, Inc.; Woodstock Financial Group, Inc.; Marquis Financial Services, Inc.; and Rockwell Global Capital LLC.

19.     **Wilshinsky**, age 59, resides in Woodland Hills, California.  Between 1988 and 2011, Wilshinky was a registered representative associated with Prudential Securities Inc.; Sutro & Co. Inc.; Wachovia Securities, LLC; Oppenheimer & Co. Inc.; and Marquis Financial Services, Inc.  On March 27, 2015, Wilshinky pleaded guilty in the Northern District of Ohio to an information charging him with one count of securities fraud in connection with the securities of Lenco and Kensington Leasing.  Wilshinksy, Harris, Scholander, and Tagliegerro are referred to herein as the "Registered Representative Defendants."

20.     **Kuhn**, age 33, resides in Port Washington, New York.  While Kuhn is not currently associated with any registered entity, between January and August 2007 he was employed as a registered representative at two registered broker-dealers.  He previously held series 7 and 63 licenses.  He is the sole owner and officer of SCR.

21.     **SCR** is a New York corporation with its sole office in Port Washington, New York.  It is wholly owned by Kuhn, who serves as its sole officer and director.  SCR claims to be an investor-relations firm that publishes a subscription-based newsletter that purportedly offers unbiased investment advice.  In reality, Engelbrecht paid SCR to use the newsletter to tout the stock of companies he controls, including Casablanca, Lustros, and Gepco.

22.     **Victor Alfaya**, age 37, resides, upon information and belief, in Port Washington, New York.  Alfaya has never been registered with the Commission.  Alfaya worked for Kuhn at SCR between 2011 and September 2014.

23.     **Kona Jones Barbera**, age 35, resides in Asheville, North Carolina.  Barbera has never been registered with the Commission.  Barbera has been indicted for marijuana trafficking and is awaiting trial in *United States v. Hezi*, 12 Cr. 20024 (E.D. Mich.).  Barbera worked for Kuhn at SCR between May 2012 and November 2013.  Between approximately December 2013

and December 2014, he and Esposito created an "investor relations" firm similar to SCR called Quantum Financial Investments.

24.    **Justin Esposito**, age 24, resides, upon information and belief, in Thornwood, New York. Esposito has never been registered with the Commission. Esposito worked for Kuhn at SCR between May 2012 and November 2013. Between approximately December 2013 and December 2014, he and Barbera created an "investor relations" firm similar to SCR called Quantum Financial Investments.

25.    **Mastromatteo**, age 41, resides in Bay Village, Ohio. While Mastromatteo is not currently associated with any registered entity, between 2001 and 2009 he was employed as a registered representative at multiple registered broker-dealers. Mastromatteo previously held series 7 and 63 licenses. Between 2001 and September 2014, Mastromatteo was a self-employed "consultant." Between 2004 and September 2014, his sole consulting client was Cope and the various entities he controls.

26.    **De Maison**, age 44, resided in Redlands, California during the events in controversy, but left the country shortly before Engelbrecht's arrest. She currently resides, upon information and belief, in Minnesota. De Maison is married to Engelbrecht. Between March 2009 and July 2014, de Maison served in senior management roles at, among others, Kensington Leasing (CEO and director), Casablanca Mining (director), Lustros (director), and Gepco (Chairwoman and director). De Maison has never held any securities licenses.

27.    **Voutsas**, age 54, resides in Santa Monica, California. Voutsas was the Chief Executive Officer and Chief Investment Officer of Gepco and GemVest, Ltd.

28.    **Loshin**, age 72, resides in San Anselmo, California. Loshin served as Gepco's Chief Creative Officer between October 2013 and August 2014.

29.     **Suprafin** is a Wyoming corporation formed in 2009. It is wholly owned by Engelbrecht, who serves as its President and Director. Malone served as Suprafin's Secretary and Treasurer. Suprafin has no operations.

30.     **Sunatco** is a Wyoming corporation formed in May 2013. It is wholly owned by Engelbrecht, who serves as its only officer. Sunatco has no operations.

31.     **Worldbridge** is a Nevada corporation formed in September 2009. Its President and sole officer is Cope and its directors are Cope and Mastromatteo. Worldbridge has no operations.

32.     **Traverse** is a Nevada corporation formed in January 2012. Its sole owner, officer, and director is Mastromatteo. Traverse has no operations.

## FACTS

I.      **The Fraudulent Issuers and Related Entities**

A.      **The Fraudulent Issuers**

33.     **Lenco Mobile Inc.** was originally incorporated as Shochet Trading.com Inc. in Delaware on July 30, 1999. The company changed its name to Shochet Holding Corp. on November 1, 1999, to Sutter Holding Co., Inc. on May 1, 2002, to CIC Holding Co., Inc. on December 6, 2006, to Global Wear Ltd. on January 10, 2008, to Sovereign Wealth Corporation on March 12, 2008, and, finally, to Lenco Mobile Inc. on February 20, 2009. Lenco purported to be in the business of mobile-phone-messaging technologies. The company filed a Chapter 11 bankruptcy petition on September 6, 2014. Malone served as Lenco's Secretary. Lenco's transfer agent was Continental Stock Transfer & Trust Company. Lenco's common stock is registered pursuant to Section 12(g) of the Exchange Act and the company is subject to Exchange Act reporting obligations pursuant to Section 13(a).

34.    **Kensington Leasing, Ltd.** was incorporated in Nevada on June 27, 2008.  The

company registered its common stock pursuant to Section 12(g) of the Exchange Act on March

16, 2009.  Kensington purported to "specialize in leasing equipment to a select clientele."  On

June 4, 2010, Kensington acquired the assets of Allianex, LLC, a private company.  Prior to that

acquisition, the company only had cash and other nominal assets, and nominal operations,

making it a shell corporation under Exchange Act Rule 12b-2.  The company filed Form 10

information in an 8-K dated June 10, 2010.  De Maison served as CEO and as a director of

Kensington Leasing, and Malone served as CFO and as a director of Kensington Leasing.

35.    **Wikifamilies, Inc.** (f/k/a Kensington Leasing, Ltd.) was the successor to

Kensington Leasing.  On May 20, 2011, the company acquired Wikifamilies SA, a private Swiss

corporation.  On October 27, 2011, the company entered into a reverse merger with its wholly-

owned subsidiary, Wikifamilies, Inc., a Nevada corporation.  As a result of the reverse merger,

the company changed its name to Wikifamilies, Inc.  Malone served as CFO and a director of

Wikifamilies.  On August 27, 2013, the company changed its name from Wikifamilies to Gepco,

Ltd.

36.    **Gepco, Ltd.** (f/k/a Wikifamilies, Inc.) was the successor to Wikifamilies.  In

October 2013, the company completed a reverse merger with a privately-held Nevada

corporation called GemVest, Ltd. ("GemVest").  The resulting company purported to "broker

high end investment grade diamonds."  Gepco's common stock (symbol "GEPC") was quoted on

OTC Link.  On September 18, 2014, the Commission suspended trading in Gepco's securities for

a period of ten business days on the ground that it appeared there was a lack of accurate

information concerning, and potentially manipulative transactions in, Gepco's securities.

37.    **Casablanca Mining Ltd.** was originally incorporated as USD Energy Corporation (UEGY) in Nevada in 2008.  On December 4, 2009, FINRA approved a Form 211 for UEGY's common stock to be quoted on OTC Link (formerly, the "Pink Sheets") operated by OTC Markets Group Inc.  On February 17, 2011, UEGY effected its name change to Casablanca Mining (CUAU).  Casablanca purported to operate a gold mine in Chile.  The company's common stock is registered pursuant to Section 12(g) of the Exchange Act and is subject to Exchange Act reporting obligations pursuant to Section 13(a).

38.    **Lustros Inc.** was originally incorporated in Utah on July 30, 1980 as Mag Enterprises, Inc.  The company's name was changed to Safari Associates, Inc. on September 10, 1993 and then to Power-Save Energy Company on September 12, 2006.  Lustros Inc. purports to mine copper sulfate in Chile.  Lustros's common stock is registered pursuant to Section 12(g) and the company is subject to 13(a) reporting.

     **B.    Related Entities**

39.    **Bridges Investments, Inc.** was a Nevada corporation formed in April 2005 with its business address at Engelbrecht and de Maison's former home.  Bridges was de Maison's nominee.  De Maison served as Bridges' President, Secretary, and as a director.  Bridges had no operations.

40.    **Kensington & Royce, Ltd.** is a Nevada corporation formed in 2006 with its business address at a home owned by de Maison.  Royce is de Maison's nominee.  De Maison serves as Royce's President.  Royce has no operations.

41.    **Walker River Investment Corp.** was a Wyoming corporation formed on September 28, 2011.  Walker River was Engelbrecht's nominee.  In reality, Engelbrecht solely

controlled Walker River, using it to trade in securities he controlled and to receive and send payments to other individuals and entities.  Walker River had no operations.

42.    **Wealthmakers, Ltd.** was a Wyoming corporation formed on January 23, 2007. Engelbrecht served as a Director and VP and Malone served as a Director, Secretary, and Treasurer.

## II.    The Fraudulent Schemes at Issue

43.    The schemes involving the Fraudulent Issuers, which transpired between approximately 2008 and 2014, followed the same general blueprint.  Engelbrecht caused each issuer to issue tens of millions of shares of restricted stock to him and his nominees, which he then used for two types of illegal distributions.  In the first, Engelbrecht illegally sold the shares into the public market, often by inducing Goldstein and the Registered Representative Defendants to place buy orders in their customers' accounts with the purpose of matching trades with Engelbrecht's sales.  In the second, Engelbrecht paid unregistered individuals undisclosed commissions to sell his shares to investors in purported private placements.  In both, Engelbrecht, Goldstein, the Registered Representative Defendants, and certain unregistered Defendants made various misrepresentations and omissions to investors in connection with the sales of these shares. Furthermore, Engelbrecht and certain other Defendants engaged in manipulative trading in order to influence the share price of the various issuers and to create the illusion of a genuine interest in these issuers' securities.

### A.    Lenco Mobile Inc.

#### 1.    Background

44.    Lenco was incorporated in 1999.  Between 1999 and 2007, the company underwent several name and business changes.  Engelbrecht gained control of the company in

2007 when it was a shell company.  On January 10, 2008, Engelbrecht changed the company's name from CIC Holding Co. to Global Wear Ltd.; both companies' line of business was apparel. On March 12, 2008, Engelbrecht changed the company's name again to Sovereign Wealth Corporation and announced the company's acquisition of a private company, Digital Vouchers (Pty) Ltd.  The stated business of this entity was "mobile marketing."

45.     On February 20, 2009, the company changed its name to Lenco Mobile Inc. While Engelbrecht never served as an officer or director of Lenco, he described himself to investors and other third parties as the person responsible for the company's financing and structuring.

46.     Lenco amended its Form 10 seven times.  In the seventh amended version filed on May 28, 2010, Lenco stated that, because it had been a shell company prior to its acquisition of Multimedia Solutions, "holders of restricted shares of our common stock will not be permitted to rely on Rule 144 to transfer their shares until 12 months following November 9, 2009, the date we filed our Form 10, provided that we timely file all periodic reports with the SEC during that period."  Between 2008 and 2010, Lenco did not file a registration statement registering any securities offering.

2.     The Undisclosed Commission Scheme

47.     Between February 2008 and June 2011, Engelbrecht paid Goldstein and the Registered Representative Defendants undisclosed commissions to use the discretionary authority they had over their customers' accounts to buy Lenco stock, usually in an effort to match Engelbrecht's sale orders.

48.     As consideration for buying Lenco stock and matching trades with Engelbrecht in their customers' accounts, Engelbrecht paid Goldstein and the Registered Representative

Defendants between 30% and 50% of the proceeds of each matched trade.  Goldstein and the

Registered Representative Defendants did not disclose to their customers that Engelbrecht was

inducing them to buy Lenco stock in their accounts for the purpose of allowing Engelbrecht to

liquidate his Lenco shares.

49.    Engelbrecht paid Goldstein and each of the Registered Representative Defendants

as follows:

- Gregory Goldstein.  Between December 2008 and September 2012, Engelbrecht made at least 139 commission payments to Goldstein and his nominee entities totaling more than $2.3 million in exchange for Goldstein buying shares of Lenco (and its immediate predecessor, Sovereign Wealth Corporation) and other Engelbrecht-controlled issuers' stock in his customers' accounts, usually in an effort to match Engelbrecht's sales.

- Stephen Wilshinsky.  Between April 2008 and June 2011, Engelbrecht made at least 31 commission payments to Wilshinsky and his nominee entities totaling more than $1.2 million in exchange for Wilshinky buying shares of Lenco (and its immediate predecessor, Sovereign Wealth Corporation) stock in his customers' accounts, usually in an effort to match Engelbrecht's sales.

- Talman Harris.  Between February 13, 2008 and November 12, 2009, Engelbrecht made at least 29 commission payments to Harris totaling more than $775,000 in exchange for Harris buying shares of Lenco (and its immediate predecessor, Sovereign Wealth Corporation) stock in his customers' accounts, usually in an effort to match Engelbrecht's sales.

- Jack Tagliaferro.  Between January 12, 2009 and July 26, 2010, Engelbrecht made 28 commission payments to Tagliaferro totaling approximately $645,000 in exchange for Tagliaferro buying shares of Lenco stock in his customers' accounts, usually in an effort to match Engelbrecht's sales.

- William Scholander. Between February 13, 2008 and November 12, 2009, Engelbrecht made at least 32 commission payments to Scholander totaling more than $225,000 in exchange for Scholander buying shares of Lenco (and its immediate predecessor, Sovereign Wealth Corporation) stock in his customers' accounts, usually in an effort to match Engelbrecht's sales.

3.     The Illegal Brokering of Lenco Stock

50.     Between January 2009 and December 2010, Engelbrecht, with the assistance of Loshin, solicited at least 43 investors to purchase restricted shares of Lenco from Engelbrecht's nominee Wealthmakers for total proceeds of approximately $6.2 million.

51.     Engelbrecht actively sought investors for Lenco, negotiated the terms of their share purchase agreements, and advised investors on the merits of the investment. While doing so, Engelbrecht did not disclose to the investors that he was concurrently liquidating his own shares in the open market, often by inducing the Registered Representative Defendants to match his sale orders by placing buy orders in their unknowing customers' accounts.

52.     The Registered Representative Defendants concealed the commission payments to their customers, the fact of which they knew or should have known would have been material to them.

53.     In January and February 2010, Loshin solicited nine individuals and brokered their purchases of Lenco stock from Wealthmakers for total proceeds of approximately $1.9 million. Engelbrecht paid Loshin commissions of $60,000 in cash and a promise to sell him 83,300 shares of Lenco stock at a deep discount of $1.00 per share and 79,129 shares at $1.50 per share. (Lenco was trading between approximately $4.00 and $6.00 at the time.) Loshin did not disclose to investors that Engelbrecht was paying him commissions to broker these sales.

54.     Between September 2010 and April 2011, Loshin solicited an additional nine investors and brokered their purchases of Lenco stock from Lenco's CEO, for total proceeds of approximately $1 million. Loshin did not disclose to these investors that he was paid commissions to broker these sales. Loshin was paid a commission of 138,000 shares of Lenco stock for brokering these transactions.

**B.**   **Kensington Leasing Ltd. and Wikifamilies, Inc.**

  1. <u>Background</u>

  55. Engelbrecht incorporated Kensington Leasing Ltd. on June 27, 2008.  On January 15, 2009, the company filed a Form 10 to register its securities pursuant to Section 12(g) of the Exchange Act.  In that filing, the company stated that it "plans to specialize in leasing equipment to a select clientele."  The filing listed de Maison as Kensington Leasing's CEO and Malone's husband as CFO; both were also listed as directors.

  56. On June 10, 2010, Kensington Leasing filed a Form 8-K announcing its June 4, 2010 reverse merger into a private company, Allianex, LLC.  In that 8-K, Kensington Leasing admitted that "[p]rior to the consummation of the Allianex Acquisition, we had cash and other nominal assets and nominal operations, which made us a 'shell' corporation as defined under Rule 12b-2 of the [Exchange Act]."  As a result of the reverse merger, the company changed its line of business to producing and distributing "prepaid stored value cards for the purchase of technology support and security services for electronic devices."

  57. On May 23, 2011, Kensington Leasing filed a Form 8-K announcing the completion of a reverse merger with a private Swiss company, Wikifamilies SA, in which the company issued 31.5 million shares of common stock to Wikifamilies' purported shareholders.  Post-acquisition, the company purported to "design, develop and operate an Internet-based social media website, Wikifamilies.com, with a unique emphasis on families and new technologies."  De Maison, who was Kensington Leasing's CEO, was replaced by Wikifamilies' principal.  Malone, who was appointed Kensington Leasing's CFO on June 23, 2010, remained as CFO of Wikifamilies.

58.     On October 27, 2011, the company changed its name to Wikifamilies, Inc., and on December 20, 2011, Wikifamilies began trading under the symbol WFAM.

59.     Wikifamilies never filed a registration statement registering any securities offering.

### 2.     Goldstein and Engelbrecht's Illegally Matched Trades

60.     During March 2010, Engelbrecht and Goldstein matched trades in Kensington Leasing's stock at least 8 times to allow Engelbrecht to liquidate shares he held in Malone's name in a brokerage account.  Goldstein coordinated with Engelbrecht to place buy orders in certain of Goldstein's customers' accounts for the purpose of matching Engelbrecht's sell orders.

61.     These orders were all executed in full within seconds of being placed and subsequently purchased by Goldstein in his customers' accounts.  The pair intentionally coordinated these trades for the purpose of creating a false or misleading appearance of active trading in Kensington Leasing's stock.

62.     Between February 3 and March 29, 2012, Engelbrecht and Goldstein intentionally matched trades in Wikifamilies stock at least 17 times for the purpose of creating a false or misleading appearance of active trading in Wikifamilies stock and to allow Engelbrecht to liquidate shares he held in the name of Walker River.  Goldstein coordinated with Engelbrecht to place buy orders in certain of his customers' accounts for the purpose of matching Engelbrecht's sell orders.

### 3.     De Maison Illegally Acted as an Unregistered Broker-Dealer

63.     De Maison acted as an unregistered broker-dealer in the unregistered sales of Kensington Leasing stock to multiple investors.  No registration statement was in effect at the time of these sales.

64.     Between October 2009 and April 2011, while Kensington Leasing was either a shell company or within one year of ceasing to be a shell, de Maison regularly solicited investors to purchase stock and promissory notes convertible into stock held by her nominee entities Bridges and Royce.

65.     For each transaction, she kept all or most of the proceeds of the sale.  In her solicitations, de Maison advised investors on the merits of the investment and the company generally, and she arranged for the execution of the governing agreements and the mailing of stock certificates to investors.

66.     Investors were told that the proceeds of these sales would be provided to Kensington Leasing for developing its business.  De Maison concealed from them the fact that the shares they purchased came from her own holdings, or those of her nominees.

C.     **Casablanca Mining Ltd**.

1.     Background

67.     Engelbrecht incorporated Casablanca's predecessor, USD Energy, in Nevada on June 27, 2008.  On January 14, 2009, the company filed a Form 10 to register its common stock pursuant to Section 12(g) of the Exchange Act.  In that filing, the company stated that it was an exploration stage oil and gas company.  The filing listed Malone as Casablanca's CEO and President and Malone's sister as COO.

68.     On February 17, 2011, the company changed its name to Casablanca Mining Ltd. and its business to the acquisition, exploration, development, and operation of precious metal properties.  At that time, Engelbrecht served as the company's President and Malone as its CFO; they both also served as directors.  On June 24, 2011, de Maison was appointed a director of Casablanca.

69.    Between December 2010 and April 2012, de Maison was at all times a 10% owner (or more) of Casablanca's common stock.

70.    Casablanca never filed a registration statement registering any securities offering.

      2.    Cope, Kuhn, and SCR Broker the Sale of Casablanca Stock to Investors Without Disclosing That Engelbrecht Paid Them Commissions.

71.    Between December 2010 and November 2011, Cope regularly solicited investors to purchase blocks of Casablanca stock held by various Engelbrecht nominees, including Suprafin. Cope's three largest investors bought more than 1 million shares for more than $3.1 million. While soliciting investors to buy Casablanca stock, Cope advised the investors on the merits of the investment, negotiated the amounts and terms of the investments, and served as an unregistered broker between the investors and Engelbrecht. A December 5, 2010 email from one of Cope's largest investors, his high school guidance counselor, reflects that Cope advised him on the merits of the investment: "After reviewing all info I'll depend upon your good judgment as to whether or not to invest with Zirk." The investor then went forward with the purchase of $995,000 worth of Casablanca stock and notes convertible into Casablanca stock, an amount representing a substantial portion of his net worth.

72.    Cope did not disclose to any of his investors that Engelbrecht was paying him commissions of 20-30% of the proceeds of each sale.

73.    Between June and November 2011, Kuhn and his employees at SCR regularly solicited investors to purchase blocks of Casablanca stock held by various Engelbrecht nominees, including Suprafin. Kuhn brokered the sale of Casablanca stock to more than 11 investors for a total investment amount of approximately $600,000.

74.    While Kuhn and SCR falsely represented to investors that the sales were part of a "private placement," in reality they were conducting a general solicitation by cold calling

potential investors nationwide that had been identified in lead sheets.  When Kuhn or an SCR

employee convinced an investor to buy Casablanca stock, they would negotiate the amount of

the purchase, send the investor the subscription agreement, and then arrange with Malone to have

stock certificates representing those restricted shares sent to the investors.

75.     Kuhn did not disclose to any of his investors that Engelbrecht was paying him

commissions of 20-30% of the proceeds of each sale.

### 3.     De Maison Illegally Acted as an Unregistered Broker-Dealer.

76.     Between 2010 and 2012, de Maison regularly solicited investors (including

investors to whom she had sold Kensington Leasing securities) to purchase the unregistered

Casablanca stock and promissory notes convertible into Casablanca stock held by her nominee

entities Bridges and Royce.  She pitched investors on Casablanca's prospects and the merits of

buying its stock.  She also traveled with some of her investors and Engelbrecht to Chile to visit

and inspect the purported mine there.  In total, de Maison sold Casablanca securities to at least

nine investors for more than $3.4 million.

77.     Investors were told that the proceeds of these sales would be provided to

Casablanca for developing its business.  De Maison concealed from them the fact that the shares

they purchased came from her own holdings, or those of her nominees.

### 4.     Cope Matched Trades with SCR Customers That Kuhn Had Solicited to Buy Casablanca Stock on the Open Market.

78.     Between June 2011 and October 2012, Cope paid Kuhn undisclosed commission

payments to direct SCR customers to place buy orders of Casablanca stock in the secondary

market that were intended to match sell orders placed by Cope.  The pair intentionally matched

trades for the purpose of creating a false or misleading appearance of active trading in

Casablanca's stock and to allow Cope to liquidate his holdings.

79.     Kuhn did not disclose to his customers that he was directing them to place orders for Casablanca stock so that Cope could sell into those orders and pay Kuhn a commission.  Nor did Kuhn disclose to his customers that this manipulative activity was intended to create an appearance of bona fide trading activity.

80.     Cope and Kuhn coordinated their trading by telephone and text message.

81.     On October 27, 2011, while Kuhn and Cope were both touting Casablanca to investors and Cope was liquidating his shares by matching trades with Kuhn's customers, the pair joked about their real beliefs about investing in Casablanca:

> **Cope:**  "Check out CUAU.  It is a great buy."
>
> **Kuhn:**  "I've been hearing a lot about them . . . aren't they on the Nasdaq?"
>
> **Cope:**  "Lol.  $40 target."
>
> **Kuhn:**  "What a score. . . .  I heard Goldman Sachs is underwriting their NYSE IPO."

82.     At the time, Casablanca was trading at $5.00 per share over the counter, not on the Nasdaq, and the company never claimed or had a basis to claim that it would list on the New York Stock Exchange or have an initial public offering underwritten by Goldman Sachs.

**D.     Lustros, Inc.**

1.     Background

83.     Lustros was incorporated in 1980.  On September 12, 2006, after a number of name and business changes, the company changed its name to Power-Save Energy Company and its line of business to solar energy.  On March 12, 2012, Power-Save filed a Form 8-K stating that the company was entering into a Share Exchange Agreement (i.e., a reverse merger) with a private Chilean company, Bluestone, S.A., and changing its line of business to mining copper

24

sulfate in Chile. The 8-K further announced Engelbrecht's appointment as CEO, Malone's appointment as CFO, and de Maison's appointment as a Director.

84.     Lustros filed a Form S-1 on December 27, 2013 to register 26.8 million shares of common stock, but it was never declared effective.

> 2.     Engelbrecht Paid Kuhn, and Kuhn in Turn Paid the SCR Defendants
> Undisclosed Commissions to Broker the Sales of Lustros Stock.

85.     Between June 2012 and January 2014, Engelbrecht paid undisclosed commissions to Kuhn to solicit investors to buy Lustros stock from his nominees Suprafin and Walker River. Kuhn in turn paid undisclosed commissions to the SCR Defendants to solicit those investments.

86.     Like Kuhn had done with Casablanca, Kuhn and the SCR Defendants falsely represented to investors that the sales of Lustros stock were part of a "private placement," but in reality they were again conducting a general solicitation by cold calling potential investors nationwide identified in lead sheets. When the SCR Defendants convinced an investor to buy Lustros stock, they would negotiate the amount of the purchase, send the investor the subscription agreement signed by Engelbrecht, and then arrange with Malone to have stock certificates representing those restricted shares sent to the investors. Kuhn and the SCR Defendants did not disclose to the investors they solicited that Engelbrecht was paying Kuhn or that Kuhn was paying the SCR Defendants commissions to sell the securities.

87.     As part of this nationwide cold calling campaign to solicit investors to buy Lustros stock pursuant to subscription agreements with Engelbrecht nominees like Suprafin, the SCR Defendants negotiated the amounts of the purchases, sent investors the subscription agreements, and arranged for Malone to send the investors stock certificates when the transactions were completed. They also solicited investors to buy Lustros in the public market, in which case they would prescribe the price and quantity of shares the investor should purchase.

For each investor's share purchase, Kuhn would pay the SCR Defendants transaction-based commissions.

88.    In sum, Kuhn, through the SCR Defendants and other SCR employees, sold approximately $2 million worth of Lustros shares to various investors nationwide. In 2012, Kuhn paid Alfaya $133,055, which included the undisclosed commissions he received for soliciting and then brokering the sales of Lustros stock to multiple investors; Barbera $220,600, which included the undisclosed commissions he received for soliciting and then brokering the sales of Lustros stock to multiple investors; and Esposito $234,625, which included the undisclosed commissions he received for soliciting and then brokering the sales of Lustros stock to multiple investors.

### 3. Kuhn Consistently Sold His Own Lustros Stock While Touting Lustros and Selling Lustros Stock to SCR's Customers.

89.    Between July 2012 and February 2014, while selling Lustros stock to investors and promoting the company generally, Kuhn simultaneously sold more than 4 million shares of his own Lustros stock for his and Engelbrecht's benefit, earning proceeds of more than $2 million.

90.    As described above, Kuhn and his employees were soliciting investors during this time to take part in the purported private placement of Lustros stock. Kuhn and his employees at SCR would contact the potential investors and offer to sell them a subscription to an emailed newsletter that purported to offer unbiased investment picks, but in reality only promoted Lustros and other Engelbrecht-controlled issuers. When individuals bought a subscription, Kuhn and his employees would then solicit their purchases of Lustros stock.

91.    The emailed newsletter that Kuhn authored and sent to subscribers included, among other things, information extolling Lustros, press releases concerning Lustros, an

interview of Engelbrecht, and an April 2012 PowerPoint presentation concerning Lustros. The PowerPoint presentation stated, among other things, that Lustros would earn $7.56 million in revenue and $3.36 million in net income from a subsidiary in 2012 and $108 million in revenue and $42.7 million in net income in 2017.

92.      The baseless projections for 2012 were not realized.  Instead, in 2012 Lustros earned $54,902 in revenue from all of its operations, realizing a net operating loss of more than $3.1 million.

93.      Neither the newsletters that SCR sent to its customers nor the subscription agreements governing the sale of Lustros stock included any disclaimer that Kuhn was being compensated by Engelbrecht in cash and stock to tout Lustros, or that Kuhn was actively selling that stock for his and Engelbrecht's benefit.

94.      Some emailed newsletters attached a link to a long disclaimer on Kuhn's website that included the following statements about SCR's general practices:

- "SCR may receive its compensation in free trading shares" from an issuer; and

- SCR "may receive the Shares [of an issuer] as compensation for disseminating the Information and thereafter sells those Shares at any time for monetary gain, including at the same time the Information is being disseminated or shortly thereafter."

95.      These statements within the disclaimer did not tell investors the actual truth—that Kuhn had actually received cash and almost 4 million shares of Lustros stock from Engelbrecht as compensation, and that he was in fact actively selling the shares while promoting the stock to investors.  Engelbrecht benefitted from Kuhn's stock sales because Kuhn funneled a part of the proceeds back to Engelbrecht.  And Engelbrecht benefitted from Kuhn's promotional work because it caused investors to buy Lustros stock in the purported private placement and the open market, thus generating trading volume to attract additional investors.

E.    **Gepco, Inc.**

1.    Background

96.    As described above, Engelbrecht controlled the company known as Gepco since its incorporation in 2008.  Between 2008 and early-2013, Engelbrecht caused Gepco to enter into a number of reverse mergers, changing Gepco's line of business from "leasing equipment to select clientele," to "the production, marketing and distribution of a retail line of prepaid stored value cards for the purchase of technology support and security services for electronic devices," to the "design, develop[ment] and operat[ion of] an Internet-based social media website, Wikifamilies.com."  In mid-2013, after failing to merge the company (then, Wikifamilies) into a private mixed martial arts company, Engelbrecht decided to create his own private company—a purported gemological business—and merge the public shell company into it.

97.    On August 27, 2013, Engelbrecht caused Malone to change the company's name from Wikifamilies, Inc. to Gepco, Ltd.  Approximately five weeks later, on October 2, 2013, Engelbrecht caused Malone to incorporate GemVest Ltd., the purported gemological business, in Nevada, naming herself, along with de Maison, Loshin, Voutsas, and another individual as directors.

98.    On October 15, 2013, Gepco announced that it had entered into a Stock Purchase Agreement with GemVest.  The reverse merger was completed on December 6, 2013 and disclosed in a Form 8-K filed on December 12, 2013.  As a result of the reverse merger, de Maison was named Executive Chairwoman of Gepco and GemVest; Voutsas was named Chief Executive Officer and Chief Investment Officer of Gepco and GemVest; and Malone was named President, Chief Financial Officer, and Secretary of Gepco and Chief Financial Officer, Chief Operating Officer, and Secretary of GemVest.

28

99.    As a result of the reverse merger, Gepco issued 150 million shares of common stock to GemVest's purported shareholders. Of those 150 million shares, 88.5 million shares were issued to de Maison and an entity she controlled, and 24 million shares were issued to the "Gil-Galad Foundation" and the "Unicorn Funds Foundation," two fictitious businesses that purport to share the same business address as Gepco's office, where only Malone and another employee of Engelbrecht's worked.

100.    Despite the fact that Gepco never named Engelbrecht as an officer or director of Gepco—either in its filings with the Commission, in press releases, or on its website—he always controlled the company. Engelbrecht's control of Gepco is evidenced by, among other things, the following facts: he caused the company's name to be changed from Wikifamilies to Gepco; he purchased the gemvest.com website; he oversaw the creation of the company's business plan; he installed Malone as CFO and Secretary; he hired Kuhn and SCR to promote Gepco's stock and sell convertible promissory notes issued by Suprafin and Sunatco; and he arranged for de Maison's personal jewelry to be sold by Gepco.

2.    Engelbrecht and Malone Caused Gepco to Issue Engelbrecht Tens of Millions of Shares of Gepco's Common Stock.

101.    After the reverse merger with GemVest, Engelbrecht caused Gepco, through Malone, to issue and transfer more than 38 million shares of restricted common stock to himself; his associates, including Cope and Mastromatteo; and others.

102.    In April and August 2013, when Gepco was a shell company and its stock was not actively traded, Engelbrecht caused Gepco, through Malone, to issue two convertible promissory notes to him. The first note, issued to Suprafin, a nominee of Engelbrecht's, was in a principal amount of $141,460. It allowed Suprafin to convert any or all of the note's principal into Gepco's common stock at a conversion rate of $.005 per share. The second note, issued to

Sunatco, another nominee of Engelbrecht's, was in a principal amount of up to $100,000. It allowed Suprafin to convert any or all of the note's principal into Gepco's common stock at a conversion rate of $.010 per share.

103.    On May 24, 2013, Suprafin in turn issued a convertible promissory note to one of Cope's nominees, Worldbridge, in the amount of $25,000 (the "Worldbridge Note"). The Worldbridge Note allowed Cope to convert any or all of its principal into Gepco common stock at the same conversion rate as in the Suprafin note—$.005 per share.

104.    That same day, Cope caused Worldbridge to assign its interest in $15,000 of the Worldbridge Note's principal to Mastromatteo's nominee, Traverse.

105.    On January 10, 2014, Mastromatteo wrote on behalf of Traverse to Suprafin, electing to convert the $15,000 of principal in its note into Gepco common stock. Malone then wrote on Gepco's behalf to Gepco's transfer agent, Continental Stock Transfer & Trust Company, directing it to issue 3 million shares of Gepco common stock to Traverse.

106.    Three days later, Gepco's transfer agent issued a stock certificate representing those 3 million shares to Traverse. The following day, January 14, 2014, Mastromatteo, writing on Traverse's behalf, asked Gepco's transfer agent to cancel the 3 million restricted shares and deliver to it a new stock certificate without a restrictive legend.

107.    Traverse's request was accompanied by an opinion letter written by Engelbrecht's long-time counsel ("Lawyer A"). In his letter, Lawyer A opined that the transfer agent could deliver unrestricted shares because, although not registered, the issuance of shares fell under one of the exemptions to the Securities Act's registration requirement. Malone, acting at Engelbrecht's direction, asked Gepco's transfer agent to rely on Lawyer A's letter. Gepco's

transfer agent then issued a certificate representing 3 million unrestricted shares of Gepco
common stock to Traverse.

108.    Mastromatteo over time then deposited the three million shares issued to Traverse
in three brokerage accounts. Between January 9 and July 28, 2014—a seven-month period of
time overlapping with Engelbrecht's and de Maison's manipulative trading in Gepco's stock—
Mastromatteo dumped more than 2.5 million of Traverse's shares into the public market at prices
between $0.09 to $0.29 per share. Because the shares were obtained at $0.005 per share,
Traverse's sales earned a realized rate of return of almost 3,000%.

109.    As Mastromatteo sold the stock, he funneled the proceeds of the sales to Cope.
For example, on March 7, 2014, Traverse received a wire of $27,500 from a trust company
holding the proceeds of some sales of the Gepco stock. On March 10, 2014 Traverse wrote a
check in the amount of $25,000 to Cope's wife, which was deposited into a joint account in the
name of Cope and his wife at JPMorgan Chase ("JPMC").

110.    On March 24, 2014, Traverse received another wire of $52,000 of proceeds of
some sales of the Gepco stock. That same day, he wrote a check in the amount of $50,000 to
Cope's wife, which was again deposited into the joint account at JPMC. Cope's seven payments
to the Commission since March 2014, pursuant to this Court's contempt Order referenced above,
were made by checks drawn on the JPMC account and by cashier's checks issued by JPMC.

111.    Mastromatteo's ability to sell the stock issued to Traverse was dependent on Cope
and Worldbridge buying the Worldbridge Note from Suprafin and then assigning $15,000 worth
of the Worldbridge Note's principal to Traverse. But for Cope and Worldbridge's involvement,
Traverse would not have received the Gepco stock and therefore would not have been able to sell

31

it into the public market.  Cope and Worldbridge played their part because Cope knew that
Mastromatteo would funnel most of the proceeds of the sales back to him.

112.    In a similar series of transactions, Cope caused Worldbridge to obtain 2 million
shares of Gepco's common stock.  On October 15, 2013 (the same day that Gepco's reverse
merger with GemVest was announced in a press release), Cope wrote on behalf of Worldbridge
to Suprafin, electing to convert the $10,000 of principal in the Worldbridge Note into Gepco
common stock.  In response, Malone wrote on Gepco's behalf to Gepco's transfer agent,
directing it to issue 2 million shares of Gepco common stock to a Bahamian broker-dealer for
Worldbridge's benefit.

113.    The following day, Malone, writing on Gepco's behalf, instructed Gepco's
transfer agent to issue a stock certificate representing the 2 million shares in Worldbridge's name
to a Bahamian broker-dealer, which the transfer agent did on October 23, 2013.  On November
19, 2013, the Bahamian broker-dealer, writing on Worldbridge's behalf, asked Gepco's transfer
agent to cancel the 2 million restricted shares and deliver to it a new stock certificate without a
restrictive legend.

114.    Worldbridge's request, like Traverse's, was accompanied by an opinion letter
written by Lawyer A that was effectively identical to the letter Lawyer A wrote for Traverse.
Malone, acting at Engelbrecht's direction, asked Gepco's transfer agent to rely on Lawyer A's
letter.  Gepco's transfer agent then issued a certificate representing 2 million unrestricted shares
of Gepco common stock to Traverse.

115.    Cope tried but was unable to transfer the 2 million shares to a domestic broker-
dealer for resale.

3.   Engelbrecht, Kuhn, and SCR Illegally Sold Convertible Promissory Notes Issued by Engelbrecht's Nominee, Sunatco.

116.   Between at least May 8, 2013 and September 2014, Engelbrecht paid Kuhn to use SCR to sell convertible promissory notes issued by Sunatco to investors—largely elderly and/or unsophisticated investors identified in a nationwide cold-calling campaign conducted by SCR. The notes were convertible into Gepco common stock.

117.   The terms of the notes allowed the investors to convert all or part of their outstanding principal into Gepco's common stock at a 40% discount to the current trading price. Investors paid for the notes by wiring funds directly to a bank account in Sunatco's name at a U.S. bank.

118.   Engelbrecht paid Kuhn commissions for the notes that SCR sold to investors. The amount of the commission was a percentage of the amount of the debt issued in the note. Kuhn in turn paid his employees at SCR a commission for each note they sold. The amount of the employees' commissions was also a percentage of the amount of the debt issued in the note.

119.   Kuhn and his employees at SCR did not disclose these commissions to investors to whom they sold the notes.

120.   When an investor elected to convert his or her note into Gepco's common stock, Engelbrecht generated the shares to be delivered in one of two ways. He either converted a portion of one of the notes that Gepco issued to Sunatco and Suprafin in mid-2013 into Gepco stock and then transferred the shares directly to the investor, or he sent an existing stock certificate in Sunatco's or Suprafin's name to Gepco's transfer agent and asked that it deliver a stock certificate to the investor and deliver the remaining shares in a new certificate back to Sunatco or Suprafin.

33

121.   Between May 2013 and September 2014, Engelbrecht earned hundreds of thousands of dollars in ill-gotten gains from Sunatco's sales of the convertible promissory notes—sales brokered by SCR and Kuhn—to investors.

4.   Engelbrecht and de Maison Manipulated the Market for Gepco's Shares.

122.   Between October 2013 and April 2014, while extracting more than 38 million shares from Gepco, while selling the Sunatco notes to investors, and while Mastromatteo was dumping Traverse's shares into the market, Engelbrecht and de Maison manipulated the market for Gepco's common stock. The purpose of their manipulative trading was twofold: (i) to increase Gepco's share price so that associates like Traverse and Mastromatteo could sell stock at inflated prices, and (ii) to create an appearance of genuine investor demand in Gepco's common stock.

123.   First, Engelbrecht and de Maison increased Gepco's trading volume by serially purchasing large blocks of Gepco stock, particularly on or around the dates of major announcements, to create an illusion of genuine investor demand and thereby induce others to purchase the stock. Engelbrecht deceptively traded not in an account of his own, but in a brokerage account held in Loshin's name. (Loshin thus beneficially owned the Gepco stock traded by Engelbrecht in this account.) De Maison separately traded in two accounts held at the same broker-dealer.

124.   For example, on October 14, 2013, the eve of the announcement of Gepco's reverse merger, de Maison's purchases accounted for more than one-third of all purchases of Gepco's stock that day. Thereafter, between October 23, 2013 and March 20, 2014, Engelbrecht's and de Maison's buying accounted for more than one-quarter of all daily

purchases on ten separate trading days, and more than 40% of all daily purchases on five of those days.

125.   As Gepco officers, de Maison and Loshin, Gepco's Chief Creative Officer, were required to file with the Commission a Form 4 disclosing any changes in their ownership of Gepco stock.  Loshin filed a Form 4 for all of Engelbrecht's trades in his account on January 21 and 23, 2014, and for some of Engelbrecht's trades in his account on January 22, but he failed to file a Form 4 for 115,000 additional shares Engelbrecht bought in his account on January 22 and for multiple days' worth of trades by Engelbrecht after January 23.  De Maison filed Form 4s disclosing her trading on December 11, 2013 and between January 8 and 22, 2014, but she failed to file a Form 4 for any of her purchases in October 2013, February 2014, and March 2014.

126.   In addition to the large volume of buying, between October 24, 2013 and March 12, 2014 de Maison placed either the last trade of the day or the second-to-last trade of the day on eleven separate trading days in an ostensible effort to increase Gepco's share price. Throughout this same time period, de Maison also consistently placed economically irrational trades.  For example, on seventeen separate occasions she placed limit orders[2] to buy Gepco stock at a price higher than the best existing ask price.  For example, on one occasion, when the best ask price for Gepco's common stock was $.13, de Maison placed a limit order to buy 500 shares of Gepco's stock at a price of $.14 or better.  In other words, when another investor was offering to sell Gepco's stock for $.13 per share, de Maison offered to buy the stock for $.14 per share.

---

[2]   A limit order is an order to buy or sell a specific number of shares at a specified price or better.

127.    Throughout this same time period, Engelbrecht, de Maison, and other associates also entered matched trades on at least thirteen separate occasions in an effort to create trading volume and thus the appearance of genuine investor demand. For example, on February 3, 2014, de Maison placed a limit order at 3:51:13 p.m. to buy 4,000 shares of Gepco's common stock at a price of $.13 or better. That order matched an order to sell 4,000 shares at $.13 placed by an Engelbrecht associate. The trade was executed at 3:51:13 p.m.—i.e., the same second that de Maison placed her buy order.

128.    Engelbrecht's and de Maison's manipulative trading worked, and thereby allowed Traverse to sell more than 2.5 million shares at artificially inflated prices. Over this time period, the price of Gepco's common stock rose from $.07 on October 14, 2013, the day before the announcement of the reverse merger, to a high of $.292 on March 13, 2014. As a result of this more than fourfold increase, Gepco had a market capitalization on March 13, 2014 of $67,484,120, a paper value belied by the company's performance and financial condition: For the period of October 15, 2013 through March 31, 2014, Gepco reported a cumulative net loss of $89,401, total stockholders' deficit of $198,299, and a cash balance of $10,385.

129.    Engelbrecht's emails and text messages to Kuhn and others demonstrate that Engelbrecht's trading was intended to generate an appearance of trading volume and to drive up Gepco's share price. For example, on October 23, 2013, at the outset of his manipulative trading, Engelbrecht wrote to Kuhn and Loshin, and expressed his desire to control Gepco's stock, saying "I don[']t want to put Gepco stock outside of our group and face the same relentless selling as with [another microcap issuer controlled by Engelbrecht]." On March 24, 2014, Engelbrecht wrote to Kuhn and others to express the need for them to find buyers: "We need to talk urgently when I land. This [Gepco] is a great opportunity and we are dropping the

ball.  The volume is Zero apart from bid hitting.  I bought 40,000 on Friday which was the only

buying.  I need help and partners.  If the deal is not for you, please tell me."

     5.  De Maison and Voutsas Participate in the Scheme by Making Materially
        Misleading Statements Concerning Gepco to the Public.

   130.  On January 23, 2014, Gepco announced in a press release the purchase of a 10.76

carat diamond—one of only two diamond purchases or sales announced by Gepco by that date.

The press release was initially drafted by Malone, who forwarded it to Engelbrecht and de

Maison on January 22 for their comments and for de Maison to provide a quote.  The final

version released the following day stated that GemVest had purchased the stone "for half of the

current Rapaport [a diamond price benchmark publication] wholesale price" and that it

anticipated being "able to at least triple our investment upon its sale."  The release also quoted

Voutsas and de Maison extolling the purchase.

   131.  De Maison was quoted as saying, "[i]t is very reassuring that our first purchase is

such a substantial stone.  The Rapaport price is over $500,000 and we paid half of that price.  We

are very confident that Peter [Voutsas] will obtain the best price for us that will still represent

fair value for the new owner.  We are very determined to continue what we are starting here and

have great confidence in the business model."

   132.  Voutsas was quoted as saying, "[t]his is a spectacular stone" and that "[b]y being

able to purchase this stone for half of the current Rapaport wholesale price, I anticipate that we

will be able to at least triple our investment upon its sale."

   133.  Both de Maison and Voutsas omitted from their statements a number of material

facts necessary to make their representations not misleading.  The first was that the diamond that

Gepco purported to purchase was actually de Maison's own ring.  They further failed to disclose

that de Maison had already pledged the stone to an investor in another Engelbrecht company to

secure a $250,000 loan; that when she was unable to repay that debt, Loshin stepped in and repaid the $250,000 and received the stone in return; and that Loshin then sold the stone to Gepco in exchange for a $250,000 promissory note that Gepco issued to him.

134.    Engelbrecht believed that the press release would cause the price of Gepco's stock to increase.  And he was right: on January 23, 2014, Gepco's stock price closed at $.165, almost 19% higher than the previous day's closing price.  Indeed, Engelbrecht had Kuhn use the fact of the announcement as a selling point to induce investors to buy Gepco's stock.  On January 21, Engelbrecht texted Kuhn about an investor, telling him to "[s]peculate about the first big diamond deal.  Very vaguely."  Kuhn responded by saying in pertinent part, "Will do."

> 6.    Engelbrecht Caused Gepco's Stock to Be Actively Promoted During the Unregistered Distributions, the Manipulative Trading, and Traverse's Dumping of Shares.

135.    While Engelbrecht and others conducted the unregistered distributions and manipulated the market for Gepco's stock, and while Traverse dumped more than 2.5 million of its shares, Engelbrecht used Kuhn and his firm, SCR, among others, to actively promote Gepco's stock to potential investors.

136.    For example, in December 2013 and January 2014, Kuhn sent an email to SCR subscribers stating, among other things, that "GemVest . . . actively sources large inventories of the highest grade polished gems and diamonds for resale"; that "GemVest purchases much of its diamonds at the source and has relationships worldwide to buy finished distress sale products up to 60% below rap report pricing"; and that "GemVest obtains customers in different geographical areas."  None of these representations was true.

137.    In addition, Kuhn caused SCR to disseminate a purported research report dated January 18, 2014 that cited a $15 million capital raise by Gepco and stated that the author saw "little limit to the amount of capital that can be raised to support the growth of this business."

Indeed, the report projected expected revenues of $45 million in 2014, $58 million in 2015, and $76 million in 2016, with corresponding share price increases to $.93 in Year 1, $1.29 in Year 2, $1.78 in Year 3, $2.46 in Year 4, and $3.40 in Year 5.  No support was provided for these baseless projections.

138.     On May 23, 2014 Kuhn sent an email to SCR subscribers touting the diamond business and Gepco, falsely claiming "$605,000 in diamond sales generated in first 14 days of sales activity."

## FIRST CLAIM FOR RELIEF

### Regarding Lenco

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder (Engelbrecht, Goldstein, Wilshinsky, Harris, Tagliaferro, and Scholander)

139.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138, as if fully set forth herein.

140.     Defendants Engelbrecht, Goldstein, Wilshinsky, Harris, Tagliaferro and Scholander, directly or indirectly, with scienter, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, the mails, or any facility of a national securities exchange, made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).

141.     By reason of the foregoing, Engelbrecht, Goldstein, Wilshinsky, Harris, Tagliaferro and Scholander directly or indirectly, have violated, and unless enjoined will again

39

violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## SECOND CLAIM FOR RELIEF

### Regarding Lenco

### Violations of Sections 17(a)(2) and (3) of the Securities Act

### (Engelbrecht, Goldstein, Wilshinsky, Harris, Tagliaferro, Scholander, and Loshin)

142.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138, as if fully set forth herein.

143.    Defendants Loshin, Engelbrecht, Goldstein, Wilshinsky, Harris, Tagliaferro and Scholander directly or indirectly, singly or in concert, in the offer and sale of securities, by the use of the means and instruments of transportation and communication in interstate commerce and of the mails, knowingly or with reckless disregard for the truth:  (a) obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (b) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

144.    By reason of the foregoing, Loshin, Engelbrecht, Goldstein, Wilshinsky, Harris, Tagliaferro and Scholander, singly or in concert, directly or indirectly, have violated, and unless enjoined and restrained will continue to violate, Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF

### Regarding Lenco

### Violations of Section 15(a) of the Exchange Act

### (Engelbrecht, Loshin)

145.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138, as if fully set forth herein.

146.     Defendants Engelbrecht and Loshin, while engaged in the business of effecting transactions in securities for the account of others made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, a security without being registered in accordance with Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

147.     Defendants Engelbrecht and Loshin have violated, and unless restrained and enjoined will in the future violate Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## FOURTH CLAIM FOR RELIEF

### Regarding Lenco

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (Engelbrecht)

148.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138, as if fully set forth herein.

149.     The shares of Lenco that Engelbrecht sold constitute "securities" within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

150.    At all relevant times, the Lenco shares that Engelbrecht sold were not registered in accordance with the provisions of the Securities Act and no exemption from registration was applicable.

151.    Engelbrecht therefore, singly or in concert, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and to sell securities when no registration statement had been filed or was in effect as to such offers and sales of such securities and no exemption from registration was available.

152.    By reason of the activities described herein, Engelbrecht, singly or in concert, directly or indirectly, has violated, and unless enjoined and restrained will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## FIFTH CLAIM FOR RELIEF

### Regarding Kensington Leasing and Casablanca

### Violations of Section 15(a) of the Exchange Act

### (De Maison)

153.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138, as if fully set forth herein.

154.    Defendant de Maison, while engaged in the business of effecting transactions in securities for the account of others made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, a security without being registered in accordance with Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

155.    Defendant de Maison has violated, and unless restrained and enjoined will in the future violate, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

42

## SIXTH CLAIM FOR RELIEF

### Regarding Kensington Leasing and Casablanca

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (De Maison)

156.    The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 138, as if fully set forth herein.

157.    The shares of Kensington Leasing and Casablanca that de Maison sold constitute

"securities" within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)]

and Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

158.    At all relevant times, the Kensington Leasing and Casablanca shares that de

Maison sold were not registered in accordance with the provisions of the Securities Act and no

exemption from registration was applicable.

159.    De Maison, therefore, singly or in concert, directly or indirectly, made use of the

means or instruments of transportation or communication in interstate commerce or of the mails

to offer and to sell securities when no registration statement had been filed or was in effect as to

such offers and sales of such securities and no exemption from registration was available.

160.    By reason of the activities described herein, de Maison, singly or in concert,

directly or indirectly, has violated, and unless enjoined and restrained will continue to violate,

Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## SEVENTH CLAIM FOR RELIEF

### Regarding Wikifamilies

### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5(a) and (c) Thereunder

### (Engelbrecht and Goldstein)

161.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138, as if fully set forth herein.

162.    Engelbrecht and Goldstein, in connection with the purchase or sale of securities, directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, with scienter, have employed devices, schemes, and artifices to defraud, and have engaged in transactions, acts, practices, and courses of business which operated as a fraud or deceit.

163.    By reason of the foregoing, Engelbrecht and Goldstein directly or indirectly, have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## EIGHTH CLAIM FOR RELIEF

### Regarding Wikifamilies

### Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act

### (Engelbrecht and Goldstein)

164.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138, as if fully set forth herein.

165.    Engelbrecht and Goldstein, directly or indirectly, singly or in concert, in the offer and sale of securities, by the use of the means and instruments of transportation and

communication in interstate commerce and of the mails, knowingly or with reckless disregard for the truth:  (a) employed devices, schemes or artifices to defraud; and (b) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

166.    By reason of the foregoing, Engelbrecht and Goldstein, singly or in concert, directly or indirectly, have violated, and unless enjoined and restrained will continue to violate, Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)].

## NINTH CLAIM FOR RELIEF

### Regarding Wikifamilies

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (Engelbrecht and Malone)

167.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138, as if fully set forth herein.

168.    The shares of Wikifamilies that Engelbrecht and Malone sold constitute "securities" within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

169.    At all relevant times, the Wikifamilies shares that Engelbrecht and Malone sold were not registered in accordance with the provisions of the Securities Act and no exemption from registration was applicable.

170.    Engelbrecht and Malone, therefore, singly or in concert, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and to sell securities when no registration statement had been filed or was

in effect as to such offers and sales of such securities and no exemption from registration was available.

171.    By reason of the activities described herein, Engelbrecht and Malone, singly or in concert, directly or indirectly, has violated, and unless enjoined and restrained will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

### TENTH CLAIM FOR RELIEF

### Regarding Kensington Leasing and Wikifamilies

### Violations of Section 9(a) of the Exchange Act

### (Engelbrecht and Goldstein)

172.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138, as if fully set forth herein.

173.    Engelbrecht and Goldstein, directly or indirectly, with scienter, by use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange, for the purpose of creating a false or misleading appearance of active trading in Kensington Leasing and Wikifamilies, or a false and misleading appearance with respect to the market for Kensington Leasing and Wikifamilies, engaged in the following unlawful activity:

    a.    Entered an order or orders for the purchase of the securities with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of the securities, had been or would be entered by or for the same or different parties; or

    b.    Entered an order or orders for the sale of the securities with the knowledge that an order or orders of substantially the same size, at substantially the same time, and

at substantially the same price, for the purchase of the securities, had been or
would be entered by or for the same or different parties.

174.    Engelbrecht and Goldstein, directly or indirectly, with scienter, by use of the
mails or any means or instrumentality of interstate commerce, or of any facility of any national
securities exchange, or for any member of a national securities exchange, effected, alone or with
one or more persons, a series of transactions in Kensington Leasing and Wikifamilies securities
creating actual or apparent trading in those securities, or raising or depressing the price of those
securities, for the purpose of inducing the purchase or sale of those securities by others.

175.    By virtue of the foregoing, Engelbrecht and Goldstein have violated, and unless
enjoined will continue to violate, Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)].

### ELEVENTH CLAIM FOR RELIEF

**Regarding Casablanca**

**Violations of Sections 17(a)(2) and (3) of the Securities Act**

**(Cope and Kuhn)**

176.    The Commission realleges and incorporates by reference each and every
allegation contained in paragraphs 1 through 138, as if fully set forth herein.

177.    Defendants Cope and Kuhn directly or indirectly, singly or in concert, in the offer
and sale of securities, by the use of the means and instruments of transportation and
communication in interstate commerce and of the mails, knowingly or with reckless disregard for
the truth:  (a) obtained money or property by means of any untrue statement of a material fact or
any omission to state a material fact necessary to make the statements made, in light of the
circumstances under which they were made, not misleading; and (b) engaged in transactions,

47

practices or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

178.    By reason of the foregoing, Cope and Kuhn, singly or in concert, directly or indirectly, have violated, and unless enjoined and restrained will continue to violate, Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)].

### TWELFTH CLAIM FOR RELIEF

**Regarding Casablanca**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder (Cope and Kuhn)**

179.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138, as if fully set forth herein.

180.    Defendants Cope and Kuhn, directly or indirectly, with scienter, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, the mails, or any facility of a national securities exchange, made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).

181.    By reason of the foregoing, Cope and Kuhn directly or indirectly, have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## THIRTEENTH CLAIM FOR RELIEF

### Regarding Casablanca

### Violations of Section 15(a) of the Exchange Act

### (Cope, Kuhn and SCR)

182.   The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138, as if fully set forth herein.

183.   Defendants Cope, Kuhn and SCR, while engaged in the business of effecting transactions in securities for the account of others, made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, a security without being registered in accordance with Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

184.   Defendants Cope, Kuhn and SCR have violated, and unless restrained and enjoined will in the future violate, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## FOURTEENTH CLAIM FOR RELIEF

### Regarding Casablanca

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Thereunder

### (Cope)

185.   The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138, as if fully set forth herein.

186.   Cope, in connection with the purchase or sale of securities, directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, with scienter, has employed devices,

schemes, and artifices to defraud, and has engaged in transactions, acts, practices, and courses of business which operated as a fraud or deceit.

187.  By reason of the foregoing, Cope, directly or indirectly, has violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## FIFTEENTH CLAIM FOR RELIEF

### Regarding Casablanca

### Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act

### (Cope)

188.  The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138, as if fully set forth herein.

189.  Cope, directly or indirectly, singly or in concert, in the offer and sale of securities, by the use of the means and instruments of transportation and communication in interstate commerce and of the mails, knowingly or with reckless disregard for the truth:  (a) employed devices, schemes or artifices to defraud; and (b) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

190.  By reason of the foregoing, Cope, singly or in concert, directly or indirectly, has violated, and unless enjoined and restrained will continue to violate, Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)].

## SIXTEENTH CLAIM FOR RELIEF

### Regarding Casablanca

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (Cope, Kuhn, SCR and de Maison )

191.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138, as if fully set forth herein.

192.    The shares of Casablanca that Cope, Kuhn, SCR and de Maison sold constitute "securities" within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

193.    At all relevant times, the Casablanca shares that Cope, Kuhn, SCR and de Maison sold were not registered in accordance with the provisions of the Securities Act and no exemption from registration was applicable.

194.    Cope, Kuhn, SCR and de Maison, therefore, singly or in concert, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and to sell securities when no registration statement had been filed or was in effect as to such offers and sales of such securities and no exemption from registration was available.

195.    By reason of the activities described herein, Cope, Kuhn, SCR and de Maison, singly or in concert, directly or indirectly, have violated, and unless enjoined and restrained will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## SEVENTEENTH CLAIM FOR RELIEF

### Regarding Casablanca

### Violations of Section 9(a) of the Exchange Act

### (Cope)

196.   The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138, as if fully set forth herein.

197.   Cope, directly or indirectly, with scienter, by use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange, for the purpose of creating a false or misleading appearance of active trading in Casablanca, or a false and misleading appearance with respect to the market for Casablanca, engaged in the following unlawful activity:

   a.   Entered an order or orders for the purchase of the securities with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of the securities, had been or would be entered by or for the same or different parties; or

   b.   Entered an order or orders for the sale of the securities with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of the securities, had been or would be entered by or for the same or different parties.

198.   Cope, directly or indirectly, with scienter, by use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange, effected, alone or with one or more persons, a series of transactions in Casablanca securities creating actual or apparent trading in those

securities, or raising or depressing the price of those securities, for the purpose of inducing the purchase or sale of those securities by others.

199.    By virtue of the foregoing, Casablanca has violated, and unless enjoined will continue to violate, Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)].

## EIGHTEENTH CLAIM FOR RELIEF

### Regarding Lustros

### Violations of Sections 17(a)(2) and (3) of the Securities Act

### (SCR Defendants)

200.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138, as if fully set forth herein.

201.    The SCR Defendants, directly or indirectly, singly or in concert, in the offer and sale of securities, by the use of the means and instruments of transportation and communication in interstate commerce and of the mails, knowingly or with reckless disregard for the truth:  (a) obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (b) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

202.    By reason of the foregoing, the SCR Defendants, singly or in concert, directly or indirectly, have violated, and unless enjoined and restrained will continue to violate, Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)].

## NINETEENTH CLAIM FOR RELIEF

**Regarding Lustros**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder**

**(SCR Defendants)**

203.   The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138, as if fully set forth herein.

204.   The SCR Defendants, directly or indirectly, with scienter, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, the mails, or any facility of a national securities exchange, made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).

205.   By reason of the foregoing, the SCR Defendants directly or indirectly, have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## TWENTIETH CLAIM FOR RELIEF

**Regarding Lustros**

**Violations of Section 15(a) of the Exchange Act**

**(SCR Defendants)**

206.   The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138, as if fully set forth herein.

207.   The SCR Defendants, while engaged in the business of effecting transactions in securities for the account of others made use of the mails or the means or instrumentalities of

interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, a security without being registered in accordance with Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

208.    The SCR Defendants have violated, and unless restrained and enjoined will in the future violate, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

**TWENTY-FIRST CLAIM FOR RELIEF**

**Regarding Lustros**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder**

**(Kuhn)**

209.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138, as if fully set forth herein.

210.    Defendant Kuhn, directly or indirectly, with scienter, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, the mails, or any facility of a national securities exchange, made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).

211.    By reason of the foregoing, Defendant Kuhn, directly or indirectly, has violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## TWENTY-SECOND CLAIM FOR RELIEF

**Regarding Lustros**

**Violations of Sections 17(a)(1) of the Securities Act**

**(Kuhn)**

212.    The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 138, as if fully set forth herein.

213.    Kuhn, directly or indirectly, singly or in concert, in the offer and sale of securities,

by the use of the means and instruments of transportation and communication in interstate

commerce and of the mails, knowingly or with reckless disregard for the truth, employed

devices, schemes or artifices to defraud.

214.    By reason of the foregoing, Kuhn, singly or in concert, directly or indirectly, has

violated, and unless enjoined and restrained will continue to violate, Sections 17(a)(1) of the

Securities Act [15 U.S.C. § 77q(a)].

## TWENTY-THIRD CLAIM FOR RELIEF

**Regarding Lustros**

**Violations of Sections 5(a) and 5(c) of the Securities Act**

**(Engelbrecht, Malone, Kuhn and SCR)**

215.    The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 138, as if fully set forth herein.

216.    The shares of Lustros that Engelbrecht, Malone, Kuhn and SCR sold constitute

"securities" within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)]

and Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

217.    At all relevant times, the Lustros shares that Engelbrecht, Malone, Kuhn and SCR sold were not registered in accordance with the provisions of the Securities Act and no exemption from registration was applicable.

218.    Engelbrecht, Malone, Kuhn and SCR, therefore, singly or in concert, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and to sell securities when no registration statement had been filed or was in effect as to such offers and sales of such securities and no exemption from registration was available.

219.    By reason of the activities described herein, Engelbrecht, Malone, Kuhn and SCR, singly or in concert, directly or indirectly, have violated, and unless enjoined and restrained will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## TWENTY-FOURTH CLAIM FOR RELIEF

### Regarding Gepco

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (Cope, Engelbrecht, Mastromatteo, Malone, Gepco, Sunatco, Suprafin, Worldbridge, and Traverse)

220.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138, as if fully set forth herein.

221.    The shares of Gepco that Cope, Engelbrecht, Mastromatteo, Malone, Gepco, Sunatco, Suprafin, Worldbridge, and Traverse sold constitute "securities" within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

222. At all relevant times, the Gepco shares that Cope, Engelbrecht, Mastromatteo, Malone, Gepco, Sunatco, Suprafin, Worldbridge, and Traverse sold were not registered in accordance with the provisions of the Securities Act and no exemption from registration was applicable.

223. Cope, Engelbrecht, Mastromatteo, Malone, Gepco, Sunatco, Suprafin, Worldbridge, and Traverse, therefore, singly or in concert, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and to sell securities when no registration statement had been filed or was in effect as to such offers and sales of such securities and no exemption from registration was available.

224. By reason of the activities described herein, Cope, Engelbrecht, Mastromatteo, Malone, Gepco, Sunatco, Suprafin, Worldbridge, and Traverse, singly or in concert, directly or indirectly, have violated, and unless enjoined and restrained will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## TWENTY-FIFTH CLAIM FOR RELIEF

### Regarding Gepco

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (Engelbrecht, de Maison, Sunatco, Kuhn, SCR)

225. The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138, as if fully set forth herein.

226. The convertible promissory notes that Sunatco sold constitute "securities" within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

58

227.   At all relevant times, the convertible promissory notes that Sunatco sold were not registered in accordance with the provisions of the Securities Act and no exemption from registration was applicable.

228.   Engelbrecht, Sunatco, Kuhn, and SCR, therefore, singly or in concert, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and to sell securities when no registration statement had been filed or was in effect as to such offers and sales of such securities and no exemption from registration was available.

229.   By reason of the activities described herein, Engelbrecht, Sunatco, Kuhn, and SCR, singly or in concert, directly or indirectly, have violated, and unless enjoined and restrained will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

### TWENTY-SIXTH CLAIM FOR RELIEF

**Regarding Gepco**

**Violations of Section 10(b) of the Exchange Act and
Rule 10b-5(a) and (c) Thereunder**

**(Cope, Engelbrecht, Mastromatteo, de Maison, Malone, Kuhn, Gepco, Sunatco,
Suprafin, Worldbridge, Traverse, and SCR)**

230.   The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138, as if fully set forth herein.

231.   Cope, Engelbrecht, Mastromatteo, de Maison, Malone, Kuhn, Gepco, Sunatco, Suprafin, Worldbridge, Traverse, and SCR, in connection with the purchase or sale of securities, directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, with

scienter, have employed devices, schemes, and artifices to defraud, and have engaged in

transactions, acts, practices, and courses of business which operated as a fraud or deceit.

232.   By reason of the foregoing, Cope, Engelbrecht, Mastromatteo, de Maison,

Malone, Kuhn, Gepco, Sunatco, Suprafin, Worldbridge, Traverse, and SCR directly or indirectly,

have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15

U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## TWENTY-SEVENTH CLAIM FOR RELIEF

### Regarding Gepco

### Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act

### (Cope, Engelbrecht, Mastromatteo, de Maison, Malone, Kuhn, Gepco, Sunatco, Suprafin, Worldbridge, Traverse, and SCR)

233.   The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 138, as if fully set forth herein.

234.   Cope, Engelbrecht, Mastromatteo, de Maison, Malone, Kuhn, Gepco, Sunatco,

Suprafin, Worldbridge, Traverse, and SCR, directly or indirectly, singly or in concert, in the

offer and sale of securities, by the use of the means and instruments of transportation and

communication in interstate commerce and of the mails, knowingly or with reckless disregard for

the truth:  (a) employed devices, schemes or artifices to defraud; and (b) engaged in transactions,

practices or courses of business which operated or would operate as a fraud or deceit upon

purchasers of securities.

235.   By reason of the foregoing, Engelbrecht, Cope, Mastromatteo, de Maison,

Malone, Kuhn, Gepco, Sunatco, Suprafin, Worldbridge, Traverse, and SCR, singly or in concert,

directly or indirectly, have violated, and unless enjoined and restrained will continue to violate, Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)].

## TWENTY-EIGHTH CLAIM FOR RELIEF

### Regarding Gepco

### Violations of Section 9(a) of the Exchange Act

### (Engelbrecht and de Maison)

236.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138, as if fully set forth herein.

237.    Engelbrecht and de Maison, directly or indirectly, with scienter, by use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange, for the purpose of creating a false or misleading appearance of active trading in Gepco, or a false and misleading appearance with respect to the market for Gepco, engaged in the following unlawful activity:

　　　　a.  Entered an order or orders for the purchase of the securities with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of the securities, had been or would be entered by or for the same or different parties; or

　　　　b.  Entered an order or orders for the sale of the securities with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of the securities, had been or would be entered by or for the same or different parties.

238.    Engelbrecht and de Maison, directly or indirectly, with scienter, by use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange, effected, alone or with one or more persons, a series of transactions in Gepco securities creating actual or apparent trading in those securities, or raising or depressing the price of those securities, for the purpose of inducing the purchase or sale of those securities by others.

239.    By virtue of the foregoing, Engelbrecht and de Maison have violated, and unless enjoined will continue to violate, Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)].

## TWENTY-NINTH CLAIM FOR RELIEF

### Regarding Gepco

### Violations of Section 16(a) of the Exchange Act and Rule 16a-3 Thereunder

### (de Maison and Loshin)

240.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138, as if fully set forth herein.

241.    Section 16(a) of the Exchange Act [15 U.S.C. § 78p] and Rule 16a-3 thereunder [17 C.F.R. § 240.16a-3] require any person that directly or indirectly beneficially owns more than 10% of a company's class of stock registered under Section 12 of the Exchange Act, or who is a director or an officer of the issuer of such security, to notify the Commission within 10 days of the acquisition.

242.    Additionally, Section 16(a) of the Exchange Act requires that if there has been a change of such ownership during a month, the reporting persons shall file with the Commission a statement indicating their ownership at the end of the calendar month and the changes in that ownership that occurred during the month.  Exchange Act Rule 16a-3 requires that initial

statements of beneficial ownership be filed on Form 3, and that statements of changes in beneficial ownership be filed on Form 4.

243.    By virtue of the conduct described above, de Maison and Loshin failed to file with the Commission Forms 4 for statements of changes in beneficial ownership of their Gepco stock.

244.    As part and in furtherance of their violative conduct, de Maison and Loshin failed to timely file Forms 4 when they had a duty to do so under Section 16(a) of the Exchange Act.

245.    By reason of the foregoing, de Maison and Loshin have violated, and unless permanently enjoined, will again violate, Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rule 16a-3 [17 C.F.R. § 140.16a-3] thereunder.

## THIRTIETH CLAIM FOR RELIEF

### Regarding Gepco

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder

### (de Maison and Voutsas)

246.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138, as if fully set forth herein.

247.    Defendants de Maison and Voutsas, directly or indirectly, with scienter, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, the mails, or any facility of a national securities exchange, made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).

248.    By reason of the foregoing, de Maison and Voutsas, directly or indirectly, have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

### THIRTY-FIRST CLAIM FOR RELIEF

#### Regarding Gepco

#### Violations of Section 15(a) of the Exchange Act

#### (SCR and Kuhn)

249.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138, as if fully set forth herein.

250.    Defendants SCR and Kuhn, while engaged in the business of effecting transactions in securities for the account of others made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, a security without being registered in accordance with Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

251.    Defendants SCR and Kuhn have violated, and unless restrained and enjoined will in the future violate Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

### THIRTY-SECOND CLAIM FOR RELIEF

#### Unjust Enrichment

#### (de Maison)

252.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138, as if fully set forth herein.

253.    Relief Defendant de Maison obtained proceeds of the fraudulent scheme alleged above under circumstances in which it is not just, equitable, or conscionable for the Relief

Defendant to retain these ill-gotten gains. Relief Defendant has no legitimate claim to these funds. Relief Defendant has therefore been unjustly enriched.

254.    By reason of the foregoing, Relief Defendant de Maison should disgorge her ill-gotten gains, plus prejudgment interest thereon

### PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court issue a Final Judgment:

### I.

Permanently restraining and enjoining:

(a)    Defendants Engelbrecht, Cope, de Maison, Mastromatteo, Malone, Kuhn, Gepco, Sunatco, Suprafin, Worldbridge, Traverse, and SCR, and their agents, servants, employees and attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77q(a) and 77q(b)], pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)];

(b)    Defendants Engelbrecht, Cope, Goldstein, Mastromatteo, de Maison, Malone, Kuhn, Gepco, Sunatco, Suprafin, Worldbridge, Traverse, and SCR, and their agents, servants, employees and attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5], pursuant to Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)];

(c)     Defendants Engelbrecht, Cope, Goldstein, Mastromatteo, de Maison, Malone,
Kuhn, Gepco, Sunatco, Suprafin, Worldbridge, Traverse, and SCR and their
agents, servants, employees and attorneys, and all persons in active concert or
participation with them who receive actual notice of the injunction by personal
service or otherwise, from violating Sections 17(a)(1) and 17(a)(3) of the
Securities Act [ 15 U.S.C. § 77q(a)(1) and (a)(3)] pursuant to Section 20(b) of the
Securities Act [15 U.S.C. § 77t(b)];

(d)     Defendants Engelbrecht, Goldstein, Loshin, Wilshinsky, Harris, Tagliaferro and
Scholander, Cope, Kuhn, Alfaya, Esposito, and Barbera, and their agents,
servants, employees and attorneys, and all persons in active concert or
participation with them who receive actual notice of the injunction by personal
service or otherwise, from violating Sections 17(a)(2) and (a)(3) of the Securities
Act [ 15 U.S.C. § 77q(a)(2) and (a)(3)] pursuant to Section 20(b) of the Securities
Act [15 U.S.C. § 77t(b)];

(e)     Defendants Engelbrecht, Goldstein and de Maison and their agents, servants,
employees and attorneys, and all persons in active concert or participation with
them who receive actual notice of the injunction by personal service or otherwise,
from violating Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)] pursuant to
Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)];

(f)     Defendants de Maison and Loshin and their agents, servants, employees and
attorneys, and all persons in active concert or participation with them who receive
actual notice of the injunction by personal service or otherwise, from violating

Section 16(a) of the Exchange Act [15 U.S.C. § 78p] and Rule 16a-3 thereunder [17 C.F.R. § 240.16a-3] pursuant to Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)];

(g) Defendants Engelbrecht, Goldstein, Wilshinsky, Harris, Tagliaferro, Scholander, Cope, Kuhn, Alfaya, Esposito, Barbera, de Maison and Voutsas and their agents, servants, employees and attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)], pursuant to Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)]; and

(h) Defendants Engelbrecht, Loshin, de Maison, Cope, Alfaya, Esposito, Barbera, SCR and Kuhn and their agents, servants, employees and attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)] pursuant to Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)].

## II.

Ordering Engelbrecht, Cope, Mastromatteo, Suprafin, Sunatco, Worldbridge, and Traverse to provide a sworn accounting, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], to determine the profit reaped from the conduct described above, the location of their assets, and their ability to pay disgorgement and civil monetary penalties.

### III.

Ordering Engelbrecht, Cope, Mastromatteo, Malone, de Maison, Goldstein, Wilshinsky, Harris, Tagliaferro, Scholander, Cope, Kuhn, Alfaya, Esposito, Barbera, Kuhn, Voutsas, Loshin, Gepco, Sunatco, Suprafin, Worldbridge, Traverse, and SCR to disgorge any and all ill-gotten gains they received as a result of the violations of the federal securities laws, plus prejudgment interest thereon, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

### IV.

Ordering Engelbrecht, Goldstein, Wilshinsky, Harris, Tagliaferro, Scholander, Cope, Kuhn, Alfaya, Esposito, Barbera, Mastromatteo, Malone, de Maison, Kuhn, Voutsas, Loshin, Gepco, Sunatco, Suprafin, Worldbridge, Traverse, and SCR to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and/or Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] for violations of the federal securities laws.

### V.

Ordering Engelbrecht, de Maison, Goldstein, Wilshinsky, Harris, Tagliaferro, Scholander, Malone, Cope, Mastromatteo, Kuhn, Alfaya, Esposito, Barbera, Loshin, and Voutsas to be barred from participation in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and/or Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)].

### VI.

Ordering Malone, de Maison, Loshin, and Engelbrecht to be barred from serving as an officer or director of a public company, pursuant to Section 20(e) of the Securities Act [15

68

U.S.C. § 77t(e)] Section 21(d)(2) of the Exchange Act [15 U.S.C.§ 78u(d)(2)] for the violations

alleged herein.

## VI.

Granting such other and further relief as the Court may deem just and proper.


Dated: New York, New York
       June 12, 2015

                                          By: _____
                                              Andrew M. Calamari
                                              SECURITIES AND EXCHANGE COMMISSION
                                              Regional Director
                                              Howard A. Fischer, Senior Trial Counsel
                                              New York Regional Office
                                              200 Vesey Street, Suite 400
                                              New York, New York 10281-1022
                                              (212) 336-0589 (Fischer)
                                              Email: FischerH@SEC.gov


Of Counsel:
Amelia A. Cottrell (CottrellA@SEC.gov)
John O. Enright (EnrightJ@SEC.gov)