UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

-against-

JASON COPE, IZAK ZIRK DE MAISON (F/K/A
IZAK ZIRK ENGELBRECHT), GREGORY
GOLDSTEIN, STEPHEN WILSHINSKY, TALMAN
HARRIS, WILLIAM SCHOLANDER, JACK
TAGLIEFERRO, VICTOR ALFAYA, JUSTIN
ESPOSITO, KONA JONES BARBERA, LOUIS
MASTROMATTEO, ANGELIQUE DE MAISON,
TRISH MALONE, KIERAN T. KUHN, PETER
VOUTSAS, RONALD LOSHIN, GEPCO, LTD.,
SUNATCO LTD., SUPRAFIN LTD.,
WORLDBRIDGE PARTNERS, TRAVERSE
INTERNATIONAL, and SMALL CAP RESOURCE
CORP.,

Defendants,

And

ANGELIQUE DE MAISON,

Relief Defendant.

14 Civ. 7575 (DLC)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF SECURITIES AND
EXCHANGE COMMISSION'S REQUEST FOR AN ORDER TO SHOW CAUSE
AS TO WHY DEFAULT JUDGMENTS SHOULD NOT BE ENTERED
AGAINST DEFENDANTS TALMAN HARRIS, WILLIAM SCHOLANDER,
VICTOR ALFAYA AND KONA JONES BARBERA**

SECURITIES & EXCHANGE COMMISSION
Howard Fischer
John Enright
New York Regional Office
Brookfield Place, 200 Vesey Street
New York, New York 10281
(212) 336-0589 (Fischer)

Attorneys for Plaintiff

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

INTRODUCTION ...................................................................................................1

STATEMENT OF FACTS .......................................................................................2

I.   Defaulting Defendants Have Failed to Respond to the Complaint .........................2

II.  The Amended Complaint's Allegations ...............................................................2

    A.   The Schemes Set Out in the Amended Complaint: A Broad
    Overview .....................................................................................................2

    B.   Defaulting Defendants and their Roles in the Fraudulent
    Schemes at Issue ..........................................................................................3

        1.   The Scheme Involving Lenco ................................................................5

        2.   The Scheme Involving Lustros ..............................................................6

    C.   Defaulting Defendants' Gains from the Fraud ...........................................8

ARGUMENT ...........................................................................................................8

I.   The Court Should Enter Judgments Against the Defaulting
Defendants ...........................................................................................................8

II.  The Complaint Establishes that the Defaulting Defendants Are
Liable Under the Federal Securities Laws ............................................................9

    A.   Defendants Harris and Scholander Violated Section
    17(a)(2) and (3) of the Securities Act and Section 10(b) of
    the Exchange Act and Rule 10b-5 Thereunder (Counts One
    and Two) ......................................................................................................9

    B.   Defendants Alfaya and Barbera Violated Section 17(a)(2)
    and (3) of the Securities Act and Section 10(b) of the
    Exchange Act and Rule 10b-5 Thereunder (Counts
    Eighteen and Nineteen) ............................................................................12

    C.   Defendants Alfaya and Barbera Violated Section 15(a) of
    the Exchange Act by Brokering the Sales of Lustros Stock
    to Multiple Investors (Count Twenty) ......................................................13

III. The Commission Is Entitled to the Relief Sought ...............................................15

i

A.     Permanent Injunctions Are Warranted.......................................................15

B.     Disgorgement of Ill-Gotten Gains Is Warranted.......................................16

C.     Civil Money Penalties Should Be Imposed ...............................................20

D.     Penny Stock Bars Are Warranted ..............................................................23

CONCLUSION..........................................................................................................24

## TABLE OF AUTHORITIES

**Cases**

*Aaron v. SEC,*
    446 U.S. 680 (1980)......................................................................................................11

*Au Bon Pain Corp. v. Artect, Inc.,*
    653 F.2d 6 (2d Cir. 1981).............................................................................................8

*Basic, Inc. v. Levinson,*
    485 U.S. 224(1988)......................................................................................................11

*City of NY v. Mickalis Pawn Shop, LLC,*
    645 F.3d 114 (2d Cir. 2011).........................................................................................9

*Flaks v. Koegel,*
    504 F.2d 702 (2d Cir. 1974).........................................................................................9

*Fustok v. ContiCommodity Servs., Inc.,*
    873 F.2d 38 (2d Cir. 1989)......................................................................................9, 17

*Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.,*
    973 F.2d 155 (2d Cir. 1992).........................................................................................9

*Guggenheim Capital, LLC v. Birnbaum,*
    722 F.3d 444 (2d Cir. 2013).........................................................................................8

*Havens Realty Corp. v. Coleman,*
    455 U.S. 362 (1982)....................................................................................................23

*In re Scholastic Corp. Secs. Litig.,*
    252 F.3d 63 (2d Cir. 2001).........................................................................................12

*Otis & Co. v. SEC,*
    106 F.2d 579 (6th Cir. 1939) ......................................................................................22

*SEC v. Amerindo Inv. Advisors, Inc.,*
    2014 WL 405339 (S.D.N.Y. Feb. 3, 2014)................................................................22

*SEC v. Anticevic,*
    2010 WL 3239421 (S.D.N.Y. Aug. 16, 2010)............................................................17

*SEC v. Baldassare,*
    2014 WL 2465622 (E.D.N.Y. May 29, 2014) .......................................................11, 12

*SEC v. Blackout Media Corp.,*
  2012 WL 4051951 (S.D.N.Y. Sept. 14, 2012).................................................................18

*SEC v. Cavanagh,*
  155 F.3d 129 (2d Cir. 1998)...................................................................................15, 16

*SEC v. Colonial Inv. Mgmt. LLC,*
  381 F. App'x 27 (2d Cir. 2010) ......................................................................................21

*SEC v. Commonwealth Chem. Sec., Inc.,*
  574 F.2d 90 (2d Cir. 1978)..............................................................................................15

*SEC v. Contorinis,*
  743 F.3d 296 (2d Cir. 2014).............................................................................................17

*SEC v. First Jersey Secs., Inc.,*
  101 F.3d 1450 (2d Cir. 1996)................................................................................... *passim*

*SEC v. Forest Res. Mgmt. Corp.,*
  2010 WL 2077202 (S.D.N.Y. May 18, 2010) ......................................................20, 21, 22

*SEC v. Hansen,*
  1984 U.S. Dist. LEXIS 17835 (S.D.N.Y. Apr. 6, 1984)..................................................14

*SEC v. Hasho,*
  784 F. Supp. 1059 (S.D.N.Y. 1992).................................................................................13

*SEC v. Jean Pierre*
  2015 WL 105495 (S.D.N.Y. May 9, 2015) ......................................................................22

*SEC v. Juno Mother Earth Asset Mgmt., LLC,*
  2014 WL 1325912 (S.D.N.Y. Mar. 31, 2014) (Griesa, J.) ........................................17, 18

*SEC v. Lybrand,*
  281 F. Supp. 2d 726 (S.D.N.Y. 2003)..............................................................................20

*SEC v. Kinnucan,*
  9 F.Supp. 3d 370 (S.D.N.Y. 2014) ..................................................................................16

*SEC v. Lazare Indus., Inc.,*
  294 F. App'x 711 (3d Cir. 2008) ......................................................................................21

*SEC v. Manor Nursing Ctrs., Inc.,*
  458 F.2d 1082 (2d Cir. 1972)...........................................................................................16

iv

*SEC v. Margolin,*
   1992 WL 279735 (S.D.N.Y. Sept. 30, 1992)................................................................14

*SEC v. Martino,*
   255 F. Supp. 2d 268 (S.D.N.Y. 2003) *aff'd and remanded,*
     94 Fed. Appx. 871, 2004 U.S. App. LEXIS 7956
     (2d Cir. Apr. 22, 2004)................................................................13

*SEC v. McNulty,*
   137 F.3d 732 (2d Cir. 1998)................................................................15

*SEC v. Mgmt. Dynamics,* 515 F.2d 801(2d Cir. 1975) ................................................................15, 16

*SEC v. Monarch Funding Corp.,*
   192 F.3d 295 (2d Cir. 1999)................................................................10, 11

*SEC v. Monterosso,*
   557 Fed.Appx. 917, 2014 WL 815403 (11th Cit. 2014)................................................................10

*SEC v. Musella,*
   748 F. Supp. 1028 (S.D.N.Y. 1989)................................................................16

*SEC v. Northshore Asset Mgmt.,*
   2008 WL 1968299 (S.D.N.Y. May 5, 2008) ................................................................10

*SEC v. Opulentica LLC,*
   479 F. Supp. 2d 319 (S.D.N.Y. 2007)................................................................20, 21

*SEC v. Palmisano,*
   135 F.3d 860 (2d Cir. 1998)................................................................20

*SEC v. Patel,*
   61 F.3d 137 (2d Cir. 1995)................................................................23

*SEC v. Rabinovich & Assocs.,*
   2008 WL 4937360 (S.D.N.Y. 2008)................................................................13

*SEC v. Savino,*
   2006 WL 375074 (S.D.N.Y. Feb.16, 2006)................................................................11

*SEC v. Schiffer,*
   1998 WL 226101 (S.D.N.Y. May 5, 1998) ................................................................22

*SEC v. Scott,*
   565 F.Supp. 1513 (S.D.N.Y. 1983) ................................................................11

*SEC v. Softpoint, Inc*
   958 F. Supp. 846 (S.D.N.Y. 1997) ...........................................................11

*SEC v. Universal Exp.,*
   475 F.Supp. 2d 412 (S.D.N.Y 2007)..........................................................22

*SEC v. Wang,*
   699 F. Supp. 44 (S.D.N.Y. 1988) ..............................................................19

*SEC v. Warde,*
   151 F.3d 42 (2d Cir. 1998)........................................................................17

*Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.,*
   109 F.3d 105 (2d Cir. 1997).......................................................................9

*Vt. Teddy Bear Co. v. 1-800 Beargram Co.,*
   373 F.3d 241 (2d Cir. 2004).......................................................................9

*Walt Disney Co. v. Best*, 1990
   WL 144209 (S.D.N.Y. Sep. 26, 1990).........................................................9

**Rules and Statutes**
Federal Rule of Civil Procedure 55(b)(2) .....................................................1
Local Rule 55.2(b) .......................................................................................1

**Securities Act of 1933**
15 U.S.C. § 77t(b)......................................................................................15
15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)........................................................6, 8
Section 17(a) ........................................................................................ *passim*
Section 17(a)(2) ..........................................................................................10
Section 17(a)(2) and (a)(3)........................................................................6, 8
Section 17(a)(3) ..........................................................................................10
Section 20(b)...............................................................................................15
Section 20(d)..........................................................................................19, 20
Section 20(d)(C).........................................................................................21
Section 3(a)(4)(A)...................................................................................13, 14
Sections 17(a)(2).....................................................................................10, 12

**Securites Exchange Act of 1934**
15 U.S.C. § 77q(a) ......................................................................................10
15 U.S.C. § 78o(a) ........................................................................................8
15 U.S.C. § 78u(d)(3) .............................................................................15, 20
17 C.F.R. § 240.10b-5(b) ..........................................................................6, 8
Section 10(b) ........................................................................................ *passim*
Section 15(a) .......................................................................................8, 13, 14
Section 21(d)(3) .................................................................................... *passim*

Pursuant to Federal Rule of Civil Procedure 55(b)(2) and Local Rule 55.2(b), Plaintiff Securities and Exchange Commission ("Commission") respectfully submits this memorandum of law in support of its application for an Order to Show Cause as to why default judgments should not be entered against Defendants Talman Harris ("Harris"), William Scholander ("Scholander"), Victor Alfaya ("Alfaya"), and Kona Jones Barbera ("Barbera") (collectively, the "Defaulting Defendants").

## INTRODUCTION

As alleged in the Commission's June 12, 2015 Amended Complaint ("Am. Cmplt."), this case involves a series of manipulative schemes involving the common stock of various microcap issuers by, among others, the Defaulting Defendants that are the subject of this application.[1] The application at bar relates to manipulative activities in the shares of two of those issuers: (1) Lenco (involving Harris and Scholander) occurring in the time period of February 2008 and June 2011(Am. Cmplt. ¶¶ 47, 49) and (2) Lustros (involving Alfaya and Barbera) occurring in the time period of June 2012 through January 2014. Am. Cmplt. ¶¶ 85, 88.

The Commission properly served Defaulting Defendants with the Summons and Amended Complaint in this matter. However, they have failed to answer, plead, or otherwise defend this action. Accordingly, the Commission respectfully requests that the Court enter an Order to Show Cause as to why default judgments should not be entered against them. For the reasons set forth below, the Commission submits that the record before the Court demonstrates that the Order to Show Cause should be issued and default judgments should be entered at the hearing on January 10, 2016 against the Defaulting Defendants, imposing (1) permanent

---

[1]     These issuers include including Lenco Mobile Inc., ticker symbol LNCM ("Lenco"); Kensington Leasing, Ltd., ticker symbol KNSL ("Kensington Leasing"); Wikifamilies Inc., ticker symbol WFAM ("Wikifamilies"); Casablanca Mining Ltd., ticker symbol CUAU ("Casablanca"); Lustros Inc. ticker symbol LSTS ("Lustros"); and Gepco, Ltd., ticker symbol GEPC ("Gepco") (collectively, the "Fraudulent Issuers").

injunctions against future violations of the securities laws; (2) disgorgement of their ill-gotten

gains, plus prejudgment interest on those amounts; (3) civil penalties; and (4) penny stock bars.

## STATEMENT OF FACTS

### I.    Defaulting Defendants Have Failed to Respond to the Complaint

On June 12, 2015, the Commission filed the Amended Complaint against, *inter alia*,

Harris, Scholander, Alfaya and Barbera. Declaration of John O. Enright, dated December 18,

2015 ("Enright Decl.") ¶ 3 & Ex. 1. After filing the Amended Complaint, the Clerk issued

summonses to these Defaulting Defendants, and they were served upon them. *Id.* ¶¶ 4-8, & Exs.

2-9. None of the Defaulting Defendants has submitted an Answer to the Amended Complaint, or

has responded in any fashion, and certificates of default have been obtained as to each. *Id.*, ¶¶ 9-

12 and Exs. 1-13. Their time to do so has expired.

The Commission has made numerous attempts to contact each of the Defaulting

Defendants and to propose some potential resolution of the action as against them. Those efforts

have proven unsuccessful. Enright Decl. ¶ 13.

### II.    The Amended Complaint's Allegations

#### A.    The Schemes Set Out in the Amended Complaint: A Broad Overview

This case concerns a series of sophisticated fraudulent schemes orchestrated between

2008 and 2014 by Izak Zirk de Maison (f/k/a Izak Zirk Engelbrecht) ("Englebrecht")[2] and a

series of confederates, including the Defaulting Defendants that are the subject of this

application. Engelbrecht describes these schemes in his December 14, 2015 Declaration,

("Engelbrecht Decl."), which is annexed as Exhibit A to the Enright Declaration.

To further these fraudulent schemes, Engelbrecht would cause each issuer to issue tens of

---

[2] On October 13, 2015, the Court entered a Consent and Judgment relating to Engelbrecht and two of the other defendant entities controlled by him, Sunatco Ltd. and Suprafin Ltd. (Docket Entries 176 and 177).

millions of shares of restricted stock to him and his nominees, which he then used for two types of illegal distributions.

In the first type of illegal distribution, Engelbrecht, along with his confederates, illegally sold the shares into the public market by inducing others to place buy orders in their customers' accounts with the purpose of matching trades with Engelbrecht's sales. Am. Cmplt. ¶ 3. Harris and Scholander participated in this kind of scheme in connection with the issuer Lenco. Enright Decl. ¶ 16; Engelbrecht Decl. ¶¶ 2-8.

In the second type of illegal distribution, Engelbrecht and his confederates paid unregistered individuals undisclosed commissions to cause investors to buy shares of Lustros in purported private placements and in the open market. Am. Cmplt. ¶ 4. Alfaya and Barbera participated in this kind of scheme in connection with the issue Lustros. Enright Decl. ¶ 16; Engelbrecht Decl. ¶¶ 9-14.

**B.    Defaulting Defendants and their Roles in the Fraudulent Schemes at Issue**

Harris, age 38, has been employed as a registered representative with numerous firms. Between 2000 and 2013, Harris was a registered representative associated with Investec Ernst & Company; Spencer Clarke LLC; Joseph Stevens & Company, Inc.; Ehrenkrantz King Nussbaum, Inc.; Harrison Securities Inc.; Benchmark Securities; New York Global Securities, Inc.; Legend Securities, Inc.; Basic Investors, Inc.; Martinez Ayme Securities; Seaboard Securities, Inc.; First Merger Capital, Inc.; and Radnor Research & Trading Company LLC.  On August 16, 2013, a FINRA Hearing Panel barred Harris from associating with any FINRA-member firm. That decision was affirmed by FINRA's National Adjudicatory Council on December 29, 2014. Harris has appealed that decision to the Commission, which is pending. On March 4, 2015, the Commission denied his motion to stay imposition of the bar pending his appeal. Am. Cmplt ¶ 16.

3

Harris is a defendant in a criminal complaint pending in the United States District Court for the Northern District of Ohio entitled *United States v. William Scholander, Talman Harris, Jack Taglieferro, Victor Alfaya and Justin Esposito*, 15 Cr. 335.

Scholander, age 39, has also been employed as a registered representative with numerous firms. Between 2000 and 2013, Scholander was a registered representative associated with Cambridge Capital, LLC; Prestige Financial Center, Inc.; Harrison Securities, Inc.; Benchmark Securities Group, Inc.; New York Global Securities, Inc.; Legend Securities, Inc.; Basic Investors Inc.; Martinez-Ayme Securities; Seaboard Securities, Inc.; First Merger Capital, Inc.; and Radnor Research & Trading Company LLC.  On August 16, 2013, a FINRA Hearing Panel barred Scholander from associating with any FINRA-member firm. That decision was affirmed by FINRA's National Adjudicatory Council on December 29, 2014. Scholander has appealed that decision to the Commission, which is pending. On March 4, 2015, the Commission denied his motion to stay imposition of the bar pending his appeal. Am. Cmplt ¶ 17. Scholander is a defendant in a criminal complaint pending in the United States District Court for the Northern District of Ohio entitled *United States v. William Scholander, Talman Harris, Jack Taglieferro, Victor Alfaya and Justin Esposito*, 15 Cr. 335.

Victor Alfaya, age 38, has never been registered with the Commission.  Alfaya worked for Kieran Kuhn, another defendant in this action, at Small Cap Resource Corp. ("SCR") between 2011 and September 2014.[3] Am. Cmplt ¶ 22. SCR claimed to be an investor-relations firm that published a subscription-based newsletter that purportedly offered unbiased investment advice. In reality, Engelbrecht paid SCR to use the newsletter to tout the stock of companies he controlled, including Casablanca, Lustros, and Gepco. Am. Cmplt ¶ 21. Alfaya is a defendant in a criminal complaint pending in the United States District Court for the Northern District of Ohio

---

[3] Settlement papers for Kuhn and SCR were submitted to the Orders and Judgment Clerk on December 17, 2015.

4

entitled *United States v. William Scholander, Talman Harris, Jack Taglieferro, Victor Alfaya and Justin Esposito*, 15 Cr. 335.

Kona Jones Barbera, age 35, resides in Asheville, North Carolina. Barbera has never been registered with the Commission. Barbera has been indicted for marijuana trafficking and is awaiting trial in *United States v. Hezi*, 12 Cr. 20024 (E.D. Mich.). Barbera worked for Kuhn at SCR between May 2012 and November 2013. Am. Cmplt ¶ 23. Barbera is a defendant in a criminal complaint pending in the United States District Court for the Northern District of Ohio entitled *Kona Jones Barbera*, 15. Cr. 287., and has pleaded guilty to Count 1 of the Information in that case, which charged Conspiracy to Commit Securities Fraud, 18 U.S.C. § 1348; and Wire Fraud, 18 U.S.C. § 1343; in violation of 18 U.S.C. § 1349..

The schemes involving the Fraudulent Issuers, which transpired between approximately 2008 and 2014, followed the same general blueprint. Engelbrecht caused each issuer to issue tens of millions of shares of restricted stock to him and his nominees, which he then used for two types of illegal distributions. Am. Cmplt. ¶ 43.

1. The Scheme Involving Lenco

With respect to Lenco, Engelbrecht paid both Harris and Scholander undisclosed commissions to use the discretionary authority they had over their customers' accounts to buy Lenco stock in those accounts, usually in an effort to match Engelbrecht's sell orders. Am. Cmplt ¶ 47; Engelbrecht Decl. ¶¶ 2-4.

As consideration for buying Lenco stock and matching trades with Engelbrecht in their customers' accounts, Engelbrecht paid Harris and Scholander between 30% and 50% of the proceeds of each matched trade. Harris and Scholander did not disclose to their customers that Engelbrecht was inducing them to buy Lenco stock in their accounts for the purpose of allowing

5

Engelbrecht to liquidate his Lenco shares. Am. Cmplt ¶ 48. The parties understood that the commission arrangement had to be concealed from investors, for if it was revealed investors would never agree to buy shares. Engelbrecht Decl. ¶ 5.

Between February 13, 2008 and November 12, 2009, Engelbrecht made at least 29 commission payments to Harris, totaling $775,104, in exchange for Harris buying shares of Lenco (and its immediate predecessor, Sovereign Wealth Corporation) in his customers' accounts, usually in an effort to match Engelbrecht's sales. Am. Cmplt ¶ 49; Enright Decl. ¶ 21, Exs.14-15.

Between February 13, 2008 and November 12, 2009, Engelbrecht made at least 19[4] commission payments to Scholander totaling more than $225,880 in exchange for Scholander buying shares of Lenco (and its immediate predecessor, Sovereign Wealth Corporation) in his customers' accounts, usually in an effort to match Engelbrecht's sales. Am. Cmplt ¶ 49; Enright Decl. ¶ 22, Exs. 14, 16. Engelbrecht also purchased high-end luxury automobiles for both Harris and Scholander, and paid their office rent on several occasions. Engelbrecht Decl. ¶ 8.

As a result of this conduct, both Harris and Scholander engaged in acts, practices, and courses of business that constituted violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)], and Section 17(a)(2) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

2. The Scheme Involving Lustros

With respect to Lustros, between June 2012 and January 2014, Engelbrecht paid undisclosed commissions to Kuhn to solicit investors to buy Lustros stock from his nominees Suprafin and Walker River. Kuhn in turn paid undisclosed commissions to Alfaya and Barbera to

---

[4] While the First Amended Complaint asserts that there were 32 such payments, the Commission's more recent analysis indicates 19 such payments were made to Scholander.

solicit those investments. Am. Cmplt ¶ 85. Engelbrecht Decl. ¶ 9.

Kuhn, along with Alfaya and Barbera, falsely represented to investors that the sales of Lustros stock were part of a "private placement," but in reality they were conducting a general solicitation by cold calling potential investors nationwide identified in lead sheets. Am. Cmplt ¶ 86; *see also* Engelbrecht Decl. ¶ 10. When Alfaya and Barbera convinced an investor to buy Lustros stock, they would negotiate the amount of the purchase, send the investor the subscription agreement signed by Engelbrecht, and then arrange with defendant Trish Malone ("Malone")[5] to have stock certificates representing those restricted shares sent to the investors. *Id*. Kuhn, Alfaya, and Barbera did not disclose to the investors they solicited that Engelbrecht was paying Kuhn or that Kuhn was paying Alfaya and Barbera commissions to sell the securities. *Id*.; *see also* Engelbrecht Decl. ¶¶ 11-12.

As part of this nationwide cold calling campaign to solicit investors to buy Lustros stock pursuant to subscription agreements with Engelbrecht nominees like Suprafin, Alfaya and Barbera negotiated the amounts of the purchases, sent investors the subscription agreements, and arranged for Malone to send the investors stock certificates when the transactions were completed. They also solicited investors to buy Lustros in the public market, in which case they would prescribe the price and quantity of shares the investor should purchase. For each investor's share purchase, Kuhn would pay the SCR Defaulting Defendants transaction-based commissions. Am. Cmplt ¶ 87.

In sum, Kuhn, through the SCR Defaulting Defendants and other SCR employees, sold approximately $2 million worth of Lustros shares to various investors nationwide. Between May 18, 2012 and March 15, 2013, Kuhn made 46 payments to Alfaya totaling $136,540, which

---

[5] On October 8, 2015, the Court entered a Consent and Judgment relating to Malone (Docket Entries 172 and 172-1).

included the undisclosed commissions he received for soliciting and then brokering the sales of

Lustros stock to multiple investors (Enright Decl. ¶ 23, Exs.27-18); between May 18, 2012 and

January 18, 2013. Barbera received 32 payments totaling $252,520, which included the

undisclosed commissions he received for soliciting and then brokering the sales of Lustros stock

to multiple investors. Am. Cmplt ¶ 88; Enright Decl. ¶ 24, Exs. 18-19.

As a result of this conduct, Alfaya and Barbera engaged in acts, practices, and courses of

business that constituted violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)

thereunder [17 C.F.R. § 240.10b-5(b)]; Section 17(a)(2) and (a)(3) of the Securities Act [15

U.S.C. §§ 77q(a)(2) and 77q(a)(3)]; and of Section 15(a) of the Exchange Act [15 U.S.C. §

78o(a)].

### C.   Defaulting Defendants' Gains from the Fraud

As set forth above, the Defaulting Defendants benefitted from the above scheme as

follows:

| | |
|---|---|
| Harris: | $775,104 |
| Scholander: | $225,880 |
| Alfaya: | $136,540 |
| Barbera: | $252,520 |

## ARGUMENT

### I.   The Court Should Enter Judgments Against the Defaulting Defendants

The Court may enter judgment against a defendant when the defendant willfully does not

answer the Complaint, *see Guggenheim Capital, LLC v. Birnbaum*, 722 F.3d 444, 455 (2d Cir.

2013),  Where, as here, a defendant defaults, the Court should accept as true all of the factual

allegations of the Complaint, except those relating to damages. *See Au Bon Pain Corp. v. Artect,*

*Inc.*, 653 F.2d 61, 65 (2d Cir. 1981); *see also Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373

8

F.3d 241, 246 (2d Cir. 2004) (noting that Rule 55 default motions track "the ancient common law axiom that a default is an admission of all well-pleaded allegations against the defaulting party"). The legal effect of a default judgment is to establish conclusively the occurrence of the violations alleged in the Complaint. *See Walt Disney Co. v. Best*, 1990 WL 144209, at *3 (S.D.N.Y. Sep. 26, 1990) ("It is settled that a default judgment entered on well-pleaded allegations in a complaint establishes a defendant's liability"). If the Court determines that these allegations establish a defendant's liability "as a matter of law," a default judgment is normally entered, *City of NY v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011) (citations omitted).

"While a default judgment constitutes an admission of liability, the quantum of damages remains to be established by proof unless the amount is liquidated or susceptible of mathematical computation." *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974); *see also Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992). Nonetheless, a court need not make this determination through a hearing. Rather, a court may rely on detailed affidavits or documentary evidence to determine the appropriate sum. *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997) (quoting *Fustok v. ContiCommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989)).

## II. The Complaint Establishes that the Defaulting Defendants Are Liable Under the Federal Securities Laws

### A. Defendants Harris and Scholander Violated Section 17(a)(2) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder (Counts One and Two)

Each and every element of these claims has been satisfied. Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder prohibit any person, in connection with the purchase or sale of any security, from, directly or indirectly, making, with scienter, any untrue statement of material

9

fact or omitting to state a material fact necessary in order to make the statements made, in light

of the circumstances under which they were made, not misleading. *SEC v. First Jersey Secs.,*

*Inc.,* 101 F.3d 1450, 1467 (2d Cir. 1996); *accord SEC v. Northshore Asset Mgmt.*, 2008 WL

1968299, at *6 (S.D.N.Y. May 5, 2008) (citations omitted). To make out a Section 10(b) and

Rule 10b-5(b) claim, the Commission must sufficiently allege that a defendant (1) made a

material misrepresentation or a material omission as to which he had a duty to speak, (2) with

scienter, and (3) in connection with the purchase of or sale of securities. *SEC v. Monarch*

*Funding Corp.,* 192 F.3d 295, 308 (2d Cir. 1999).

Securities Act Section 17(a) makes it unlawful, in the offer or sale of a security, to use

interstate commerce, directly or indirectly: under Section 17(a)(2), to obtain money or property

by means of any material misrepresentation or omission of fact; and under Section 17(a)(3), to

"engage in any transaction, practice, or course of business which operates or would operate as a

fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a). *See also SEC v. Monterosso*, 557

Fed.Appx. 917, 2014 WL 815403 (11th Cit. 2014)("To show a violation of section 17(a)(2) or

17(a)(3), the SEC need only demonstrate (1) material misrepresentations or materially

misleading omissions, (2) in the offer or sale of securities, (3) made with negligence.")

The Amended Complaint contains sufficient well-pleaded facts to find that each element

of these causes of action is satisfied here.

Harris and Scholander are liable for violating Section 10(b) of the Exchange Act, Rule

10b-5(b) thereunder, and Sections 17(a)(2) and (a)(3) of the Securities Act. First, they did not

disclose the commission payments from Engelbrecht to their customers, the fact of which they

knew or should have known would have been material to them. To prove violations based on

misrepresentations or omissions under Securities Act Section 17(a)(2) and Exchange Act Rule

10

10b-5(b), the Commission must show that the misrepresentations or omissions were material. *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996). A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision and having significantly altered the total mix of information. *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

Courts have repeatedly held that the failure to disclose to an investor that the issuer has paid a commission to a stockbroker in exchange for the broker's purchase of the issuer's securities in the customer's account constitutes a material omission under Section 10(b) of the Exchange Act, Rule 10b-5(b) thereunder, and Section 17(a) of the Securities Act. *SEC v. Baldassare*, 2014 WL 2465622, at *5 (E.D.N.Y. May 29, 2014) ("[A] reasonable investor would certainly consider the knowledge that her stockbroker was receiving kickbacks to be important in deciding whether to buy the at-issue stock, since such payments necessarily affect a stockbroker's judgment."); *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 863 (S.D.N.Y. 1997) (Sotomayor, J.) ("[A]n apparent kickback agreement between an issuer and an underwriter is material because it 'raises an inherent conflict of interest.'") (citing *SEC v. Scott*, 565 F.Supp. 1513, 1527 (S.D.N.Y. 1983)). *See also SEC v. Savino,* 2006 WL 375074, at *13–14 (S.D.N.Y. Feb.16, 2006).

In addition, for a violation under Rule 10b-5(b), the Commission must prove that Defaulting Defendants acted with scienter.[6] *Aaron v. SEC*, 446 U.S. 680, 695 (1980). With respect to scienter, the Second Circuit has held that scienter may be established by proof of conscious misbehavior or recklessness, including that "the defendant[] knew facts or had access

---

[6]    A showing of negligence is sufficient to establish a violation of Section 17(a)(2) or (3) of the Securities Act.  *See Aaron*, 446 U.S. at 701-02; *SEC v. Monarch Funding*, 192 F.3d 295, 308 (2d Cir. 1999)

to non-public information, contradicting [his] public statements." *In re Scholastic Corp. Secs. Litig.*, 252 F.3d 63, 74, 76 (2d Cir. 2001).

Harris and Scholander acted with scienter by accepting the payments and concealing them from their customers. Furthermore, an issuer who pays a commission to a broker and agrees to conceal the fact of the commission payment from an investor acts with the requisite scienter under Rule 10b-5(b). *See Baldassare*, 2014 WL 2465622, at *6. Furthermore, the "in connection with" requirement is met where, as is the case here, the concealment of a commission arrangement is intended to induce the purchase of a security because it's meant to influence the investor to buy the stock without affording the investor the opportunity to know of the secret arrangement. *Id.* Intent is further shown by the fact that they agreed to conceal the payments from their customers, as well as by the fact that they both directed Engelbrecht to make the payments to others to avoid creating a paper trail that would enable regulators and legal authorities to track their wrongful acts. Engelbrecht Decl. ¶¶ 6-7.

In addition, Harris and Scholander obtained money as a result of the trades, which was accepted "in connection with" their purchases of the stock in their customers' accounts. *See SEC v. Hasho*, 784 F. Supp. 1059, 1110 (S.D.N.Y. 1992) ("Misrepresenting or omitting to disclose a broker's financial or economic incentive in connection with a stock recommendation constitutes a violation of the anti-fraud provisions.").

### B.   Defendants Alfaya and Barbera Violated Section 17(a)(2) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder (Counts Eighteen and Nineteen)

For the same reasons discussed immediately above, Alfaya and Barbera are also liable for violating Section 10(b) of the Exchange Act, Rule 10b-5(b) thereunder, and Sections 17(a)(2) and (3) of the Securities Act. First, they did not disclose to their customers that Kuhn was paying

them commissions, the fact of which surely would have been material to the customers. Second, they acted with scienter by accepting the payments and concealing them from their customers. *See* Engelbrecht Decl.¶¶ 11-13. Third, they obtained money as a result of the stock sales, which they accepted "in connection with" the transactions because the commissions induced them to effect the sales. *See SEC v. Hasho*, 784 F. Supp. 1059, 1110 (S.D.N.Y. 1992) ("Misrepresenting or omitting to disclose a broker's financial or economic incentive in connection with a stock recommendation constitutes a violation of the anti-fraud provisions.").

**C.    Defendants Alfaya and Barbera Violated Section 15(a) of the Exchange Act by Brokering the Sales of Lustros Stock to Multiple Investors (Count Twenty)**

Section 15(a)(1) of the Exchange Act makes it unlawful for any broker or dealer to use jurisdictional means, such as the telephone or mails, to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security unless such broker or dealer: (1) is registered with the Commission; (2) in the case of a natural person, is an associated person of a registered broker-dealer; or (3) satisfies the conditions of a safe harbor or exemption, none of which is relevant in this case.  A showing of scienter is not required to prove a violation of Section 15(a). *SEC v. Rabinovich & Assocs.*, 2008 WL 4937360, at *5 (S.D.N.Y. 2008). Section 3(a)(4)(A) of the Exchange Act broadly defines "broker" as one who "engaged in the business of effecting transactions in securities for the account of others." In determining whether a particular individual or entity falls within this definition, courts consider whether the individual may be "characterized by 'a certain regularity of participation in securities transactions at key points in the chain of distribution.'" *SEC v. Martino,* 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003), *aff'd and remanded*, 94 Fed. Appx. 871, 2004 U.S. App. LEXIS 7956 (2d Cir. Apr. 22, 2004) (*quoting SEC v. Hansen*, 1984 U.S. Dist. LEXIS 17835, at *10 (S.D.N.Y. Apr. 6, 1984)); *see also SEC v.*

13

*Margolin,* No. 1992 WL 279735, at \*5 (S.D.N.Y. Sept. 30, 1992) ("brokerage" conduct may include receiving transaction-based income, advertising for customers, and possessing client funds and securities). Courts also consider whether the individual (1) is an employee of the issuer; (2) received commissions as opposed to a salary; (3) is selling, or previously sold, the securities of other issuers; (4) is involved in negotiations between the issuer and the investor; (5) makes valuations as to the merits of the investment or gives advice; and (6) is an active rather than passive finder of investors. *Hansen*, 1984 U.S. Dist. LEXIS 17835, at \*10.

Alfaya and Barbera actively sought out investors to buy Lustros stock, transmitted and took part in the drafting and negotiation of the agreements governing the sales, and received transaction-based compensation for each sale in the form of undisclosed commissions. As a result, they are brokers within the meaning of Section 3(a)(4)(A).

Between June 2012 and January 2014, Alfaya and Barbera solicited investors in a nationwide cold calling campaign to buy Lustros stock pursuant to subscription agreements with Engelbrecht nominees like Suprafin. They negotiated the amounts of the purchases, sent investors the subscription agreements, and arranged for Malone to send the investors stock certificates when the transactions were completed. They also solicited investors to buy Lustros in the public market, in which case they would prescribe the price and quantity of shares the investor should purchase. For each investor's share purchase, Kuhn would pay them transaction-based commissions. Am. Cmplt. ¶¶ 87-88.

Thus, Alfaya, and Barbera violated Section 15(a) of the Exchange Act by acting as unregistered brokers.

14

III.    **The Commission Is Entitled to the Relief Sought**

The Commission is entitled to the forms of relief set forth in the introduction of this

memorandum, which are addressed separately below.

A.    **Permanent Injunctions Are Warranted**

The Complaint seeks injunctive relief, permanently enjoining Defaulting Defendants

from further violations of the federal securities laws that they violated as set forth above.

Permanent injunctions may be ordered as part of a judgment by default upon a finding by the

Court that a factual basis for such relief exists. *See, e.g., SEC v. McNulty*, 137 F.3d 732. 736-37

(2d Cir. 1998); *SEC v. Mgmt. Dynamics*, 515 F.2d 801, 814 (2d Cir. 1975).

Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d)(3) of the

Exchange Act, 15 U.S.C. § 78u(d)(3), authorize the Commission to seek injunctive relief upon a

showing that (1) violations of the securities laws have occurred, and (2) a reasonable likelihood

exists that violations will occur in the future. *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir.

1998); *SEC v. Commonwealth Chem. Sec., Inc.,* 574 F.2d 90, 99–100 (2d Cir. 1978). Unlike

private litigants, the Commission need not show risk of irreparable injury or the unavailability of

remedies at law in a request for injunctive relief. *See Management Dynamics, Inc.*, 515 F.2d at

808-09 (standards of public interest, not requirement of private litigation, govern Commission

requests for injunctive relief).

Here, as set forth above, the Commission has demonstrated that Defaulting Defendants

violated the federal securities laws. With respect to the second part of the test, to determine

whether there is a reasonable likelihood that a defendant will commit future violations, courts

generally consider:

> the fact that the defendant has been found liable for illegal conduct;  the degree of
> scienter involved;  whether the infraction is an 'isolated occurrence';  whether
> defendant continues to maintain that his past conduct was blameless; and whether,

> because of his professional occupation the defendant might be in a position where
> future violations could be anticipated.

*SEC v. Kinnucan*, 9 F.Supp. 3d 370, 375 (S.D.N.Y. 2014) (quoting *SEC v. Cavanagh*, 155 F.3d

129, 135 (2d Cir. 1998)); *see also Mgmt. Dynamics*, 515 F.2d at 814 ("Certainly, the commission

of past illegal conduct is highly suggestive of the likelihood of future violations. . . . [C]essation

of illegal activity does not ipso facto justify the denial of an injunction.") (citations omitted).

"Fraudulent past conduct" supports "an inference of a reasonable expectation" of future

violations, *SEC v. Musella*, 748 F. Supp. 1028, 1042 (S.D.N.Y. 1989) (citing *SEC v. Manor

Nursing Ctrs., Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972)), and a permanent injunction is

particularly warranted where, as here, the alleged misconduct involves "systematic wrongdoing,

rather than an isolated occurrence." *First Jersey Secs., Inc.*, 101 F.3d at 1477 (quotations

omitted).

In this case, injunctive relief is clearly warranted. The Defaulting Defendants' conduct

was not an isolated occurrence, but occurred over a significant period of time, and involved

numerous victims. Enright Decl. ¶ 19; *see generally* Engelbrecht Decl.

Nor have Defaulting Defendants recognized their wrongful conduct or given assurances

that they will not commit future violations. Such activity on the part of Defaulting Defendants

evinces a cavalier attitude toward these proceedings and the harm caused by their conduct. In

short, it demonstrates a strong probability of future violations.

For these reasons, a permanent injunction precluding Defaulting Defendants from future

violations of the federal securities laws that they violated here.

### B.   Disgorgement of Ill-Gotten Gains Is Warranted

The "primary purpose of disgorgement as a remedy for violation of the securities laws is

to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of

16

those laws." *First Jersey*, 101 F.3d at 1474; *SEC v. Juno Mother Earth Asset Mgmt., LLC*, 2014 WL 1325912, at *2-3 (S.D.N.Y. Mar. 31, 2014) ("Through disgorging any ill-gotten gain, the court returns the Defaulting Defendants to their status quo prior to the wrongdoing."). "Because disgorgement's underlying purpose is to make lawbreaking unprofitable for the law-breaker, it satisfies its design when the lawbreaker returns the fruits of his misdeeds, regardless of any other ends it may or may not accomplish." *SEC v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014).

A court may award disgorgement and prejudgment interest on a default motion without holding an evidentiary hearing, where, as here, the existing record is sufficient to establish the appropriate amount to be disgorged. *See Fustock v. ContiCommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989) (detailed affidavits, documentary evidence and a judge's knowledge formed sufficient basis for damages awarded in default judgment).

A district court has broad discretion not only in determining whether to order disgorgement but also in calculating the amount to be disgorged. *Id.* (quoting *First Jersey*, 101 F.3d at 1474-75).; *see also SEC v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014) "In meeting its burden for disgorgement, the '[p]laintiff is not required to trace every dollar of proceedings . . . nor . . . required to identify misappropriated monies which have been commingled . . . .'" *SEC v. Anticevic*, 2010 WL 3239421, at *5 (S.D.N.Y. Aug. 16, 2010) (internal citation omitted) (default judgment). "[D]isgorgement need only be a reasonable approximation of profits causally connected to the violation. So long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty." *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998).

Once the Commission has met its burden to come forward with a reasonable approximation of profits causally connected to the violation, "the burden shifts to the defendant[]

17

to contest the Government's calculations." *Juno Mother Earth*, 2014 WL 1325912, at \*2.  No different rules apply with respect to a disgorgement request made as part of a motion for a default judgment. *See, e.g., SEC v. Blackout Media Corp.*, 2012 WL 4051951, at \*2 (S.D.N.Y. Sept. 14, 2012) (granting disgorgement as part of a default judgment on the basis of supporting documentation).

Here, as set forth in greater detail in the accompanying Enright Declaration, each of the Defaulting Defendants received substantial compensation as a result of their violations of the securities laws:

- Harris received $775,104 from Engelbrecht in 29 increments in exchange for his buying shares of Lenco for the accounts of customers over which he exercised discretionary authority. Enright Decl. ¶ 21, Exs. 14-15.

- Scholander received $225,880 from Engelbrecht in 19 increments in exchange for his buying shares of Lenco for the accounts of customers over which he exercised discretionary authority. Enright Decl. ¶ 22, Exs. 14, 16.

- Alfaya received $136,540 from Kuhn in 46 increments between May 2012 and March 2013 for brokering shares of Lustros to unsuspecting investors. Enright Decl. ¶ 23, Exs. 17-18.

- Barbera received $252,520 from Kuhn in 32 increments between May 2012 and January 2013 for brokering shares of Lustros to unsuspecting investors. Enright Decl. ¶ 24, Exs. 18-19.

The Court should also grant the Commission prejudgment interest on Defaulting Defendants' disgorgement. The Court has discretion as to whether to grant prejudgment interest on the amount to be disgorged and the applicable rate. The grant of prejudgment interest "is

18

intended to deprive the wrongdoer of the benefit of holding the illicit gains over time by reasonably approximating the cost of borrowing such gain from the government." *Contorinis*, 743 F.3d at 308. Typically, courts apply the IRS underpayment rate to the amount to be disgorged. *See, e.g., First Jersey*, 101 F.3d at 1476-77 (approving of that rate).

Accordingly, the Commission respectfully requests that the Court award it prejudgment interest, compounded at the IRS underpayment rate, on the total disgorgement amount referenced above. As of December 18, 2015, prejudgment interest (calculated from the date of the last payment each person received) was as follows:  $166,955.41 for Harris; $48,653.97 for Scholander; $11,336.81 for Alfaya; and $22,292.79 for Barbera. Enright Decl. ¶ 25, Ex. 20.

### C.   Civil Money Penalties Should Be Imposed

In addition, to disgorgement, the Court should also order Defaulting Defendants to pay a third-tier penalty, as set forth in more detail below. "[B]ecause disgorgement represents merely a return of ill-gotten gains," courts recognize that "an additional monetary penalty is necessary to appropriately punish and deter . . . fraudulent activities." *SEC v. Forest Res. Mgmt. Corp.*, 2010 WL 2077202, at \*2 (S.D.N.Y. May 18, 2010).  "District courts have discretion in determining the appropriate amount of any penalty" imposed under the federal securities laws. *SEC v. Lybrand*, 281 F. Supp. 2d 726, 729 (S.D.N.Y. 2003).

The imposition of civil penalties is appropriate on an application for default judgments. *See SEC v. Wang*, 699 F. Supp. 44, 46 (S.D.N.Y. 1988) (awarding civil penalties on application for default judgment).

Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act both provide three separate tiers of potential penalties that increase depending upon the seriousness of the violation. There are three tiers of penalties; under each, the Court is authorized to impose the

greater of the defendant's "pecuniary gain" from the violation, or the applicable tier of the penalty amount per each violation. 15 U.S.C. § 78u(d)(3)(B)

For first-tier penalties, these statutes, as modified for inflation by the Debt Collection Improvement Act of 1996 and the corresponding Commission regulations, provide that, for violations occurring after March 3, 2009 but before March 2013 (as is the case here), the amount of the penalty for a natural person shall not exceed the greater of $7,500 per violation or the gross amount of pecuniary gain to that person. That $7,500 amount increases to $75,000 for second-tier penalties and to $150,000 for third tier penalties. *See* 15 U.S.C. § 77t(d)(2)(A); 15 U.S.C. § 78u(d)(3)(B)(i); 17 C.F.R. § 201.1004. Table IV to Subpart E.

"The first tier of fines applies to all securities law violations; the second provides higher maximum fines for violations that involved fraud; and the third provides the highest maximums for violations that involved fraud and 'resulted in substantial losses or created a significant risk of substantial losses to other persons.'" *SEC v. Palmisano*, 135 F.3d 860, 866 (2d Cir. 1998) (citation omitted).

Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d)(2), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), state that the amount of the penalty shall be determined by a court "in light of the facts and circumstances.". Factors that courts consider in determining whether penalties should be imposed, and the amount of the penalty, include (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's *scienter*; (3) whether the defendant's conduct created substantial losses to other persons: (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition. *Forest Res. Mgmt. Corp.*, 2010 WL 2077202, at *2 (citation omitted); *SEC v. Opulentica, LLC*, 479 F. Supp.2d 319, 331

(S.D.N.Y. 2007).

Here, the conduct was particularly egregious. The Defaulting Defendants took kick-backs to encumber their clients with shares that proved to be worthless in issuers whose sole *raison d'être* was to perpetuate a fraud. They perpetrated this fraud knowingly, repeatedly, and over an extended period of time, defrauding numerous victims. The Defaulting Defendants' conduct clearly involved fraud, deceit, and deliberate or reckless disregard for regulatory requirements and clearly resulted in substantial losses to investors. Accordingly, the maximum, third tier penalty is appropriate here. *SEC v. Opulentica LLC*, 479 F. Supp. 2d 319, 331-32 (S.D.N.Y. 2007) (finding defendant's "principal" role in fraudulent scheme that deprived investors of $443,000 and diversion of $185,000 for personal use "alone" justified a third-tier penalty); *see also Forest Resources Management Corp.*, 2010 WL 2077202 at * 2 (fraudulent scheme conducted over six months in publicly traded stock that resulted in hundreds of thousands of dollars in ill-gotten gains justified third tier penalties).

This statutory scheme provides discretion to the Court to impose civil money penalties based either on a per-violation method, or based on the gross amount of pecuniary gain to the Defaulting Defendants as a result of their violations. Should the Court determine to use the per-violation method rather than the method premised on pecuniary gain, the amount is not an overall limitation, but a maximum amount for "each such violation." *See* Securities Act § 20(d)(C); Exchange Act § 21(d)(3), and numerous courts hold that a per-violation calculation may be based on each violative act, measured either by the number of violative transactions, or kickback payments.[7] In this case, the Defaulting Defendants committed violations each time they received an undisclosed kick-back:

---

[7] *E.g., SEC v. Colonial Inv. Mgmt. LLC*, 381 F. App'x 27, 32 (2d Cir. 2010) (affirming penalty of $25,000 for each of the defendant's eighteen violative transactions); *SEC v. Lazare Indus., Inc.*, 294 F. App'x 711, 715 (3d Cir. 2008)

- Harris received 29 payments during the life of the scheme, justifying a penalty of 29 times $150,000, or $4,350,00. Enright Decl., ¶ 21 and Exs.14-15.

- Scholander received 19 payments during the life of the scheme, justifying a penalty of 19 times $150,000, or $2,850,000. Enright Decl., ¶ 22 and Exs. 14, 16.[8]

- Alfaya received 46 payments during the life of the scheme, justifying a penalty of 46 times $150,000 or $6,900,000. Enright Decl., ¶ 23 and Exs. 17-18.

- Barbera received 32 payments during the life of the scheme, justifying a penalty of 32 times $150,000 or $4,800,000. Enright Decl., ¶ 23 and Exs. 18-19.[9]

### D. Penny Stock Bars Are Warranted

The Court should also impose a penny stock bar against all Defaulting Defendants. Section 20(g) of the Securities Act and Section 21(d)(6) of the Exchange Act authorize a federal district court to impose a penny stock bar "against any persons participating in, or at the time of the alleged misconduct, who was participating in, an offering of penny stock." All of the issuers' common stock discussed above qualify as penny stocks as defined by Section 3(a)(51) of the Exchange Act and Rule 3a51-1 thereunder.

Courts decide whether to impose a penny stock bar by using the standard for imposing an officer-or-director bar. *See SEC v. Universal Exp.*, 475 F.Supp.2d 412, 429 (S.D.N.Y. 2007).

---

(statute permits penalty equal to the maximum amount multiplied by the 54 illegal sales of stock); *cf. Otis & Co. v. SEC*, 106 F.2d 579, 584 (6th Cir. 1939) (each sale of stock constitutes separate violation of act).

[8] While both Harris and Scholander received some payments outside of the five year statute of limitations for the imposition of penalties, because the receipt of undisclosed commissions was a continuous integrated scheme that was part of a continuing violation, the Court would be justified in imposing penalties for all the acts that constituted that violation. *See, e.g., SEC v. Schiffer*, 1998 WL 226101 (S.D.N.Y. May 5, 1998) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 362, 380-81 (1982); *see also SEC v. Amerindo Inv. Advisors, Inc.*, 2014 WL 405339, * 9 (S.D.N.Y. Feb. 3, 2014).

[9] Courts also sometimes impose a penalty for each statutory violation. *See, e.g., SEC v. Jean-Pierre*, 2015 WL 1054905, * 12 (S.D.N.Y. Mar. 9, 2015) (collecting cases). Under this analysis, Scholander and Harris would receive three penalties, amounting to $450,000 each; and Alfaya and Barbera would receive four penalties, for a total of $600,000 each.

Pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), courts may bar a person from serving as an officer or director of a public company if (1) the person has violated the antifraud provisions, and (2) the person's conduct demonstrates "substantial unfitness" for future service as an officer or director. The Second Circuit has identified six principal factors to consider in determining whether a defendant's conduct demonstrates substantial unfitness: "(1) the egregiousness of the underlying violation;(2) the defendant's repeat offender status; (3) the defendant's role or position in the company when he engaged in the violation; (4) the degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that the misconduct will recur." *See SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995) (internal quotation marks omitted).

Each Defaulting Defendant committed numerous egregious violations, did so repeatedly, were instrumental in the scheme to defraud their customers, did so with scienter, obtained significant financial compensation for doing so, and, based on their past history, are likely to do so again. Consequently, permanent penny stock bars are warranted.

23

## CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court enter an Order to Show Cause why default judgment should not be entered against Harris, Scholander, Alfaya and Barbera. In addition, for the reasons set forth above, the Commission requests that at the Order to Show Cause hearing on January 10, 2016, the Court enter a default judgment against Harris, Scholander, Alfaya and Barbera imposing (1) an injunction against future violations of the securities laws; (2) disgorgement of their ill-gotten gains, plus prejudgment interest on those amounts; (3) civil penalties; and (4) penny stock bars.

Dated: December 18, 2015
      New York, New York

                 Respectfully submitted,

                 Howard A. Fischer
                 John O. Enright

                 SECURITIES AND EXCHANGE COMMISSION
                 New York Regional Office
                 200 Vesey Street, Suite 400
                 New York, NY 10281-1022
                 Tel: (212) 336-0589 (Howard A. Fischer, Senior Trial
                 Counsel)
                 Email: FischerH@SEC.Gov