```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
SECURITIES AND EXCHANGE COMMISSION,    :
                                       :
                    Plaintiff,         :      14cv7575 (DLC)
                                       :
        -v-                            :      OPINION AND ORDER
                                       :
JASON COPE, IZAK ZIRK DE MAISON (F/K/A):
IZAK ZIRK ENGELBRECHT), GREGORY        :
GOLDSTEIN, STEPHEN WILSHINSKY, TALMAN  :
HARRIS, WILLIAM SCHOLANDER, JACK       :
TAGLIAFERRO, VICTOR ALFAYA, JUSTIN     :
ESPOSITO, KONA JONES BARBERA, LOUIS    :
MASTROMATTEO, ANGELIQUE DE MAISON,     :
TRISH MALONE, KIERNAN T. KUHN, PETER   :
VOUTSAS, RONALD LOSHIN, GEPCO, LTD.,   :
SUNATCO LTD., SUPRAFIN LTD.,           :
WORLDBRIDGE PARTNERS, TRAVERSE         :
INTERNATIONAL, and SMALL CAP RESOURCE  :
CORP.,                                 :
                                       :
                    Defendants,        :
                                       :
              And                      :
                                       :
ANGELIQUE DE MAISON,                   :
                                       :
                    Relief Defendant.  :
-------------------------------------- X
```

APPEARANCES:

For the Securities and Exchange Commission:
Howard A. Fischer
John O. Enright
Brookfield Place, 200 Vesey Street,
New York, New York, 10281

For Trish Malone:
Trish Malone
Pro Se

For Angelique de Maison:
Jeffrey B. Coopersmith
Lauren Rainwater

Davis Wright Tremaine LLP
1201 Third Avenue, Ste. 2200
Seattle, Washington 98101

DENISE COTE, District Judge:

Pursuant to the judgments entered against them on consent, the Securities and Exchange Commission ("SEC") seeks an assessment of civil penalties against three individuals -- Angelique de Maison, Trish Malone, Louis Mastromatteo -- and one entity, Traverse International. For the reasons that follow, the four defendants are ordered to pay disgorgement, prejudgment interest, and civil penalties.

BACKGROUND

The above-captioned case, first brought by the SEC on September 18, 2014, arises out of a series of fraudulent schemes conducted by the defendants -- masterminded by defendant Izak Zirk de Maison F/K/A/ Izak Zirk Engelbrecht ("Engelbrecht") -- between 2008 and 2014.[1]  In general, the SEC alleges that

---

[1] This case is related to prior securities fraud litigation before this Court.  See generally SEC v. Milan Capital Group, Inc., 00cv108 (DLC), 2000 WL 1682761 (S.D.N.Y. Nov. 9, 2000). That litigation largely centered around the fraudulent activity of Jason Cope ("Cope") and, later, the SEC's difficulty in recovering from Cope.  Cope is a defendant in the instant litigation and has pleaded guilty to related criminal conduct in the Northern District of Ohio.  Judgment in this civil action was entered against Cope on December 17, 2015.

Englebrecht, with the aid of the co-defendants and others, would cause corporations ("Fraudulent Issuers")[2] to issue tens of millions of shares of restricted stock to himself and his nominees, which he would then use for illegal distributions.

On October 22, 2014, after a conference held with the SEC and counsel representing three defendants,[3] the Court entered a preliminary injunction order, enjoining the defendants from committing federal securities violations and freezing the assets of certain defendants and their spouses, including de Maison, Mastromatteo, and Traverse (the "Freeze Order").[4]  On June 15, 2015, after continuing its investigation into the alleged fraud, the SEC filed an Amended Complaint.  The Amended Complaint expanded the scope of the conduct charged: defendants were added, the number of Fraudulent Issuers increased, the time period of the allegedly violative conduct widened, and the

---

[2] The Fraudulent Issuers were: Lenco Mobile Inc. ("Lenco"), Kensington Leasing Inc. ("Kensington"), Wikifamilies Inc. ("Wikifamilies"), Casablanca Mining Ltd. ("Casablanca"), Lustros Inc. ("Lustros"), and Gepco, Ltd. ("Gepco").

[3] Counsel for defendants Engelbrecht, Sunatco, and Suprafin appeared.  Sunatco and Suprafin were entities controlled by Engelbrecht.  Final judgment was entered against Engelbrecht, Sunatco, and Suprafin on October 13, 2015.

[4] Malone was not subject to the Freeze Order.  On December 23, 2016 the Freeze Order was modified to allow de Maison to pay $93,478.65 in attorneys' fees to Davis Wright Tremain and for the payment of $25,000 to de Maison as compensation for her efforts in connection with the sale of real estate.

amount of relief sought increased.  Mastromatteo and Traverse answered the Amended Complaint on September 18.  On October 7, the SEC, in a status letter, informed the Court that it had reached settlements or was engaged in settlement discussions with multiple defendants, including de Maison.

Judgment against Malone was entered October 8, 2015. Judgment was entered against de Maison on December 23, 2015. Judgment was entered against Mastromatteo and Traverse on January 4, 2016.  Along with each respective judgment, the Court so ordered a Consent between the SEC and each settling defendant.

Pursuant to the terms of their respective Judgment and Consent, Malone and de Maison agreed to eventually pay disgorgement of their ill-gotten gains, along with prejudgment interest, and a civil penalty.  Mastrometteo and Traverse's Judgment noted the following:

> The Court shall determine whether it is appropriate to order Defendants to pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]. If it is determined that such disgorgement, prejudgment interest, and a civil penalty is warranted, the Court shall determine the amounts of the disgorgement and civil penalty upon motion of the Commission.

(Emphasis supplied.)  In the Consent signed by Mastromatteo (in his individual capacity and in his representative capacity on behalf of Traverse), defendants "agree[d] that the Court shall

4

order disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty pursuant" to the relevant statutes. (Emphasis supplied.)  All defendants agreed that "for the purposes of a [an SEC motion for disgorgement and/or civil penalties], the allegations of the Complaint shall be accepted and deemed as true by the Court."

On January 26, 2018, the SEC moved for monetary relief against de Maison, Malone, Traverse, and Mastromatteo.[5] Specifically, the SEC requests disgorgement of ill-gotten gains in the amount of $4,240,049.30 from de Maison, $394,741.24 from Malone, $58,753 from Mastromatteo and Traverse, and that each defendant pay prejudgment interest on their respective disgorgement sums.  The SEC has also asked that the Court impose civil money penalties.  The SEC has not requested a specific sum for those civil penalties, but has suggested multiple methods of

_____

[5] The SEC has not moved for monetary relief against ten defendants whose claims were settled.  Those defendants have all pleaded guilty to conduct relating to matters alleged in the SEC's Amended Complaint in a criminal case before the Northern District of Ohio.  The SEC does not seek relief against those defendants in light of the orders of restitution and prison sentences imposed against them.  Two other defendants, whose claims were also settled, have not yet been sentenced: Kona Jones Barbera and Jason Cope.  Barbera's sentencing has been rescheduled to August 2, 2018; Cope's sentencing has recently been rescheduled to August 10, 2018.  The SEC expects that any sentence imposed on Cope and Barbera will include restitution, and thus has not asked for disgorgement or civil penalties to be imposed.  The SEC has reserved the right to move for such penalties if the restitution orders are less than the anticipated disgorgement amount.

calculation.  Malone and de Maison both oppose the imposition of disgorgement and civil penalties.  Mastromatteo and Traverse have not opposed the SEC's motion.  A summary of each of the defendant's underlying conduct relevant to the disgorgement and civil penalties the SEC seeks, taken from the Amended Complaint, follows.

## I. De Maison

De Maison, Engelbrecht's wife, sought out investors to purchase unregistered securities in two of the Fraudulent Issuers, Kensington and Casablanca.  She raised approximately $1 million for Kensington, and $3.5 million for Casablanca.  De Maison did not transfer all proceeds from those investments to the companies as promised, but used some of the proceeds to pay her own personal expenses and diverted other proceeds to other entities associated with the scheme.  De Maison advised investors on the merits of potential investments and the companies she was advertising.  Investors lost their entire investments in Casablanca and Kensington.  She also arranged for the execution of the governing agreements and the mailing of stock certificates to investors.  The SEC identifies $748,000 in ill-gotten gains from investments related to Kensington, and $3,456,049.30 from investments related to Casablanca, for a total of $4,240,049.30.

De Maison made materially misleading statements concerning another company of which she was an officer, Gepco.  De Maison provided quotes concerning the sale and purchase of diamonds for a Gepco press release.  De Maison omitted material facts, including that she was personally involved with the relevant purchases and sales.  The SEC does not, in the instant motion, identify any ill-gotten gains from de Maison's involvement with Gepco.

On December 23, 2015, the Court entered a partial judgment against de Maison, accompanied by her signed Consent.  In that Consent, she agreed to be enjoined from violating Sections 5, 17(a)(1), and 17(a)(3) of the Securities Act; and Sections 10(b), 15(a), and 16(a) of the Exchange Act, and Rule 10b-5 thereunder.

## II. Malone

Malone served as the Chief Financial Officer ("CFO") for several of the Fraudulent Issuers -- Lustros, Kensington, Wikifamiles, and Gepco -- and also held positions at a number of the other companies alongside Engelbrecht.  In her role as CFO, Malone engaged in multiple unregistered securities offerings. The SEC seeks ill-gotten gains in the form of Malone's salary during the periods she served as an officer of the Fraudulent Issuers during unregistered offerings.

7

Malone was at the center of many of Engelbrecht's schemes and fraudulent transactions.  For example, Malone helped to merge Wikifamilies, at the time a shell company, into new company, rename it, and conduct a "reverse merger," allowing the shell company to issue over 30 million shares of common stock, including to herself and other co-defendants.  Malone also served as president, CFO, and secretary of Gepco and facilitated the issuance of shares to Jason Cope, a co-defendant in this action, and other individuals to liquidate in the open market. Neither Gepco nor Wikifamilies, at the time, had registered any of their securities with the SEC and no exemption from the standard registration requirements applied.

The SEC has calculated $394,741.24 in ill-gotten gains from the salary payments Malone received for her service as CFO of the various companies.  Specifically, the SEC requests disgorgement of $4,615.39, Malone's pay for a week in May 2011, during which Wikifamilies issued 31.5 million shares of unregistered securities; disgorgement of $309,783.85, the sum of Malone's pay between June 2012 and January 2014, during which time she was involved in the offering of unregistered shares of Lustros; and disgorgement of $80,342.00, Malone's pay between February and September 2014, during which time she participated in the unregistered offerings of Gepco securities.

On October 8, 2015, the Court entered a partial judgment

8

against Malone, accompanied by her signed Consent.  In that
Consent she agreed to be enjoined from violating Sections 5,
17(a)(1), and 17(a)(3) of the Securities Act; and Section 10(b)
of the Exchange Act, and Rule 10b-5 thereunder.

III. Mastromatteo and Traverse

Mastromatteo, individually and through his corporation
Traverse, participated in a fraudulent scheme to acquire and
sell more than 2.5 million shares of Gepco stock in an
unregistered offering, after which Mastromatteo funneled most of
the proceeds to Cope.  Cope used the proceeds to pay a judgment
to the SEC that had previously been entered against him by this
Court in the Milan litigation.  In return, Cope made payments
back to Mastromatteo through Traverse.  The SEC seeks $58,753 in
ill-gotten gains, the amount Mastromatteo allegedly received in
payments from Cope.

On January 5, 2016, the Court entered a partial judgment
against Mastromatteo and Traverse, accompanied by a signed
Consent.  In the Consent, they agreed to be enjoined from
violating Sections 5(a), 5(c), and 17(a) of the Securities Act;
and Section 10(b) of the Exchange Act, and Rule 10b-5
thereunder.

PROCEDURAL HISTORY

The instant motion was filed on January 26, 2018.  Malone, who is appearing pro se, submitted a response dated March 26.[6] De Maison filed a response on March 30.  Mastromatteo and Traverse have not filed any response.  The SEC filed its reply on April 27.  Malone submitted an unsolicited sur-reply dated July 10.[7]

DISCUSSION

I. Disgorgement

"Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits."  SEC v. Razmilovic, 738 F.3d 14, 31 (2d Cir. 2013) (citation omitted).  Disgorgement is used "to prevent wrongdoers from unjustly enriching themselves through violations, which has the effect of deterring subsequent fraud." SEC v. Cavanagh, 445 F.3d 105, 117 (2d Cir. 2006).  See also SEC v. Fischbach Corp., 133 F.3d 170, 175 (2d Cir. 1997).  "[T]he

---

[6] The opposition was received and entered on the docket on March 30.

[7] Malone's letter was received and entered on the docket on July 13.

size of a disgorgement order need not be tied to the losses suffered by defrauded investors." Official Committee of Unsecured Creditors of WorldCom, Inc. v. SEC, 467 F.3d 73, 81 (2d Cir. 2006) (citation omitted).  Courts may even require disgorgement "regardless of whether the disgorged funds will be paid to . . . investors as restitution." Kokesh v. SEC, 137 S. Ct. 1635, 1644 (2017) (citation omitted).

"The district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." SEC v. Contorinis, 743 F.3d 296, 301 (2d Cir. 2014) (citation omitted).  To calculate disgorgement, the district court engages in "factfinding . . . to determine the amount of money acquired through wrongdoing," and then issues "an order compelling the wrongdoer to pay that amount plus interest." Cavanagh, 445 F.3d at 116.  The Supreme Court has recently noted that, at least for statute of limitations purposes, "SEC disgorgement is imposed for punitive purposes." Kokesh, 137 S. Ct. at 1643.  Kokesh, however, did not disrupt settled precedent that courts "possess authority to order disgorgement in SEC enforcement proceedings." Id. at 1542 n.3.[8]

---

[8] The Second Circuit has noted that Kokesh "held that disgorgement ordered as a consequence of a violation of securities laws was a 'penalty' for purposes of 28 U.S.C. § 2462, which imposes a five-year statute of limitation . . . ."

"[B]ecause of the difficulty of determining with certainty the extent to which a defendant's gains resulted from his frauds . . . the court need not determine the amount of such gains with exactitude." Razmilovic, 738 F.3d at 31. The ordered disgorgement amount "need only be a reasonable approximation of profits causally connected to the violation; any risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty." SEC v. First Jersey Securities, Inc., 101 F.3d 1450, 1475 (2d Cir. 1996) (citation omitted).

The SEC bears the burden "of establishing a reasonable approximation of the profits causally related to the fraud," but once it has met this burden, "the burden shifts to the defendant to show that his gains were unaffected by his offenses." Razmilovic, 738 F.3d at 31 (citation omitted). A defendant may not avoid disgorgement by arguing that he had limited or no control over the ill-gotten gains, or that the gains did not "personally accrue" to him. Contorinis, 743 F.3d at 306.

Additionally, an order which only accounts for the profits retained by the wrongdoer is an inadequate measure of disgorgement. See id. at 305-06 ("[T]he proposition, unsupported in our case law, that the wrongdoer need disgorge

---

United States v. Brooks, 872 F.3d 78, 91 (2d Cir. 2017) (emphasis supplied).

only the financial benefit that accrues to him personally . . .
is without foundation."). Indeed, to limit disgorgement to the
direct pecuniary benefit of the wrongdoer "would run contrary to
the equitable principle that the wrongdoer should bear the risk
of any uncertainty affecting the amount of the remedy" and
"permit evasion of [the prohibited conduct] by allowing the
direction of benefits to acquaintances." Id. at 306.


II. Prejudgment Interest

As with disgorgement, an award of prejudgment interest lies
within the discretion of the court. See First Jersey, 101 F.3d
at 1476. Generally, "an award of prejudgment interest may be
needed in order to ensure that the defendant not enjoy a
windfall as a result of its wrongdoing." Slupinski v. First
Unum Life Ins. Co., 554 F.3d 38, 54 (2d Cir. 2009).

> In deciding whether an award of prejudgment interest is
> warranted, a court should consider (i) the need to fully
> compensate the wronged party for actual damages suffered,
> (ii) considerations of fairness and the relative equities
> of the award, (iii) the remedial purpose of the statute
> involved, and/or (iv) such other general principles as are
> deemed relevant by the court.

First Jersey, 101 F.3d at 1476 (citation omitted).

It is within the "discretion of a court to award
prejudgment interest on the disgorgement amount for the period
during which a defendant had use of [its] illegal profits."
Razmilovic, 738 F.3d at 36. "In an enforcement action brought

13

by a regulatory agency, the remedial purpose of the statute takes on special importance." First Jersey, 101 F.3d at 1476. The Second Circuit has approved the use of the "IRS underpayment rate" to calculate prejudgment interest because that rate "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendants received from its fraud." Id. When a defendant has had some or all of her assets frozen "at the behest of the government in connection with [an SEC civil] enforcement action, an award of prejudgment interest relating to those funds would be inappropriate" with respect to the period covered by the freeze order, because the defendant has already, for that period, "been denied the use of those assets." Razmilovic, 738 F.3d at 36.

III. Civil Money Penalty

The Securities Act and the Exchange Act authorize three tiers of civil penalties. See 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3).

> Under each statute, a first-tier penalty may be imposed for any violation; a second-tier penalty may be imposed if the violation involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; a third-tier penalty may be imposed when, in addition to meeting the requirements of the second tier, the violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.

14

Razmilovic, 738 F.3d at 38 (citation omitted).  At each tier, "for each violation, the amount of penalty shall not exceed the greater of a specified monetary amount or the defendant's gross amount of pecuniary gain; the amounts specified for an individual defendant for the first, second, and third tiers, respectively, are $5,000, $50,000, and $100,000." Id. (citation omitted).

Beyond these restrictions, the amount of the penalty is within "the discretion of the district court." Id. (citation omitted).  The amount of the penalty should be determined "in light of the facts and circumstances" surrounding the violations.  15 U.S.C. § 78u(d)(3).  Courts in this district have

> look[ed] to a number of factors, including (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

SEC v. Tavella, 77 F. Supp. 3d 353, 362-63 (S.D.N.Y. 2015) (citation omitted).

While the SEC requests the imposition of a civil money penalty for each defendant, it does not request a specific penalty amount for any defendant.  Instead, the SEC proposes

15

alternative methods of calculating a penalty: a penalty based on a defendant's pecuniary gain, a penalty assessed weighing the defendant's role in an illegal scheme, or a penalty based on the number of statutory or regularity violations the defendant has committed.

IV. Application

    a. De Maison

    The SEC seeks $4,240,049.30 in disgorgement, with prejudgment interest in the amount of $938,201.13, and the imposition of a money penalty.[9]  $4,240,049.30 in disgorgement is a reasonable approximation of the extent to which de Maison profited from violations of the federal securities laws to which she has admitted.  In light of the allegations in the Amended Complaint, which are deemed true for the purposes of this motion, the SEC has demonstrated that between July 2010 and October 2011 de Maisons's illegal conduct generated proceeds of $4,240,049.30.

    De Maison argues that a disgorgement order is inappropriate.  She argues that Engelbrecht, her husband at the time of the fraudulent scheme, had complete control over her

---

[9] The SEC clarified in its reply memorandum that it inadvertently included an investment of $200,000 in its original request for disgorgement.

financial accounts.  She claims she did not understand that she
was part of a fraud and that she simply carried out instructions
given to her by Engelbrecht.  De Maison signed her Consent on
November 5, 2015.  That document states "[d]efendant agrees that
the Court shall order the payment of sums by which she has been
unjustly enriched, disgorgement ill-gotten gains, prejudgment
interest thereon and a civil penalty."  That Consent further
states, the "defendant will be precluded from arguing that she
did not violate the federal securities laws as alleged in the
complaint" and that for the purposes of the remedies motion that
"the complaint shall be accepted as and deemed true by the
Court."  She is precluded from contesting her liability here.

With respect to the amount of disgorgement sought, de
Maison does not dispute that she raised that amount of money in
unregistered offerings.  She argues instead that she did not
receive $4.2 million in ill-gotten gains for her personal
benefit.  Further, she argues that the investment money was
immediately diverted into other accounts over which she had no
control.  These arguments are unavailing.  Disgorgement need not
be tied to the direct benefit of the defendant, nor does the SEC
need to demonstrate that the defendant exercised full control
over the ill-gotten gains.

Finally, de Maison argues she returned over $1 million to
the investors, so ill-gotten gains have been repaid.  $1 million

is significantly less than the amount of disgorgement the SEC seeks.  In any event, de Maison has not carried her burden to demonstrate that any of the ill-gotten gains were repaid to the investors.  De Maison submitted many pages reflecting financial transactions which do not demonstrate what she argues they do. The SEC has examined those documents and has discovered no evidence of a repayment for the investments at issue here.  In fact, de Maison's largest claimed "return" to an investor of $300,000 is actually a promissory note for that amount, which she defaulted on.

Even when the documents de Maison submitted in opposition to the SEC's motion reflect payment by de Maison to an investor, there is no evidence of linkage to Kensington or Casablanca. For example, de Maison offers a September 20, 2013 transfer for $10,000 to investor Frank Mastronuzzi.  The memorandum line on the transfer, however, reads "Refund final pmt of purchase of LSTS stock."  "LSTS" is the ticker symbol for another Fraudulent Issuer, Lustros.  The disgorgement the SEC seeks from de Maison is not related to investments in Lustros.

The same is true for other documents de Maison submitted. For example, the instructions for a March 11, 2013 wire transfer to Todd Williamson read "For The Blue Painting."  Other documents simply include information that transfers were made, but include nothing to suggest that the transfers were made as

18

reimbursement for the investments at issue here.

De Maison never actually argues that the payments reflected in these documents were related to the transactions for which the SEC seeks disgorgement.  Instead, she broadly argues that the investors were "repaid" and therefore her disgorgement amount should be reduced.  The documents she includes for that proposition do not support an inference that she "repaid" or refunded investors, let alone for the fraudulent investments at issue in the SEC's motion.

In addition to disgorgement, de Maison should pay prejudgment interest to prevent her from obtaining a benefit of what amounts to an interest free loan procured as a result of illegal activity.  The SEC seeks prejudgment interest running from Malone's last-received payment from each issuer -- Kensington and Casablanca -- from which she received improper payments to the present day.[10]  This request amounts to $938,201.13.

Prejudgment interest will not be collected, however, on any assets that were frozen from the date those assets were frozen. When a defendant's funds have been frozen in connection with an enforcement action, and are now available to satisfy the disgorgement order, the defendant should not be ordered to pay

---

[11] For Kensington, May 1, 2011; for Casablanca, November 1, 2011.

prejudgment interest on those funds.  See Razmilovic, 738 F.3d at 36-37.[11]  When a defendant's funds are so frozen, if the freeze is not violated, the defendant derives no benefit from the ill-gotten gains.  $612,551.64 of de Maison's assets were frozen the date the Freeze Order went into effect, October 22, 2014.  Those funds were put into a trust account controlled by de Maison's counsel, Davis Wright Tremaine.  As of December 23, 2016, the date the Freeze Order was modified, $494,072.99 remained in that trust account.  The SEC does not argue that de Maison violated the Freeze Order.  The frozen assets will presumably be turned over to the SEC in partial satisfaction of the disgorgement order.  The SEC may not collect prejudgment interest on the frozen amount.  Given that frozen assets, however, do not completely satisfy the disgorgement order,[12] the SEC may collect prejudgment interest on any outstanding amount running through to the present day.

---

[11] Some courts in this District have cabined Razmilovic's holding to the proposition that a defendant whose assets have been frozen may not be ordered to pay prejudgment interest at the IRS rate.  See SEC v. Tavella, 77 F. Supp. 3d 353, 360-361 (S.D.N.Y. Jan 6, 2015).  Determining the scope of Razmilovic is unnecessary here as the SEC has asked for an application of the IRS underpayment rate, not a different rate and, as such, even at its most narrow, Razmilovic is on point.  In any event, the issue of whether to impose prejudgment interest is soundly within the discretion of the district court.

[12] De Maison has not argued or made any showing that any assets other than the funds in trust account were frozen.

20

Finally, De Maison's violations of the securities laws support the imposition of a third-tier civil penalty. De Maison had a principal role in a fraudulent scheme that deprived investors of over $4 million. This alone warrants imposition of a third-tier penalty under the relevant statutes, satisfying the requirement that the violations involved fraud and resulted in substantial losses. In de Maison's case, considering the seriousness of the fraud, the significant role she played, and considering the personal benefits that she received from the violations of the securities laws, the maximum fine -- an amount equal to the disgorgement sum of $4,240,049.30 -- is appropriate.

De Maison urges the Court not to impose a civil penalty or, if a penalty is imposed, it should be "minimal." She argues that she has cooperated with the SEC and Department of Justice throughout the SEC's enforcement action. She also reiterates that she is destitute. While consideration of a defendant's financial consideration is a factor to be considered in assessing a civil penalty, it is but one of many a court considers when exercising its discretion. De Maison's conduct was egregious and recurrent. It resulted in substantial losses to investors. The seriousness of her wrongdoing justifies a serious punitive response. A civil penalty equal to the disgorgement sum is appropriate.

b. Malone

The SEC seeks $394,741.24 in disgorgement of the documented wages and payments Malone received for her services to Engelbrecht and the Fraudulent Issuers, prejudgment interest of $55,539.30, and a civil penalty.  $394,741.24 is a reasonable approximation of the extent to which Malone profited from violations of the federal securities laws to which she has admitted for purposes of this motion.  The SEC's disgorgement request is reasonable.

Like de Maison, Malone may not contest her liability here. A Section 5 claim is a strict liability claim; any argument that Malone did not intend to help carry out fraudulent transactions is not germane.  See SEC v. Cavanagh, 98cv1818 (DLC), 2004 WL 1594814, at *19 (S.D.N.Y. July 16, 2004) ("[Defendant] contends that the disgorgement remedy is limited to securities violations involving fraudulent intent.  Using their powers of equity, courts can and have granted disgorgement against defendants found liable under strict liability statutes such as Section 5."), aff'd, SEC v. Cavanagh, 445 F.3d 105 (2d Cir. 2006).  Like de Maison, Malone signed a Consent in which she "agree[d] that the Court shall order disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty."  She also consented that she would be "precluded from arguing that she did

22

not violate the federal securities laws as alleged in the [Amended] Complaint."

Malone resists disgorgement with several arguments.  First, Malone argues that she signed the Consent because the SEC represented that she would not have to pay a penalty.[13]  This is not a credible argument; the text of the Consent she signed explicitly and unambiguously denotes that disgorgement and a civil penalty will be imposed.

Malone next argues that the money the SEC seeks does not constitute ill-gotten gains because it reflects a salary she earned for her legitimate work for the Fraudulent Issuers.  She alleges that she had no knowledge of the scheme perpetrated by her co-defendants and was simply and dutifully carrying out instructions.  As a threshold matter, Malone is precluded from contesting her liability given the Consent she signed.  Further, the allegations in the Amended Complaint, taken as true for the purposes of this motion, belie Malone's protestations.  Malone, in her capacity as an officer of Kensington, Wikifamilies, and Gepco, helped further illegal activities, including unregistered securities offerings and a reverse merger of a public shell company.

Malone finally contends that the amount sought by the SEC

---

[13] Malone reiterates this, and other arguments made in her opposition to the motion, in a letter received on July 13, 2018.

is financially crippling.  First, the SEC seeks no disgorgement beyond documented payments Malone received.  Second, courts in this District have generally agreed that financial hardship does not preclude the imposition of an order of disgorgement.  <u>See, e.g.</u>, <u>SEC v. Wyly</u>, 56 F. Supp. 3d 394, 406 (S.D.N.Y. 2014); <u>SEC v. Taber</u>, 13mc282 (KBF), 2013 WL 6334375, at *2 (S.D.N.Y. Dec. 4, 2013) (collecting cases).

The imposition of prejudgment interest on Malone is appropriate.  The SEC seeks prejudgment interest of $55,429.30, running from Malone's last-received salary payment in connection with work performed for each Fraudulent Issuer -- Wikifamilies, Lustros, and Gepco.[14]  Malone contests the imposition of disgorgement in its entirety, but makes no separate argument with respect to prejudgment interest or a specific amount of prejudgment interest.

Finally, Malone's violations of the securities laws support the imposition of a second-tier civil money penalty.  Her unlawful actions involved fraud, deceit, manipulation, or deliberate or reckless disregard of the securities laws and regulations.  Malone should be subject to a severe penalty, but not the maximum one.  She is ordered to pay $25,000 per

---

[13] For Wikifamilies, June 1, 2011; for Lustros, February 1, 2014; for Gepco, October 1, 2014.

violation, totaling $125,000.[15]

     c. Mastromatteo and Traverse

    The SEC seeks $58,753 in disgorgement from Mastromatteo and
Traverse (together, "Mastromatteo"), $7,461.69 in prejudgment
interest, and a civil penalty.  Disgorgement is appropriate
here, and the SEC's request is a reasonable approximation of the
extent to which Mastromatteo profited from violations of the
federal securities laws to which he has admitted for purposes of
this motion.

    $58,753 in disgorgement is a reasonable approximation of
Mastromatteo's ill-gotten gains.  This amount is documented in
bank deposits to accounts in Mastromatteo's own name and in the
name of Traverse, an entity he controlled.  The payments were
made by Cope directly or were proceeds of the sales of Gepco
stock.  Mastromatteo has not opposed the SEC's motion.  He has
not attempted to show that the payments were unaffected by his
offenses.  Mastromatteo and Traverse are jointly and severally
liable for the civil money penalty.  See First Jersey, 101 F.3d
at 1475-76 (affirming district court's order of joint and
several disgorgement against First Jersey and its sole owner,

---

[15] The Amended Complaint alleged that Malone violated Sections 5,
17(a)(1), and 17(a)(3) of the Securities Act; Section 10(b) of
the Exchange Act, and Rule 10b-5 thereunder, totaling five
violations.

noting that "[n]o more than the total amount of First Jersey's unlawful profits, plus interest on those amounts, is to be disgorged").

The SEC seeks $7,461.69 in prejudgment interest, calculated at the IRS underpayment rate from August 1, 2014, immediately following the last month Mastromatteo and Traverse received illegal payments from Cope, through to the present. The imposition of prejudgment interest on Mastromatteo and Traverse is appropriate. While prejudgment interest should not be collected on any assets that were frozen, no party has made a showing that any of Mastromatteo or Traverse's assets were actually frozen pursuant to the Freeze Order. Mastromatteo and Traverse failed to respond to the SEC's instant motion. As such, the SEC may collect prejudgment interest from August 1, 2014.

Finally, the imposition of a second-tier civil money penalty is appropriate. Mastromatteo, individually and through Traverse, knowingly and deliberately disregarded the securities laws and regulations by acquiring millions of shares of Gepco stock in an unregistered offering, and then channeling the proceeds to Cope. Mastromatteo benefitted directly from this scheme through kick-backs from Cope. Mastromatteo is fully culpable for his violations, from which he profited. Given the relatively small amount of pecuniary gains, a penalty equal to

26

that amount, $58,753, is appropriate, which is well within the statutory range given the number of violations.  Mastromatteo and Traverse are jointly and severally liable for the civil money penalty.

<u>CONCLUSION</u>

For the above reasons, it is hereby

ORDERED that de Maison shall disgorge her ill-gotten gains in the amount of $4,240,049.30, plus prejudgment interest.

IT IS FURTHER ORDERED that the SEC shall recalculate the amount of prejudgment interest owed by de Maison in accordance with the instructions in this Opinion and file a letter with its calculations by July 30.  Any response, limited to discussions of the calculations alone, is due August 3.

IT IS FURTHER ORDERED that de Maison shall pay a civil penalty of $4,240,049.30.

IT IS FURTHER ORDERED that Malone shall disgorge her ill-gotten gains in the amount of $394,741.24, plus prejudgment interest to be calculated at the IRS underpayment rate, running from the date of the last received payment from Wikifamilies, Lustros, and Gepco, through to the present.

IT IS FURTHER ORDERED that Malone shall pay a civil penalty of $125,000.

IT IS FURTHER ORDERED that Mastromatteo and Traverse shall

27

disgorge their ill-gotten gains in the amount of $58,753, plus prejudgment interest to be calculated at the IRS underpayment rate, running from August 1, 2014 through to the present. Mastromatteo and Traverse are jointly and severally liable for the disgorgement payment.

IT IS FURTHER ORDERED that Mastromatteo and Traverse shall pay a civil penalty of $58,753.  Mastromatteo and Traverse are jointly and severally liable for the civil money penalty.

IT IS FURTHER ORDERED that by August 6, 2018, the SEC shall submit a proposed order implementing the Court's rulings as to all four defendants.


Dated:    New York, New York
          July 30, 2018

_____
DENISE COTE
United States District Judge

28